# Exhibit 2

EXECUTION VERSION

## CONTENTS

Definitions and Rules of Construction..................................................................................... 1

Section 1.1.    Definitions. ....................................................................................... 1

Section 1.2.    Rules of Construction......................................................................... 6

Purchase and Sale; Assumption of Certain Liabilities.............................................................. 6

Section 2.1.    Purchase and Sale of Assets. ............................................................. 6

Section 2.2.    Assignment and Assumption of Liabilities. ........................................ 7

Section 2.3.    Purchase Price. .................................................................................. 7

Section 2.4.    Deemed Consents and Cure Payments................................................ 7

Section 2.5.    Obligations in Respect of Assumed Contracts. .................................... 7

Section 2.6.    Post-Closing Assignment of Contracts. ............................................... 7

Closing ................................................................................................................................ 7

Section 3.1.    Closing. ............................................................................................. 7

Section 3.2.    Deliveries by Trustee. ........................................................................ 8

Section 3.3.    Deliveries by Purchaser...................................................................... 8

Representations and Warranties of Trustee and Sellers............................................................ 8

Section 4.1.    Power and Authorization.................................................................... 9

Section 4.2.    Title to Assets.................................................................................... 9

Section 4.3.    Conflicts; Consents. ........................................................................... 9

Section 4.4.    Brokers. ............................................................................................ 10

Representations and Warranties of Purchaser......................................................................... 10

Section 5.1.    Organization, Standing and Power..................................................... 10

Section 5.2.    Authorization..................................................................................... 10

Section 5.3.    No Conflict or Violation. ................................................................... 10

Section 5.4.    Availability of Funds.......................................................................... 10

Section 5.5.    Cure Amounts. .................................................................................. 10

Section 5.6.    Brokers. ............................................................................................ 11

Section 5.7.    Limitation of Representations and Warranties..................................... 11

Section 5.8.    Sophistication of Purchaser ............................................................... 11

Section 5.9.    Purchaser is Knowledgeable .............................................................. 11

Covenants of Purchaser and Sellers; Other Agreements ......................................................... 12

Section 6.1.    Consents and Approvals..................................................................... 12

Section 6.2.    Access to Information. ................................................................. 12

Section 6.3.    Further Assurances. .................................................................. 12

Section 6.4.    Bankruptcy Actions. .................................................................. 13

Section 6.5.    Other Bids. ........................................................................... 13

Section 6.6.    Disclosure Schedules and Supplements. ........................................ 13

Section 6.7.    Conduct of Trustee and Sellers Prior to Closing. ........................... 14

Section 6.8.    Assumed Obligations. ................................................................ 15

Section 6.9.    Disclaimer. ............................................................................. 15

Section 6.10.   Acquisition of DZS Subsidiaries. ............................................... 15

Section 6.11.   Post-Closing Accounts Receivable and Payments. ......................... 15

Section 6.12.   Cure Payments ....................................................................... 15

Conditions Precedent to Obligations of Purchaser ............................................... 16

Section 7.1.    Representations and Warranties; Covenants. ................................ 16

Section 7.2.    Bankruptcy Court Approval. ...................................................... 16

Section 7.3.    No Injunctions. ....................................................................... 16

Section 7.4.    Closing Deliveries. ................................................................... 16

Section 7.5.    Assignment Arrangements ......................................................... 16

Conditions Precedent to Obligations of Sellers ................................................... 17

Section 8.1.    Representations and Warranties; Covenants. ................................ 17

Section 8.2.    Consideration. ......................................................................... 17

Section 8.3.    Bankruptcy Court Approval. ...................................................... 17

Section 8.4.    No Injunctions. ....................................................................... 17

Section 8.5.    Closing Deliveries. ................................................................... 17

Termination; Termination Payment .................................................................. 17

Section 9.1.    Termination. ........................................................................... 17

Section 9.2.    Expense Reimbursement. ........................................................... 18

Section 9.3.    Deposit Reimbursement ............................................................. 18

Section 9.4.    Effect of Termination or Breach. ............................................... 19

Additional Post-Closing Covenants .................................................................. 19

Section 10.1.   Joint Post-Closing Covenant of Purchaser and Sellers. ................. 19

Section 10.2.   Tax Matters. ........................................................................... 19

Miscellaneous ............................................................................................... 20

Section 11.1.   Expenses. ............................................................................... 20

Section 11.2.    Amendment. ..................................................................................... 21

Section 11.3.    Notices........................................................................................... 21

Section 11.4.    Waivers.......................................................................................... 22

Section 11.5.    Counterparts and Execution. ............................................................ 22

Section 11.6.    Headings. ....................................................................................... 22

Section 11.7.    Governing Law; Jurisdiction. .......................................................... 22

Section 11.8.    Binding Nature; Assignment. ........................................................... 23

Section 11.9.    No Third-Party Beneficiaries. ......................................................... 23

Section 11.10.   Construction. .................................................................................. 23

Section 11.11.   Public Announcements..................................................................... 23

Section 11.12.   Entire Understanding........................................................................ 23

Section 11.13.   Closing Actions. ............................................................................. 23

Section 11.14.   Conflict Between Transaction Documents........................................... 23

Section 11.15.   No Survival .................................................................................... 24

<u>Exhibits</u>

Exhibit A – Bill of Sale

Exhibit B – Intellectual Property Assignment Agreement

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made and entered into as of this 22nd day of April, 2025 (the "Execution Date"), by and among Fibre Acquisition Corporation, a Texas corporation ("Purchaser"), and Michelle H. Chow, solely in her capacity as Chapter 7 Trustee (the "Trustee") of the bankruptcy estates of each of DZS Inc., a Delaware corporation, DZS Services Inc., a Delaware corporation and DZS California Inc., a Delaware corporation (each referred to herein as a "Seller" and collectively as the "Sellers". Purchaser, the Trustee and each Seller are each referred to herein as a "Party", and collectively as the "Parties").

**WHEREAS,** each of the Debtors (as defined herein) is a debtor in the Chapter 7 Cases;

**WHEREAS**, the Trustee is entering in this Agreement on behalf of each Seller, subject to the approval of the Bankruptcy Court; and

**WHEREAS**, Purchaser desires to purchase, and Sellers, through the Trustee, desire to sell, convey, assign, transfer and deliver to Purchaser, certain assets of the Debtors.

**NOW, THEREFORE, BE IT RESOLVED**, in consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and the Trustee, acting solely in her capacity as such and upon the approval of the Bankruptcy Court, hereto agree as follows:

## ARTICLE I.
## DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1.   Definitions.** Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Acquired Assets" means, to the extent assignable, all of the direct and indirect right, title and interest of Sellers in and to the property and assets of Sellers set forth on Schedule 1.1 under the heading Acquired Assets. For purposes of clarification, the Acquired Assets shall not include any Excluded Assets.

"Affiliate" of any particular Person means any other Person directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Agreement" means this Asset Purchase Agreement, including all the Exhibits and the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"AI Technologies" means any and all deep learning, machine learning, and other artificial intelligence technologies, including without limitation any and all: (i) proprietary algorithms, Software, or systems that make use of or employ neural networks, statistical learning algorithms (such as linear and logistic regression, support vector machines, random forests, or k-means

clustering), or reinforcement learning, and (ii) proprietary embodied artificial intelligence and related hardware or equipment.

"Allocation" shall have the meaning set forth in Section 10.2(b) hereof.

"Alternate Proposal" means a proposal (other than by Purchaser or any of its Affiliates) relating to any acquisition of some or all of the Acquired Assets pursuant to one or more transactions.

"Assumed Contracts" means, collectively, those Contracts of Debtors designated as "Assumed Contracts", in notices filed with the Bankruptcy Court (each a "Notice of Assumed Contract"), from time to time through and including May 12, 2025 in accordance with the terms of this Agreement.

"Assumed Obligations" means the obligations (i) assumed by, and assigned to, Purchaser pursuant to a Sale Order, this Agreement and/or any Transaction Document, or (ii) which are ongoing and provided under any Assumed Contract or directly related to an Acquired Asset.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division.

"Bidders" shall have the meaning set forth in Section 6.5 hereof.

"Bids" shall have the meaning set forth in Section 6.5 hereof.

"Bill of Sale" shall have the meaning set forth in Section 3.2(a) hereof.

"Books and Records" means all information, books, records and lists of Debtors relating to the Acquired Assets and in the possession of the Trustee, including, without limitation, (i) all records relating to customers and suppliers of Debtors (including, without limitation, customer, prospective customer, supplier, prospective supplier, Intellectual Property provider and mailing lists) and (ii) all books, ledgers, files, reports, plans, logs, guides, manuals, materials, drawings and operating records of Debtors, in each case, whether in written, printed, electronic or computer printout form, or stored on computers, media devices or other data and software storage; provided, however, that "Books and Records" shall not include any information regarding the Debtors' former employees or the originals of any Debtor's minute books, stock books and Tax Returns.

"Business Day" means a day other than Saturday, Sunday or other day that banks located in Dallas, Texas are authorized or required by Law to close.

"Cash Purchase Price" shall have the meaning set forth in Section 2.3 hereof.

"Chapter 7 Cases" means collectively the cases commenced by Debtors under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court, titled *In Re DZS Inc.* (EDTX 25-40712), *In Re DZS Services Inc.* (EDTX 25-40713) and *In Re DZS California Inc.* (EDTX 25-40714).

"Claim" has the meaning ascribed by Bankruptcy Code §101(5), and includes all (a) rights to payment, whether or not any such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) rights to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not any such right to equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Closing" shall have the meaning set forth in Section 3.1 hereof.

"Closing Date" shall have the meaning set forth in Section 3.1 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality Agreement, dated March 28, 2025 between Managed Network Systems, Inc. and the Trustee.

"Contract" means any agreement, contract, commitment, indenture, note, bond, lease, sublease or other binding arrangement or understanding, whether written or oral.

"Credentials" means all user names, identification numbers, passwords, licenses or security keys, security tokens, identification numbers, security codes or other login credentials used in or necessary for access to or development of Software or to access or operate the Acquired Assets, including, without limitation, login credentials to third-party services including source code repositories and collaboration tools, including, without limitation, for services provided to the Sellers in connection with the Software and Acquired Assets prior to Closing by Amazon Web Services, Inc., Atlassian Corporation, Salesforce, Inc, Oracle Corporation and their Affiliates.

"Cure Payments" means any cure payment or obligations (pursuant to section 363 or 365 of the Bankruptcy Code) due by Sellers, and required by the Bankruptcy Court to be made upon assumption of the Assumed Contracts by Purchaser, in order to cure any default with respect to any Acquired Assets or Assumed Obligations.

"Debtor" or "Debtors" means, individually or collectively, DZS Inc., Delaware corporation, DZS Services Inc., a Delaware corporation, and DZS California Inc., a Delaware corporation.

"Deposit" means an amount in cash equal to One Million and NO/100 Dollars ($1,000,000.00), such amount having been paid by Managed Network Services Inc. (an Affiliate of Purchaser) pursuant to that certain letter of intent dated April 2, 2025 between it and the Trustee, and held by the Trustee pursuant to the terms hereof.

"Dollars" or "$" means dollars of the United States of America.

"DZS Subsidiaries" means ASSIA S.R.L., DZS Canada Inc., DZS do Brasil LTDA, DZS GmbH, DZS International Inc., DZS International Ltd., DZS Italy S.R.L., DZS Solutions India Private Limited, DZS Solutions Spain S.L.U., NetComm Wireless Pty Ltd., Paradyne Corporation, Zhone Technologies Campus, LLC, Zhone Technologies SA, and Zhone Technologies PTE. Ltd.

"Execution Date" shall have the meaning set forth in the Preamble hereto.

"Exhibits" means the exhibits hereto.

"Excluded Assets" means any assets of Sellers other than the Acquired Assets. For purposes of clarification, but not limitation, the Acquired Assets shall not include (i) cash or cash equivalents held by Sellers, (ii) bank accounts in the name of any Debtor or Seller, (iii) securities and investments held by or for the benefit of any Debtor or Seller, (iv) all rights to any and all avoidance actions and/or claims of any Seller currently held by the Trustee, other than all rights to any and all avoidance actions of Sellers currently held by the Trustee (1) related to the Assigned Contracts, or (2) of customers or suppliers of Debtors which are related to the Acquired Assets, (v) all rights in connection with *Perficient, Inc. v. DZS, Inc.* in the United States District Court for the Eastern District of Texas, Sherman Division (Case 4:22-CV-00801-SDJ), (vi) any Claims (or potential Claims) or causes of action brought by the Trustee which are not related to the Acquired Assets, including, but not limited to any Claims or causes of action against EdgeCo, LLC, (vii) all prepaid

insurance and all directors' and officers' insurance policies of Sellers and any related claims, and (viii) as set out in Schedule 1.1 (subject to the terms set out therein).

"Excluded Liabilities" shall mean any and all Claims, Liens, Tax or liability, obligation, agreement or contract other than an Assumed Obligation, and shall include, without limitation, any and all obligations relating to (i) all Taxes of Debtors, and (ii) all former employees of Debtors arising or accruing prior to the Closing including those for workplace safety and insurance, wages, salaries, bonuses, accrued vacation, pensions and benefits, termination and severance (taking into consideration their seniority). For greater certainty, Purchaser will not be responsible for any obligations to any of the employees of Debtors who are terminated by Debtors before, on or after Closing.

"Final Order" means an Order which has not been stayed or vacated and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Intellectual Property" means all right, title and interest of Sellers, if any, in and to all (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals and foreign counterparts thereof and all registrations and renewals in connection therewith and all patents claiming priority of the foregoing, (ii) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (iii) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (iv) mask works and all applications, registrations and renewals in connection therewith, (v) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (vi) Software and AI Technologies, (vii) the Credentials, (viii) Internet addresses, uniform resource locaters, domain names, social media accounts and handles, websites and web pages, (ix) any and all other intellectual property and proprietary property or rights, (x) any applications for or registrations of the foregoing, (xi) goodwill related to all of the foregoing, and (xii) all causes of action and rights of recovery associated with the foregoing.

"Intellectual Property Assignment Agreement" shall have the meaning set forth in Section 3.2(b) hereof.

"Law" means any law, statute, regulation, ruling, ordinance, code, rule, treaty, decree, writ, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Liability" means any indebtedness, obligation or other liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted).

"Licensed Intellectual Property" means all material Intellectual Property used by Sellers, other than the Owned Intellectual Property, and excluding any Intellectual Property in the Excluded Assets.

"Lien" or "Liens" means with respect to any property or asset, any charge, claim, lien, option, encumbrance, mortgage, pledge, security interest, conditional sale agreement or other title retention agreement, lease, security agreement, right of first refusal, option, restriction, tenancy, license, covenant, right of way, contractual right of set-off, restriction on transfer, easement or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or statute or law of any jurisdiction) on such property or asset.

"Option" shall have the meaning set forth in Section 6.10 hereof.

"Order" means any decree, order, injunction, rule, judgment or consent of or by any Governmental Authority.

"Owned Intellectual Property" means all Intellectual Property owned by Sellers, excluding any Intellectual Property in the Excluded Assets.

"Party" and "Parties" shall have the meaning set forth in the Preamble hereto.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses possessed by Sellers, or through which Sellers have rights, that are used, useable or useful in the use or enjoyment or benefit of the Acquired Assets.

"Permitted Liens" means (i) Liens granted or reserved by an instrument executed in connection with this Agreement or the transactions contemplated hereby or thereby; and (ii) any contractual right of set-off or restriction on transfer contained in any Assumed Contract, but only to the extent that such contractual right of set-off or restriction on transfer does not prohibit or otherwise limit the assignment and assumption of such Assumed Contract pursuant to the provisions of this Agreement.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Purchase Price" shall have the meaning set forth in Section 2.3 hereof.

"Purchaser" shall have the meaning set forth in the Preamble hereto.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"Sale Order" means an Order entered by the Bankruptcy Court in a form satisfactory to Purchaser and Sellers, authorizing Trustee to sell the Acquired Assets to Purchaser pursuant to this Agreement and Sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests other than the Assumed Obligations.

"Schedules" means the schedules attached hereto.

"Seller" and "Sellers" shall have the meaning set forth in the Preamble hereto.

"Software" means all computer software, programs and databases in any form, compilations, tool sets, application programming interfaces, libraries, data compilers, higher level or "proprietary" language, scripts and macros, including Internet web sites, web content, member or user lists and information associated therewith, links, firmware, middleware, embedded code, operating systems and specifications, data, database management code, utilities, graphical user interfaces, menus, images, icons, forms, methods of processing, software engines, and platforms, all versions, updates, corrections, enhancements, replacements and modifications of the foregoing, whether in source code or object code form, and all related documentation, diagrams, descriptions and programs, computer print-outs, underlying tapes and materials.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person all federal, state, local, county, foreign and other taxes, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Transaction Documents" means this Agreement, the Bill of Sale, the Intellectual Property Assignment Agreement, the Notices of Assumed Contracts and all other agreements, instruments, certificates and other documents to be entered into or delivered by any Party in connection with the transactions consummated pursuant to this Agreement.

"Trustee" shall have the meaning set forth in the Preamble hereto.

**Section 1.2.   Rules of Construction.** Unless the context otherwise clearly indicates, in this Agreement:

(a)   the singular includes the plural;

(b)   "includes" and "including" are not limiting;

(c)   "may not" is prohibitive and not permissive; and

(d)   "or" is not exclusive.

## ARTICLE II.

## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

**Section 2.1.   Purchase and Sale of Assets.** On the terms and subject to the conditions set forth in this Agreement, at the Closing, Sellers, through the Trustee, shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and

delivery of, for the consideration specified in <u>Section 2.3</u>, all of the Acquired Assets, free and clear of all Liens other than Permitted Liens.

      **Section 2.2.  Assignment and Assumption of Liabilities.** Subject to the terms and conditions set forth in this Agreement, Purchaser shall assume from Sellers, and thereafter be solely responsible for the payment, performance or discharge, of the Assumed Obligations. Purchaser shall have no liability or obligation with respect to any Excluded Liabilities or for greater certainty, any other Liabilities of Sellers or Debtors that are not Assumed Obligations.

      **Section 2.3.  Purchase Price.** The aggregate purchase price for the Acquired Assets (the "<u>Purchase Price</u>") shall be (i) cash in an amount equal to EIGHTEEN MILLION AND NO/100 DOLLARS (US$18,000,000.00) (the "<u>Cash Purchase Price</u>"), and (ii) aggregate dollar value of the  Assumed Obligations. At the Closing, Purchaser shall pay by wire transfer to the Trustee an amount in cash equal to the Cash Purchase Price, minus the Deposit. The Purchase Price shall be allocated amongst the Acquired Assets in accordance with <u>Section 10.2(b)</u>.

      **Section 2.4.  Deemed Consents and Cure Payments.** For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Contract if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, Sellers are authorized to assume and assign such Assumed Contract to Purchaser pursuant to Section 365 of the Bankruptcy Code and any applicable Cure Payments have been satisfied by Purchaser on behalf of Sellers, as provided herein.

      **Section 2.5.  Obligations in Respect of Assumed Contracts.** To the extent that any Assumed Contract is subject to a cure amount pursuant to Sections 363 or 365 of the Bankruptcy Code or otherwise, Purchaser shall directly pay or otherwise provide for the payment of the amount of any applicable Cure Payment immediately after Closing or such other date as agreed to by Purchaser and the counterparty to such Assumed Contract.

      **Section 2.6.  Post-Closing Assignment of Contracts.** With respect to any Sellers' Contract that is not an Assumed Contract, and provided that such Contract is still in effect and has not been rejected (or deemed rejected sixty (60) days following the date of filing of the Chapter 7 Cases) by Sellers pursuant to Section 365 of the Bankruptcy Code, upon written notice(s) from Purchaser, as soon as practicable, Sellers shall take all actions reasonably necessary to assume and assign to Purchaser, pursuant to Section 365 of the Bankruptcy Code, any Contract(s) set forth in Purchaser's notice(s); <u>provided, that</u> any applicable Cure Payment with respect to such Contract(s) shall be satisfied by Purchaser. Sellers agree and acknowledge that they shall provide Purchaser with reasonable advance notice of any motion(s) to reject any Contract relating to the Acquired Assets. Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed by, and assigned to, Purchaser in writing pursuant to this <u>Section 2.6</u>, such Contract shall be deemed to be an Assumed Contract for all purposes under this Agreement.

## ARTICLE III.

## CLOSING

      **Section 3.1.  Closing.** Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "<u>Closing</u>") will take place electronically via the exchange of electronic documents and signature pages at 10:00 a.m. (Dallas, Texas time), the date that is the [**second**] Business Day after the date

on which the conditions set forth in Article VII and Article VIII have been satisfied or waived; or on such other earlier or later date or place as Purchaser and Seller may agree in writing (the "<u>Closing Date</u>").

      **Section 3.2.   Deliveries by Trustee.** At the Closing, the Trustee on behalf of Sellers, shall deliver or procure delivery to Purchaser of:

      (a)   one or more bill of sale, assignment and assumption agreements, substantially in the form attached hereto as <u>Exhibit A</u> (collectively, the "<u>Bill of Sale</u>"), conveying in the aggregate all of the owned personal property of Sellers included in the Acquired Assets and assigning the Assumed Obligations, in each case to Purchaser, duly executed by the Trustee on behalf of Sellers;

      (b)   one or more Intellectual Property assignment agreements, substantially in the form attached hereto as <u>Exhibit B</u> (collectively, the "<u>Intellectual Property Assignment Agreement</u>"), assigning all of Seller's right, title and interest in and to any and all Owned Intellectual Property to Purchaser, duly executed by the Trustee on behalf of Sellers;

      (c)   the Credentials, to the extent in the possession of the Trustee or any advisor of the Trustee;

      (d)   duly executed statutory and regulatory consents and approvals, if any, which are required under the laws or regulations of the United States and other Governmental Authorities, including, without limitation, the Bankruptcy Code;

      (e)   the Books and Records;

      (f)   evidence of the transfer of all of the issued and outstanding equity securities of the DZS Subsidiaries to which Purchaser has exercised the Option to purchase prior to Closing, in form and substance reasonably acceptable to Purchaser;

      (g)   evidence of the transfer of Sellers' Permits included in the Acquired Assets, to the extent transferable, to Purchaser, in form and substance reasonably acceptable to Purchaser; and

      (h)   all other agreements, records and other documents required by this Agreement.

      **Section 3.3.   Deliveries by Purchaser.** At the Closing, Purchaser shall deliver or procure delivery to Trustee of:

      (a)   the Cash Purchase Price less the amount of the Deposit; and

      (b)   the Bill of Sale duly executed by Purchaser.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF TRUSTEE AND SELLERS

Except as disclosed in the Schedules delivered by Trustee to Purchaser on the Execution Date (with any disclosure in any section or subsection thereof being deemed and understood to be a disclosure in each other section or subsection thereof to which the applicability of the disclosure is apparent on its face, notwithstanding the reference to a specific section or paragraph), which Schedules may, subject to the terms of this Agreement, be amended from time to time through the

Closing Date, Trustee (where applicable) and Sellers (jointly and severally) represent and warrant to Purchaser as follows:

**Section 4.1.    Power and Authorization.** Subject to any necessary authorization from the Bankruptcy Court, the Trustee, acting on behalf of each Seller, has all requisite power and authority to execute and deliver the Transaction Documents to which it or each Seller is a party and to perform its obligations thereunder. All Transaction Documents to which any Seller is a party have been duly executed by the Trustee, on behalf of each Seller, and delivered by the Trustee on behalf of such Seller, except such Transaction Documents that are required by the terms of this Agreement to be executed and delivered by the Trustee, on behalf of a Seller, after the Execution Date, in which case such Transaction Documents will be duly executed and delivered by the Trustee, on behalf of such Seller, at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court and consistent with any applicable Sale Order or Final Order, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Sellers as provided in the Sale Order or any Final Order.

**Section 4.2.    Title to Assets.** Subject to Bankruptcy Court approval and consistent with any applicable Sale Order or other Final Order, Sellers have the power and the right to sell, assign and transfer and Sellers will sell, assign and/or transfer and deliver to Purchaser, and Purchaser will be vested with good, valid, marketable and undivided title to, the Acquired Assets, free and clear of all Liens other than Permitted Liens and the Assumed Obligations.

**Section 4.3.    Conflicts; Consents.**

(a)    Subject to Bankruptcy Court Approval and consistent with any applicable Sale Order or other Final Order, the execution, delivery and performance by each Seller of this Agreement, the Transaction Documents and the consummation of the transactions contemplated hereby, and compliance by each Seller with any of the provisions of this Agreement do not, or will not at the time of execution or thereafter, result in the creation of any Lien upon the Acquired Assets and do not, or will not at the time of execution, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of: (i) such Seller's certificate of incorporation, bylaws or comparable charter or organizational documents, (ii) subject to entry of the Sale Order, any Assumed Contract to which such Seller is a party or by which any of the Acquired Assets are bound, (iii) subject to entry of the Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to such Seller or any of the Permits, licenses, rights, properties or assets of such Seller as of the date hereof, or (iv) subject to entry of the Sale Order, any applicable Law.

(b)    Subject to entry of the Sale Order, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the

assignment or conveyance of the Acquired Assets, including without limitation, the Assumed Contracts.

**Section 4.4.   Brokers.** No Seller has incurred any Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby, other than Liabilities which will be paid by Sellers following the Closing as provided by the Bankruptcy Code or approved by the Bankruptcy Court.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows:

**Section 5.1.   Organization, Standing and Power.** Purchaser is a corporation duly incorporated, validly existing and in good standing under the Laws of the state of Texas.

**Section 5.2.   Authorization.** Purchaser has all requisite power and authority to own, lease and operate its properties, to carry on its business and to execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder. All Transaction Documents to which Purchaser is a party have been duly executed and delivered by Purchaser, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Purchaser after the Execution Date, in which case such Transaction Documents will be duly executed and delivered by Purchaser at or prior to the Closing, and all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

**Section 5.3.   No Conflict or Violation.** Except to the extent any of the foregoing is not enforceable due to operation of applicable bankruptcy Law or the Sale Order, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Purchaser do not and shall not violate any Law or any provision of the charter or organizational documents of Purchaser in any material respects.

**Section 5.4.   Availability of Funds.** Purchaser has cash available or has existing borrowing facilities, which together are sufficient to enable it to consummate the transactions contemplated by this Agreement. The Trustee has been provided financial information sufficient, in its business judgment, to evidence the ability of Purchaser to consummate the transactions contemplated by this Agreement and, upon request of the Bankruptcy Court at the Sale Hearing, will provide similar information (or such other information as the Bankruptcy Court shall require) to the Bankruptcy Court for an in camera review or as otherwise directed by the Bankruptcy Court.

**Section 5.5.   Cure Amounts.** At Closing, Purchaser will provide to Sellers information related to of the Cure Payments required to be satisfied for purposes of the assumption and assignment to Purchaser of the Assumed Contracts under Section 365 of the Bankruptcy Code to the extent that any such Cure Payments are different from the amounts contained in the *Notices Of Executory Contracts And Unexpired Leases That May Be Assumed And Assigned, Pursuant To Section 365 Of The Bankruptcy Code, In Connection With The Sale Of Substantially All Of The Estates' Assets, And The Proposed Cure Amounts.*

**Section 5.6.    Brokers.** Purchaser has incurred no Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

**Section 5.7.    Limitation of Representations and Warranties.** PURCHASER REPRESENTS AND ACKNOWLEDGES THAT IF THE CLOSING IS CONSUMMATED, THE ACQUIRED ASSETS AND ASSUMED OBLIGATIONS ARE BEING SOLD TO PURCHASER ON AN "AS IS, WHERE IS" BASIS WITH ALL FAULTS, WITHOUT ANY WARRANTIES OR REPRESENTATIONS, EITHER EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, OTHER THAN AS PROVIDED IN THIS AGREEMENT. THE REPRESENTATIONS AND WARRANTIES SET FORTH IN <u>SECTION 4.1</u> THROUGH <u>SECTION 4.4</u> ARE ONLY SET FORTH HEREIN FOR PURPOSES OF DEFINING THE CONDITION TO PURCHASER'S OBLIGATIONS TO CLOSING SET FORTH IN Article VII. IMMEDIATELY FOLLOWING THE CLOSING, SUCH REPRESENTATIONS AND WARRANTIES WILL CEASE TO HAVE ANY FURTHER FORCE OR EFFECT AND ANY BREACH THEREOF, WHETHER BEFORE OR AFTER THE CLOSING, MAY NOT SERVE AS A BASIS FOR A BREACH OF CONTRACT OR OTHER CLAIM BY PURCHASER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO (A) ANY PROJECTIONS, ESTIMATES OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OF FUTURE FINANCIAL RESERVES, FUTURE REVENUES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) FROM THE ACQUIRED ASSETS OR (B) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO PURCHASER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS WITH RESPECT TO SELLERS OR THE ACQUIRED ASSETS OR ASSUMED LIABILITIES. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, THERE WILL BE NO PURCHASE PRICE ADJUSTMENTS OF ANY TYPE OR MANNER, INCLUDING ANY QUALITY ASSESSMENT OF THE ACQUIRED ASSETS BEING CONVEYED. SELLERS MAKE NO REPRESENTATIONS AS TO THE CONDITION OF THE ACQUIRED ASSETS AND PURCHASER HAS MADE ITS OWN INSPECTION AND IS SATISFIED WITH THE ACQUIRED ASSETS IN ALL RESPECTS.

**Section 5.8.    Sophistication of Purchaser.** PURCHASER IS A SOPHISTICATED PURCHASER WHO IS FAMILIAR WITH THE OWNERSHIP AND OPERATION OF ASSETS SIMILAR TO THE ACQUIRED ASSETS, AND PURCHASER HAS HAD ADEQUATE OPPORTUNITY OR WILL HAVE ADEQUATE OPPORTUNITY PRIOR TO CLOSING TO COMPLETE ALL PHYSICAL AND FINANCIAL EXAMINATIONS RELATING TO THE ACQUISITION OF THE ACQUIRED ASSETS IT DEEMS NECESSARY, AND WILL ACQUIRE THE SAME SOLELY ON THE BASIS OF AND IN RELIANCE UPON SUCH EXAMINATIONS, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLERS.

**Section 5.9.    Purchaser is Knowledgeable.** PURCHASER IS A KNOWLEDGEABLE BUSINESS OPERATOR OF ASSETS SUCH AS THE ACQUIRED ASSETS AND, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, HAS RELIED SOLELY ON ITS OWN

REVIEW AND ANALYSIS AND THAT OF ITS OWN LEGAL AND FINANCIAL ADVISORS.

## ARTICLE VI.

### COVENANTS OF PURCHASER AND SELLERS; OTHER AGREEMENTS

**Section 6.1.    Consents and Approvals.** Prior to Closing, Sellers and Purchaser shall cooperate and use commercially reasonable efforts to: (a) obtain all necessary consents and approvals to consummate the purchase and sale of the Acquired Assets and the assignment of the Assumed Obligations, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including, without limitation, obtaining the Sale Order, (b) to make all filings, applications, statements and reports to any Governmental Authority that are required to be made prior to the Closing by or on behalf of Sellers pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby, and (c) to obtain all required consents and approvals (if any) necessary to assign and transfer Sellers' Permits included in the Acquired Assets to Purchaser at Closing. In the event that certain of Sellers' Permits included in the Acquired Assets are not transferable or replacements therefore are not obtainable on or before the Closing, but such Permits are transferable or replacements therefore are obtainable after the Closing, Sellers and Purchaser shall continue to cooperate and use such commercially reasonable efforts after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits after Closing and shall do all things necessary to give Purchaser the benefits that would be obtained under such Permits.

**Section 6.2.    Access to Information.** Sellers shall, prior to the Closing Date, (a) provide Purchaser and its representatives, upon reasonable written notice and at reasonable times, access to the Books and Records as it reasonably requests and, to the extent Sellers are able, access to Sellers' office and facilities, (b) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations of Sellers related to the Acquired Assets as Purchaser shall reasonably request, and (c) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may reasonably require, provided, that Purchaser shall be bound by and shall comply with the terms of the Confidentiality Agreement with respect to Purchaser's ability to use or disclose any such information and provided, further, that no Seller shall be required to disclose any internal or confidential materials prepared by or on behalf of it in connection with the transactions contemplated hereby, and provided, further, that Sellers shall not disclose or provide copies of any documents or materials that are covered by Sellers' attorney-client privilege.  Notwithstanding anything contained in this Agreement to the contrary, Sellers are only required to provide information including Books and Records that are in Sellers' actual possession.

**Section 6.3.    Further Assurances.**

(a)    Sellers will use commercially reasonable efforts to obtain the entry of the Sale Order on the Bankruptcy Court's docket as soon as practicable and no later than April 29, 2025.

(b)    With respect to each Assumed Contract, to the extent required by the Bankruptcy Court, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract by Purchaser. Purchaser shall take such commercially reasonable actions as may be reasonably requested by Sellers to assist Sellers in obtaining the

Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)   From time to time after the Closing and without further consideration, (i)(i) Trustee on behalf of Sellers, upon the reasonable request of Purchaser, but at no cost to Sellers, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby and to vest in Purchaser title to the Acquired Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement, and (ii) subject to the Sale Order, Purchaser, upon the reasonable request of Sellers, but at no cost to Purchaser, shall execute and deliver such documents and instruments of contract or lease assumption as Sellers may reasonably request in order to confirm Purchaser's assumption of the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement.

**Section 6.4.   Bankruptcy Actions.** Trustee, on behalf of each Seller shall:

(a)   promptly make any filings, take all actions and use all commercially reasonable efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Transaction Documents.

(b)   shall give notice to all Parties entitled to notice of the Sale Order and any motions related thereto in accordance with all applicable Laws, the Rules and any applicable local rules, and to any other Persons reasonably requested by Purchaser.

(c)   shall promptly notify Purchaser if any Party appeals, requests a stay of, or seeks reconsideration of the Sale Order or takes any action which would prevent or delay the Sale Order from becoming a Final Order and provide Purchaser a copy of any related notices, applications or motions within one (1) Business Day after receipt by Sellers.

**Section 6.5.   Other Bids.** Purchaser acknowledges that Sellers will solicit bids ("Bids") from other prospective purchasers (collectively, "Bidders") for the sale of all or any portion of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement. In the event that the Trustee receives a Bid prior to April 25, 2025 at 5:00 p.m. (Dallas, Texas time) which she determines to be a higher and better offer, Purchaser shall have the right to provide a revised bid that is higher and/or better than such Bid.  Such revised bid from Purchaser must be submitted at or prior to the Sale Hearing.  Purchaser shall have the right to seek approval from the Bankruptcy Court of any such revised offer and to object to other Bids as not being higher and/or better. The Parties agree that the Bankruptcy Court shall have the sole authority to determine the ultimate highest and best offer.

**Section 6.6.   Disclosure Schedules and Supplements.** Trustee on behalf of Sellers shall notify Purchaser of, and shall supplement or amend the Schedules to this Agreement with respect to, any matter that (a) arises after the Execution Date and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement, or (b) makes it necessary to correct any information in the Schedules

to this Agreement or in any representation and warranty of Sellers that has been rendered inaccurate thereby. Each such notification and supplementation, to the extent known, shall be made no later than two (2) Business Days after discovery thereof and no later than three (3) days before the date set for the Closing by the Parties. Each such supplement or amendment to the Schedules to this Agreement shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement, but only if approved in writing by Purchaser, with such approval not to be unreasonably withheld.

**Section 6.7.   Conduct of Trustee and Sellers Prior to Closing.** Except as expressly contemplated by this Agreement or with Purchaser's prior written consent, and except to the extent expressly required or permitted under the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court, Trustee on behalf of Sellers or Sellers,:

(a)   shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim or other encumbrance, except for Permitted Liens;

(b)   shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a material breach of any representation or warranty made by Trustee or Sellers in this Agreement;

(c)   shall comply in all material respects with all Laws applicable to them or having jurisdiction over Sellers or any Acquired Asset;

(d)   shall not enter into any Contract material to Sellers (taken as a whole) to which any Seller is a party or by which it is bound and that are related to the Acquired Assets or amend, modify, reject or terminate any Assigned Contract;

(e)   shall not cancel or compromise any material debt or claim or waive or release any right of Sellers that constitutes an Acquired Asset;

(f)   shall not terminate, amend, reject or modify in any manner any lease for leased real property;

(g)   shall, subject to the Trustee's duties and consistent with Trustee's responsibilities under the Bankruptcy Code in a Chapter 7 bankruptcy case, at its own expense promptly notify Purchaser of any and all necessary and appropriate actions known to the Trustee needed to maintain, preserve and protect all of the Acquired Assets, and keep all tangible Acquired Assets in good repair, working order and condition (taking into consideration ordinary wear and tear) to the extent that such tangible Acquired Assets are in the possession or control of the Trustee;

(h)   shall, subject to the Trustee's duties and consistent with Trustee's responsibilities under the Bankruptcy Code in a Chapter 7 bankruptcy case, take all required actions to retain possession and control of the Acquired Assets;

(i)   shall, subject to the Trustee's duties and consistent with Trustee's responsibilities under the Bankruptcy Code in a Chapter 7 bankruptcy case, maintain all Books and Records in the condition they exist on the Execution Date;

(j)   shall periodically report to Purchaser concerning the Trustee's knowledge of the state of the Acquired Assets, including, without limitation, the Trustee's knowledge concerning any diminished inventory; and

(k)   shall not take, agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

**Section 6.8.   Assumed Obligations.** Subsequent to the Closing, Purchaser agrees to be solely responsible for the payment and performance of the Assumed Obligations.

**Section 6.9.   Disclaimer.** Sellers do not make, have not made and, if previously made, hereby expressly disclaim, any representations or warranties in connection with the transactions contemplated hereby other than those expressly set forth in this Agreement. It is understood that any data, any financial information, and projections or any memoranda or offering materials or presentations are not and shall not be deemed to be or to include representations or warranties of Sellers and no representation or warranty is made with respect thereto and, if made, is hereby expressly disclaimed. Except as expressly set forth in this Agreement, no Person, other than the Trustee, has been authorized by Sellers to make any representation or warranty relating to Sellers, the Acquired Assets, the Assumed Obligations or otherwise in connection with the transactions contemplated hereby and, if made, such representation or warranty is expressly disclaimed and may not be relied upon as having been authorized by Sellers.

**Section 6.10. Acquisition of DZS Subsidiaries.** Purchaser shall have the option (the "Option"), but not the obligation, to acquire all of the issued and outstanding equity securities of each of the DZS Subsidiaries. The purchase price shall be One Hundred and No/100 Dollars (US$100.00) per DZS Subsidiary to which Purchaser elects to exercise the Option. The Option may be exercised by Purchaser at any time prior to May 30, 2025 by delivering written notice to the Trustee, together with the applicable purchase price for such acquisition.

**Section 6.11. Post-Closing Accounts Receivable and Payments.**

(a)   Within the later of (i) three (3) Business Days following the Closing Date, or (ii) issuance by Purchaser of an intent to include a Contract as an Acquired Asset, and in any case prior to the termination of the Chapter 7 Cases, Purchaser, at its sole cost and expense, shall deliver a written notice, in form and substance satisfactory to Purchaser, acting reasonably, to the customers of, and all applicable account managers, agents and/or administrators with respect to, the Assumed Contracts included in the Acquired Assets regarding the transfer of the Assumed Contracts to Purchaser and directing that all future payments thereunder be made to Purchaser. The Trustee, acting on behalf of Sellers, shall reasonably cooperate with Purchaser in sending such notices (so long as such cooperation is at no expense to Trustee, Sellers or Sellers), including, without limitation, by signing such written notice.

(b)   Any (i) funds, proceeds or other property or assets forming part of the Acquired Assets, or (ii) other proceeds collected or derived from an Acquired Asset, in each case collected or received by the Trustee or Sellers from and after the Closing Date, other than the Purchase Price paid hereunder, shall be held in trust for the benefit of Purchaser, and such funds shall not form part of Debtors' estate or otherwise be made available to the Debtors' stakeholders, and, upon receipt following the Closing, shall promptly be paid to, and for the benefit of, Purchaser in accordance with its rights under this Agreement.

**Section 6.12. Cure Payments.** Prior to the Sale Hearing, Purchaser will provide to Seller an estimated summary of the aggregate total of the Cure Amounts it anticipates it will pay

following Closing.  Purchaser will promptly update the same if the aggregate total Cure Amounts increase or decrease from the amounts set forth in such estimated summary prior to the Sale Hearing.

## ARTICLE VII.

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are, at the option of Purchaser, subject to satisfaction of the following conditions precedent on or before the Closing Date.

**Section 7.1.   Representations and Warranties; Covenants.**

(a)   Each of the representations and warranties of Sellers contained herein shall be true and correct on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct in all respects as of that date) with the same force and effect as though made on and as of the Closing Date.

(b)   Sellers shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

**Section 7.2.   Bankruptcy Court Approval.** The Sale Order shall have been entered by the Bankruptcy Court and shall have become a Final Order.

**Section 7.3.   No Injunctions.** On the Closing Date, there shall be no Laws, Orders or other legal proceedings that operate to restrain, enjoin or otherwise prevent or make illegal the consummation of the transactions contemplated by this Agreement. No action or proceeding initiated by any Governmental Authority seeking an Order prohibiting the consummation of the transactions contemplated by this Agreement shall be pending.

**Section 7.4.   Closing Deliveries.** Sellers shall have delivered to Purchaser: (a) a certificate signed by Trustee on behalf of Sellers dated the Closing Date, in form and substance reasonably satisfactory to Purchaser, certifying that the conditions specified in Section 7.1(a) and Section 7.1(b) have been satisfied as of the Closing, and (b) all of the closing deliveries set forth in Section 3.2.

**Section 7.5.   Assignment Arrangements.** Purchaser shall have (a) (i) entered into consents to assignment, and amendment, as applicable, and (ii) agreed on Cure Payments, or (b) received verbal comfort, with each of the customers, suppliers, Intellectual Property providers or other Persons that has a business relationship with Seller or its Affiliates, set forth in Schedule 7.5, under terms and conditions acceptable to Purchaser.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers under this Agreement are, at the option of Sellers, subject to the satisfaction of the following conditions precedent on or before the Closing Date.

**Section 8.1.    Representations and Warranties; Covenants.**

(a)    The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date in all material respects) with the same force and effect as though made by Purchaser on and as of the Closing Date.

(b)    Purchaser shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

**Section 8.2.    Consideration.** Purchaser shall have delivered the Cash Purchase Price pursuant to Section 2.3.

**Section 8.3.    Bankruptcy Court Approval.** The Sale Order shall have been entered by the Bankruptcy Court.

**Section 8.4.    No Injunctions.** On the Closing Date, there shall be no Laws or Orders that operate to restrain, enjoin or otherwise prevent or make illegal the consummation of the transactions contemplated by this Agreement. No action or proceeding initiated by any Governmental Authority seeking an Order prohibiting the consummation of the transactions contemplated by this Agreement shall be pending.

**Section 8.5.    Closing Deliveries.** Purchaser shall have delivered to Sellers: (a) a certificate signed by an officer of Purchaser, dated the Closing Date, in form and substance reasonably satisfactory to Sellers, certifying that the conditions specified in Section 8.1(a) and Section 8.1(b) have been satisfied as of the Closing; (b) the individual(s) named in the certificate is a duly elected qualified and acting officer of Purchaser, and each such individual is authorized to execute and deliver on behalf of Purchaser each document to which it is a party, and all other agreements, documents and certificates delivered by Purchaser; and (c) all of the closing deliveries set forth in Section 3.3.

## ARTICLE IX.

## TERMINATION; TERMINATION PAYMENT

**Section 9.1.    Termination.** This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written agreement of Purchaser and Seller;

(b)    automatically and without any action or notice by either Seller to Purchaser, or Purchaser to Seller, and immediately upon the entry thereof, if there shall be in effect a Final Order or other legal proceeding restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated under this Agreement;

17

(c) by either Purchaser or Sellers (provided that the terminating Party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other Party, which breach would give rise to the failure of the condition set forth in Section 7.1 or Section 8.1, as applicable, and such breach is not cured within ten (10) days following written notice to the Party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(d) by Purchaser, if the Sale Order shall not have been entered by May 12, 2025;

(e) by Purchaser or Sellers if the Bankruptcy Court enters an order approving any Alternate Proposal;

(f) by either Purchaser or Sellers on any day on or after May 12, 2025 if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Sellers in writing), provided that the right to terminate this Agreement under this Section 9.1(f) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been a significant cause of, or resulted in, the failure of the Closing on or before such date;

(g) by Purchaser, if, prior to the Closing any of Sellers' Chapter 7 Cases shall have been dismissed;

(h) by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in Article VII has not been fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied); and

(i) by Sellers (provided that no Seller is then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in Article VIII has not been fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied).

**Section 9.2. Expense Reimbursement.** If any Seller consummates an Alternate Proposal, Purchaser shall have the right to request the Bankruptcy Court to reimburse Purchaser's actual legal expenses in an amount not to exceed $750,000 incurred in pursuit of the transactions contemplated hereby.

**Section 9.3. Deposit Reimbursement.**

(a) If this Agreement is automatically terminated pursuant to Section 9.1(b), then the Trustee shall return one hundred percent (100.0%) of the Deposit, together with all accrued interest, to Purchaser.

(b) If Purchaser terminates this Agreement pursuant to Section 9.1(d) or Section 9.1(f), then the Trustee shall (i) return fifty percent (50.0%) of the Deposit, together with all

accrued interest, to Purchaser, and (ii) the remaining fifty percent (50.0%) of the Deposit shall be forfeited to the Trustee.

(c)    If Purchaser terminates this Agreement pursuant to, <u>Section 9.1(c)</u>, <u>Section 9.1(e)</u>, <u>Section 9.1(g)</u>, or <u>Section 9.1(h)</u>, then the Trustee shall return one hundred percent (100.0%) of the Deposit, together with all accrued interest, to Purchaser.

(d)    If the Trustee terminates this Agreement pursuant to <u>Section 9.1(c)</u> or <u>Section 9.1(i)</u>, then one hundred percent (100.0%) of the Deposit, together with all accrued interest, shall be forfeited to the Trustee.

**Section 9.4.    Effect of Termination or Breach.** If the transactions contemplated hereby are not consummated, this Agreement shall become null and void and of no further force and effect, except (a) for this <u>Section 9.4</u>, (b) for the provisions of <u>Section 9.2</u>, <u>Section 9.3</u>, <u>Section 11.1</u>, <u>Section 11.7</u>, <u>Section 11.8</u>, <u>Section 11.9</u> and <u>Section 11.11</u> hereof, and (iii) that the termination of this Agreement for any cause shall not relieve any Party hereto from any Liability which at the time of termination had already accrued to any other Party hereto or which thereafter may accrue in respect of any act or omission of such Party prior to such termination.

# ARTICLE X.

# ADDITIONAL POST-CLOSING COVENANTS

**Section 10.1. Joint Post-Closing Covenant of Purchaser and Sellers.** Purchaser and Sellers jointly covenant and agree that, from and after the Closing Date, Purchaser and Sellers will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (a) the preparation of an audit of any Tax Return of any Seller or Purchaser for all periods prior to or including the Closing Date, (b) any audit of Purchaser and/or any audit of any Seller with respect to the sales, transfer and similar Taxes imposed by the Laws of any Governmental Authority, relating to the transactions contemplated by this Agreement, (c) pending litigation as of the Closing Date, and (d) investigation or action by any Governmental Authority, including, without limitation, the Securities and Exchange Commission, including preserving any documents or data (in any and all mediums) and tangible personal property that any such agency may request, provided that any cooperation efforts that Seller requests from Purchaser in connection with (c) and (d) will be at no cost to Purchaser. In furtherance hereof, Purchaser and Sellers further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith. All costs and expenses incurred in connection with this <u>Section 10.1</u> referred to herein shall be borne by the Party who is subject to such action.

**Section 10.2. Tax Matters.**

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Sellers and Sellers shall indemnify, defend (with counsel reasonably satisfactory to Purchaser), protect and save and hold Purchaser harmless from and against any and

all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes.

(b) Purchaser shall, within the later of (i) one hundred twenty (120) days after the Closing Date or (ii) thirty (30) days prior to the date by which Sellers' federal income Tax Returns must be filed, prepare and deliver to Sellers a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the purchase price) among the respective Sellers and the Acquired Assets (such schedule, the "Allocation"). The Allocation shall be deemed final unless the Trustee notifies Purchaser in writing that the Trustee objects to one or more items reflected in the Allocation within thirty (30) days after delivery of the same to Sellers.  In the event of any such objection, Purchaser and the Trustee shall negotiate in good faith to resolve the dispute. Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Authority or any other proceeding). Purchaser and Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to such Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 10.2(b) shall survive the Closing without limitation.

## ARTICLE XI.

## MISCELLANEOUS

### Section 11.1. Expenses.

(a) Except as otherwise provided in this Agreement, each Party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

(b) The Parties hereto agree that if any Claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees or commissions are ever asserted against Purchaser or Sellers in connection with the transactions contemplated hereby, all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify (with counsel reasonably satisfactory to the Party(ies) entitled to indemnification) and hold the other Party harmless from and against any and all such claims or demands asserted by any Person, firm or corporation in connection with the transaction contemplated hereby.

**Section 11.2. Amendment.** This Agreement, including the Exhibits and Schedules hereto, may not be amended, modified or supplemented except by a written instrument signed by Trustee on behalf of Sellers and Purchaser.

**Section 11.3. Notices.** Any notice, request, instruction or other document to be given hereunder by a Party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy, email or other wire transmission (with answer back confirmation of such transmission, if applicable), (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid. Unless another address is specified in writing, any notice, request, instruction or other documents given to the Parties to this Agreement shall be sent to the addresses indicated below:

To Purchaser:

Fibre Acquisition Corporation
c/o Managed Network Systems Inc.
3363 Tecumseh Rd E
Windsor, ON N8W 1H4
Attn: Clayton Zekelman
Telephone: (519) 985-8410
Email: clayton@MNSi.Net

with a required copy to:

Bennett Jones LLP
100 King St W, Suite 3400
Toronto, ON M5X 1A4
Attn: Curtis Cusinato and Lucas Stevens-Hall
Telephone: (416) 777-5774 and (416) 777-4685
Email: CusinatoC@bennettjones.com and
StevensHallL@bennettjones.com

And to:

Dykema Gossett PLLC
112 E. Pecan Street, Suite 1800
San Antonio, TX 78205
Attention: Deborah D. Williamson
Telephone: (210) 554-5272
Email: DWilliamson@dykema.com

| | |
|---|---|
| To Sellers: | Michelle Chow |
| | Chapter 7 Bankruptcy Trustee 16200 |
| | 16200 Addison Road, Suite 140 |
| | Addison, TX 75001 |
| | Telephone: (972) 380-5533 |
| | Email: mhchow@swbell.net |
| | |
| with a required copy to: | Singer & Levick |
| | 16200 Addison Road, Suite 140 |
| | Addison, TX 75001 |
| | Attn: Michelle E. Shriro |
| | Telephone: (972) 380-5533 |
| | Email: mshriro@singerlevick.com |
| | |
| | And to: |
| | |
| | Grable Martin PLLC |
| | 5473 Blair Road, Suite 100 |
| | PMB 51281 |
| | Dallas, Texas 75231-4227 |
| | Attention: Shauna Martin |
| | Telephone: (512) 415-4635 |
| | Email: smartin@grablemartin.com |

**Section 11.4. Waivers.** The failure of a Party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a Party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Sellers, in the case of a waiver by any Seller, or Purchaser, in the case of any waiver by Purchaser, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

**Section 11.5. Counterparts and Execution.** This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

**Section 11.6. Headings.** The headings preceding the text of the Articles and Sections of this Agreement and the Schedules are for convenience only and shall not be deemed part of this Agreement.

**Section 11.7. Governing Law; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Texas (without giving effect to the principles of conflicts of Laws or choice of Law thereof that would compel the application of the substantive Law of any other jurisdiction), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.

For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in the State of Texas.

**Section 11.8. Binding Nature; Assignment.** Upon the approval of this Agreement by the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto without prior written consent of the other Parties (which shall not be unreasonably withheld or delayed), except: (a) this Agreement may be assigned to any Affiliate or Affiliates of Purchaser, and (b) as otherwise provided in this Agreement.

**Section 11.9. No Third-Party Beneficiaries.** This Agreement is solely for the benefit of the Parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the Parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.

**Section 11.10. Construction.** The language used in this Agreement will be deemed to be the language chosen by the Parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any Party. Any reference to any federal, state, local or foreign Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise.

**Section 11.11. Public Announcements.** Except as required by Law or in connection with the Chapter 7 Cases, neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party(ies) hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable Law, the disclosing Parties shall give the other Party a copy of the proposed disclosure and reasonable opportunity to comment on the same. Notwithstanding the foregoing, Purchaser shall not be restricted from making any public announcements or issuing any press releases after the Closing.

**Section 11.12. Entire Understanding.** This Agreement, the Exhibits and the Schedules set forth the entire agreement and understanding of the Parties hereto in respect to the transactions contemplated hereby. This Agreement, the Exhibits and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

**Section 11.13. Closing Actions.** All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the Party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

**Section 11.14. Conflict Between Transaction Documents.** The Parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way

inconsistent with or in conflict with any term, condition or provision of any other Transaction Document referred to herein, this Agreement shall govern and control.

**Section 11.15. No Survival**. The representations and warranties of Sellers and Purchaser contained in this Agreement or in any instrument delivered in connection herewith shall not survive the Closing**.**

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed and delivered on the date first above written.


**PURCHASER:**

**FIBRE ACQUISITION CORPORATION**

By: _____
Name:    Clayton Zekelman
Title:    President


**SELLERS:**

By: _____
Michelle H. Chow, in her capacity as
Chapter 7 Trustee of DZS Inc.
(EDTX 25-40712); DZS Services,
Inc. (EDTX 25-40713); and DZS
California Inc. (EDTX 25-40714)

25

<u>Exhibit A</u>

<u>Bill of Sale</u>

## *[REDACTED]*

<u>Exhibit B</u>

<u>Intellectual Property Assignment Agreement</u>

***[REDACTED]***

<u>Disclosure Schedules</u>

*[REDACTED]*