# Exhibit 27

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | DSZ Inc. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Eastern District of Texas |
| Case number | 25-40712 (BTR) |

## Official Form 410

# Proof of Claim

12/24

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

EdgeCo, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| R. Adam Swick, Esq. c/o Akerman LLP<br>Name | EdgeCo, LLC   c/o Robert Binkele<br>Name |
| 500 W. 5th Street, Ste. 1210<br>Number     Street | 3326 Aspen Grove Dr., Suite 400<br>Number     Street |
| Austin          TX       78701<br>City          State          ZIP Code | Franklin          TN       37067<br>City          State          ZIP Code |
| Contact phone  (737) 999-7100 | Contact phone  (760) 409-7117 |
| Contact email  adam.swick@akerman.com | Contact email  rbinkele@myept.com |

Uniform claim identifier (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____
                                                                                                 MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

---

**7. How much is the claim?**   $_____15,300,593.10   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Loan Agreements - See Addendum Attached.

---

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:   Security on essentially all of Debtor's assets

Basis for perfection:   Security Agreement

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:   $_____

Amount of the claim that is secured:   $_____

Amount of the claim that is unsecured:   $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $_____

Annual Interest Rate (when case was filed) 20.00 %

☑ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Docusign Envelope ID: 4407A9F3-2561-4515-8581-5A8FED8BEEE4C

Case 24-40712 Doc 216 Filed 04/23/25 Entered 04/23/25 17:20:11 Desc Exhibit 27 - Proof of Claim of EdgeCo LLC Page 4 of 86

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | | | |
|---|---|---|---|---|

☑ No

☐ Yes. *Check one:*             **Amount entitled to priority**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.    $_____

    * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:**    **Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   4/4/25
           MM / DD / YYYY

DocuSigned by:

_____
149CD354FC8E4F5...
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Robert | | Binkele |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Manager |
|---|---|

| Company | EdgeCo, LLC |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 3326 Aspen Grove Drive, Suite 400 | | |
|---|---|---|---|
| | Number   Street | | |
| | Franklin | TN | 37067 |
| | City | State | ZIP Code |

| Contact phone | (760) 409-7117 | Email | rbinkele@myept.com |
|---|---|---|---|

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| In re: | CHAPTER 7 |
| DZS INC. | CASE NO. 25-40712 (BTR) |
| Debtor. | |

## ADDENDUM TO SECURED PROOF CLAIM OF EDGECO, LLC

Claimant EdgeCo, LLC (**"EdgeCo"** or **"Claimant"**), submits the following addendum to Claimant's proof of claim (the **"Proof of Claim"**) against debtor DZS Inc. (the **"Debtor"**). In support of the Proof of Claim, Claimant states as follows:

### A. The Loan Agreements

1. On or about December 29, 2023, EdgeCo, as lender, and the Debtor, as borrower, entered into a *Loan Agreement* in the principal amount of $15,000,000. Pursuant to the Initial Loan Agreement (the "**Initial Loan Agreement**"). The Debtor, for the purpose of evidencing the Initial Loan Agreement and the payments due thereunder, executed and delivered to EdgeCo, (i) a *Secured Promissory Note* (the **"$15mm Note"**) in the amount of $15,000,000, and (ii) a *Security Agreement* (the **"Security Agreement,"** together with the Initial Loan Agreement and the $15mm Note, the **"Loan Documents"**).

2. On or about May 31, 2024 (the **"Effective Date"**), EdgeCo, as lender, and the Debtor, as borrower, entered into a *Loan Agreement* (the "**Amended Loan Agreement**") for an additional loan in the amount of $15,000,000 to allow Debtor to fund certain business acquisition activities as further evidenced by the (i) *Amended and Restated Secured Promissory* Note in the principal amount of $30,000,000 (the **"$30mm Note"**), and (ii) *Amended and Restated Security Agreement* (the **"Amended Security Agreement,"** together with the Amended Loan Agreement and the $30mm Note, the **"Amended Loan Documents"**). A copy of the Amended Loan Documents is attached hereto as **Exhibit 2.**

### B. Prepetition Payments

3. A portion of the combined $30,000,000 loan indebtedness was repaid. The current principal loan balance is $11,770,858.75.

4. The last loan payment was made on February 1, 2025. Therefore, there is a past due balance in the amount of $325,000 for the month of March, 2025.

5. Interest on the unpaid loan amount is 13% per annum compounded annually on the basis of a 365-day year.

6.  Section 2(i) of the Amended Promissory Note provides that if any monthly installment of interest is not paid within ten (10) days of its due date, then a Late Fee is payable in the amount of five percent (5%) of the late payment. In this case the payment was due on March 1, 2025, is more than ten (10) days past due and there is a late fee due in the amount $16,250.00.

7.  Section 2(g) of the Amended Promissory note provides for a prepayment penalty. Specifically, Section 2(g) provides that if the prepayment occurs prior to the 18 month anniversary of the Amended Note, DZS owes EdgeCo a prepayment premium equal to 18 months interest on the loan *minus* the amount of interest actually paid prior to such prepayment This provision was included to ensure EdgeCo was guaranteed a return of 18 months interest on the Loan, regardless of when it was paid;. This amount is $5,850,000.00, of which $2,925,000.00 has been paid. Therefore, giving credit for the March, 2025 interest payment above, the remaining balance owed on the prepayment penalty is $2,600,000.00.

8.  Upon an acceleration of the obligation, DZS owes EdgeCo a Default Penalty pursuant to Section 2(f) of the Amended Note in the amount equal to four percent (4%) of the then outstanding principal and accrued and outstanding interest. That amount is $588,484.35 · Section 2(f) provides for a default interest rate of 20% per annum. The per diem interest rate based on a 365 day year is $8383.89

9.  As shown on the attached spreadsheet as **Exhibit 1**, the total amount of principal, interest, late fees and default fees owed to EdgeCo, LLC as of March 14, 2025 is $15,300,484.35. Interest accrues at the daily rate of $8,383.89.

10.  EdgeCo believes it is over secured.

11.  EdgeCo's UCC filings are attached as **Exhibit 3**.

## C.  The Bankruptcy

1.  On March 14, 2025 (the "**Petition Date**"), the Debtor filed voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Texas (the "**Bankruptcy Court**").

2.  There is currently no date set for filing of proofs of claim.

3.  As of the Petition Date, the Debtor was indebted to and had certain obligations to EdgeCo under the Amended Loan Documents, as a result of the Debtor's defaults under the Amended Loan Documents in the minimum amount of **$15,300,484.35** as itemized on **Exhibit 1**.

4.  This Proof of Claim may not include all amounts relating to all pre- and post-Petition Date interest, fees, costs, expenses, charges, and attorney and other professional fees and expenses as to which the Debtor is liable, including without limitation all costs and expenses incurred in enforcing and preserving EdgeCo's rights under the Loan. EdgeCo reserve all rights to (i) amend, clarify, modify, update, or supplement this Proof of Claim at any time and in any

2

respect, including without limitation to assert additional claims and requests for payment or additional grounds for EdgeCo's claim, and/or to specify the amount of EdgeCo's contingent, unmatured and/or unliquidated claims, if any, as they become non-contingent, matured and/or liquidated; (ii) file additional proofs of claim at any time and in any respect; (iii) file separate proofs of claim as: (a) permitted by any order entered in this case establishing a deadline to file proofs of claim; (b) required or permitted by law; or (c) otherwise ordered by the Court; and/or (iv) file a request for payment of an administrative expense or priority claim in accordance with 11 U.S.C. §§ 503(b) and 507(a). By virtue of the filing of this Proof of Claim, EdgeCo does not waive, and hereby expressly reserves, EdgeCo's rights to pursue any and all claims and requests for payment, including but not limited to, the claims and requests for payment described herein against the Debtor based on the facts and circumstances giving rise to the claims asserted in this Proof of Claim or any other alternative legal theories. EdgeCo does not waive any of its rights to any and all such claims by not ascribing a specific dollar amount thereto at this time.

5. All reservations of rights and benefits set forth in this Proof of Claim apply to the indebtedness and claims set forth herein.

6. No judgment has been rendered on this Proof of Claim.

7. The execution and filing of this Proof of Claim is not and shall not be deemed or construed as: (a) a waiver or release of EdgeCo's rights against any person, entity, or property, which may be liable for all or any part of the claims asserted herein, including but not limited to guarantors or co-debtors; (b) a consent by EdgeCo to the jurisdiction or venue of the Bankruptcy Court with respect to proceedings, if any, commenced in the Bankruptcy Cases against or otherwise involving EdgeCo; (c) a waiver or release of EdgeCo's right to trial by jury in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a waiver or release of EdgeCo's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (e) a waiver of the right to move or to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in the Bankruptcy Cases against or otherwise involving EdgeCo; (f) an election of remedies; or (g) a waiver or limitation of any procedural or substantive rights or defenses to any claim that may be asserted against EdgeCo by the Debtor, any official committee of unsecured creditors, trustee or examiner appointed in this case or any subsequent case, or any other party.

8. All notices concerning this Proof of Claim should be sent to counsel for EdgeCo, c/o Akerman, LLP, Attn.: R. Adam Swick, Esq., 500 West 5th Street, Suite 1210, Austin, Texas 78701.

Docusign Envelope ID: 4407A8F8-2551-4E1E-95E1-5A2ED8BEEEAC

# EXHIBIT 1

# ITEMIZATION OF SECURED CLAIM

**EDGECO, LLC -- DZS LOAN OBLIGATION ( as of March 14, 2025)**

| | Category | Loan Document Reference | Amount |
|---|---|---|---|
| a. | Principal Balance (3-14-25) | | $11,770,858.75 |
| b. | March 1, 2025 Payment Due | | $325,000.00 |
| c. | Late Fee for March 1, Payment | Section 2(i) of Amended Note | $16,250.00 |
| d. | Balance of Prepayment Penalty | Section 2(g) of Amended Note | $2,600,000.00 |
| e | Subtotal | | $14,712,108.75 |
| f. | Default Fee (4%) | Section 2(f) of Amended Note | $588,484.35 |
| g. | Balance Due from Acceleration Date | | $15,300,593.10 |
| h. | Interest Rate from Acceleration Date | Section 2(f) of Amended Note | 20% |
| i. | Per Diem Interest Rate | | $8,383.89 |

| | |
|---|---|
| Sum of (a)-(c): | $12,112,108.75 |
| Schedule 206(d): | $12,118,992.40 |
| Difference: | $6,883.65 |

Docusign Envelope ID: 4407J9F8-2F61-4C1F-8EE1-5A9FED8BEEE4C

Case 25-40712 Doc 80-6 Filed 04/23/25 Entered 04/23/25 17:20:11 Desc Exhibit
27 - Proof of Claim of EdgeCo LLC Page 10 of 86

# EXHIBIT 2

Docusign Envelope ID: 4A0729F8-8591-4315-8F80-57BED95EEEC9

Case 25-40712 Doc 20-27 Filed 04/24/25 Entered 04/26/25 17:20:12 Page 10 of 85 Exhibit 27 - Proof of Claim of EdgeCo LLC Page 11 of 86

*EXECUTION VERSION*

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Loan Agreement") is made and entered into as of May 31, 2024 (the "Effective Date"), by and between EdgeCo, LLC, a Wyoming limited liability company ("Lender"), and DZS Inc., a Delaware corporation ("Borrower"), with respect to the following:

## RECITALS

WHEREAS, Lender and Borrower have previously entered into that certain Loan Agreement, dated as of December 29, 2023, wherein Lender extended a $15,000,000 loan (the "Loan" and such Loan Agreement, the "Initial Loan Agreement") to Borrower on certain terms and conditions set forth therein;

WHEREAS, Borrower has requested Lender to make an additional loan of $15,000,000 (the "Additional Loan") to Borrower to allow Borrower to fund certain business acquisition activities;

WHEREAS, Borrower has entered into that certain Share Purchase Agreement (the "Acquisition Agreement") dated as of May 3, 2024, by and between Borrower and Casa Communications Holdings Pty Ltd (Administrators Appointed) ACN 632 732 659, a private limited company registered in New South Wales, Australia ("Seller"), wherein Borrower has agreed to purchase all the issued share capital of NetComm Wireless Pty Ltd (Administrators Appointed) CN 002 490 986, a private limited company registered in New South Wales, Australia (the "Target") from Seller upon certain terms and conditions set forth therein (the "Target Acquisition"); and

WHEREAS, Lender has agreed to make the loan described in this Loan Agreement on the terms and conditions set forth in this Loan Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements of the parties set forth in this Loan Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## ARTICLE I
## DEFINITIONS

Unless a particular word or phrase is otherwise defined or the context requires otherwise, capitalized terms used in this Loan Agreement shall have the meanings set forth below:

1.1. <u>Business</u>. The term "Business" shall mean the business operations of Borrower offering access, optical, and cloud software and network innovations to communications service providers and businesses reasonably related, complementary, or ancillary thereto.

1.2. <u>Business Day</u>. The term "Business Day" shall mean any day on which banks are open for business in Orange County, California, other than Saturdays, Sundays, and legal holidays designated by federal law.

1.3. <u>Effective Date</u>. The term "Effective Date" shall mean the date set forth in the preamble of this Agreement.

1.4. <u>Event of Default</u>. The term "Event of Default" shall have the meaning set forth in Article 6 of the Loan Agreement.

1.5. <u>Indebtedness</u>. The term "Indebtedness" means (a) indebtedness created, issued, or incurred by Borrower for borrowed money (whether by loan or the issuance and sale of debt securities), whether or not recourse is limited to specific assets of Borrower, including, without limitation, the Amended Promissory Note; (b) obligations of Borrower to pay the deferred purchase or acquisition price of property or services, other than trade accounts payable arising in the ordinary course of business as long as such trade accounts payable are not for borrowed money and are paid within 270 days of the date the respective goods are delivered or the respective services are rendered (unless such trade account payable is being contested in good faith and a sufficient cash reserve, in accordance with GAAP, has been established); (c) indebtedness of others secured by a lien on the property of Borrower, whether or not the indebtedness so secured has been assumed by Borrower; (d) obligations of Borrower in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of Borrower; and (e) indebtedness of others guaranteed by Borrower.

1.6. <u>Loan Documents</u>. The term "Loan Documents" means all documents executed by Borrower for the benefit of Lender in connection with the Loan or Additional Loan, but excluding the 2023 Warrant Agreement, the 2024 Warrant Agreement, and the Amended Registration Rights Agreement. The term "Loan Documents" includes, but is not limited to, this Loan Agreement, the Initial Loan Agreement, the Amended Promissory Note, the Amended Security Agreement, any other agreement designated in writing as a "Loan Document" by Borrower and Lender, and any future amendments or modifications hereto or thereto.

1.7. <u>Obligations</u>. The term "Obligations" means the Borrower's obligation to pay to Lender (a) any and all sums due Lender under the Loan, the Additional Loan, or otherwise under the terms of the Loan Documents; (b) in the event of any proceeding to enforce the collection of the Obligations, or any of them, after an Event of Default, the reasonable expenses of any exercise by Lender of its rights, together with reasonable attorney fees, expenses of collection, and court costs, as provided in the Loan Documents; and (c) any other indebtedness or liability of Borrower to Lender, whether direct or indirect, absolute or contingent, now or hereafter arising, under the Loan Documents.

1.8. <u>Principal Balance</u>. The term "Principal Balance" means, without duplication, the outstanding principal balance under the Loan, the Additional Loan, or the Amended Promissory Note from time to time, as evidenced in Lender's account ledger on which the Principal Balance and all payments relating to the Loan or the Additional Loan shall be entered, which account ledger will be definitive as to the amounts outstanding absent manifest error.

1.9. <u>Amended Promissory Note</u>. The term "Amended Promissory Note" means the Amended and Restated Secured Promissory Note in form and substance as attached as **Exhibit A** hereto.

1.10. <u>Amended Security Agreement</u>. The term "Amended Security Agreement" means the Amended and Restated Security Agreement in form and substance as attached as **Exhibit B** hereto.

1.11. <u>2023 Warrant Agreement</u>. The term "2023 Warrant Agreement" means the Warrant Agreement dated as of December 29, 2023, between Borrower and Lender.

1.12 <u>2024 Warrant Agreement</u>. The term "2024 Warrant Agreement" means the Warrant Agreement in form and substance as attached as **Exhibit C**.

1.13. <u>Amended Registration Rights Agreement</u>. The term "Amended Registration Rights Agreement" means the Amended and Restated Registration Rights Agreement in form and substance as attached as **Exhibit D**.

1.14. <u>Restated Certificate of Incorporation</u>. The term "Restated Certificate of Incorporation" means the Restated Certificate of Incorporation of Borrower, as amended through February 28, 2017, and as amended by (i) the Certificate of Amendment of Restated Certificate of Incorporation, dated August 26, 2020, and (ii) the Certificate of Amendment to the Restated Certificate of Incorporation, dated June 1, 2023, as the same may be amended or restated from time to time.

## ARTICLE II
## TERMS OF THE LOAN

2.1. <u>Nature of Facility; Use of Proceeds</u>. Subject to the terms and conditions of the Loan Documents, including all conditions precedent set forth in Article 5, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender funds in the aggregate principal amount of an additional $15,000,000 (the "Additional Loan"). The duties and obligations of Borrower to repay the Additional Loan shall be evidenced by this Loan Agreement, the Amended Promissory Note, and the Amended Security Agreement. In the event of any conflict in the terms of the Initial Loan Agreement, this Loan Agreement, the Amended Promissory Note, or the Amended Security Agreement, the terms of this Loan Agreement shall govern. The Additional Loan shall be secured as provided in the Amended Security Agreement. Upon the Effective Date, Lender shall deposit the Additional Loan proceeds into a non-interest bearing escrow account of Lender's choice and sole discretion. The Additional Loan shall be made available to Borrower exclusively for the Target Acquisition, which is expected to close on May 31, 2024 (subject to Borrower's receipt of the Additional Loan proceeds). Lender shall disburse the Additional Loan proceeds as follows: (1) an amount directly to Seller to fund the purchase amount of the Target Acquisition pursuant to the Acquisition Agreement immediately after receipt of Borrower's written request therefor; and (2) the remaining proceeds directly to Borrower as operating capital for Target following the successful Completion (as defined in the Acquisition Agreement) of the <u>Target Acquisition.</u> The Additional Loan shall be exclusively

Case 25-40211 Document 26 Filed 04/23/25 Entered 04/23/25 17:20:12 Page 43 of 85

Case 25-40211 Doc 20-27 Filed 04/24/25 Entered 04/24/25 17:20:12 Desc Exhibit
27 - Proof of Claim of EdgeCo LLC Page 14 of 86

Docusign Envelope ID: 4A0789F2-8561-4315-8F60-57DED95EEF19

used to fund the Target Acquisition and as operating capital for the Target after the Completion; provided, however, in the event the Completion fails to be attained with six months of the Effective Date of this Loan Agreement, this Loan Agreement shall terminate and the Additional Loan proceeds shall be returned to Lender unless otherwise agreed by Lender and Borrower.

2.2.     Additional Loan Term.  The Additional Loan term (the "Term") shall be 36 months from the Effective Date.  The Loan term shall also be extended from its existing maturity date, such that the Loan term shall be 36 months from the Effective Date.

2.3.     Interest Rate.  The Principal Balance of all monies advanced by Lender under the Additional Loan shall bear interest at a rate equal to 13% per annum compounded annually on the basis of a 365-day year, commencing on the Effective Date (the "Interest Rate").

2.4.     Calculation of Interest.  Interest shall accrue on the Additional Loan on the basis of a 365-day year.  Borrower agrees that any calculation of amounts accruing hereunder at the Interest Rate shall in each instance be made by Lender and shall, if determined in good faith, be conclusive and binding on Borrower in the absence of manifest error.

2.5.     Origination Fee.  Borrower shall pay Lender an origination fee of 2% ($300,000) of the principal amount of the Additional Loan (the "Origination Fee").  Upon the Effective Date, the Origination Fee shall be withheld from the funds to be transmitted to Lender's escrow account established for Borrower's use to fund the Target Acquisition.

2.6.     Transaction Fees.  Borrower shall pay Lender $100,000 for transaction expenses including the legal, due diligence, UCC-1 searches and filing, and other miscellaneous costs (the "Transaction Fees").  Upon the Effective Date, the Transaction Fees shall be withheld from the funds to be transmitted to Lender's escrow account established for Borrower's use to fund the Target Acquisition.

2.7.     Payment.  Payments on the Additional Loan shall be interest only payments, payable monthly, on the first day of every month, in arrears, at the calculated Interest Rate for the Term, and the Principal Balance shall be due and payable at the close of the Term.

2.8.     Prepayment.  Borrower shall have the right to prepay all or any portion of the Additional Loan outstanding at any time; provided, however, if such prepayment is prior to the 18 month anniversary of the funding date for the Additional Loan, Borrower shall pay Lender a prepayment premium equal to 18 months' calculated interest with any such Additional Loan prepayment, *minus* the amount of interest actually paid prior to such prepayment, in each case in respect of the principal amount prepaid.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BORROWER

To induce Lender to make the Additional Loan and to enter into the Loan Documents, Borrower makes the following representations and warranties, which shall be true and correct as of the date hereof and throughout the Term of this Loan Agreement:

Docusign Envelope ID: 440709E3 B561 4315 8E60 5FED9EFEEFC0

Case 25-40712 Doc 126   Filed 04/23/25   Entered 04/23/25 17:20:12   Desc Exhibit 27 - Proof of Claim of EdgeCo   LLC   Page 15 of 86

3.1.    <u>Status of Borrower; Power and Authority</u>.  Borrower is a corporation duly formed, validly existing, and in good standing under the laws of the State of Delaware.  Borrower has the power to borrow and to execute, deliver, and carry out the terms and provisions of the Loan Documents.  Borrower has taken or caused to be taken all necessary action to authorize the execution, delivery, and performance of the Loan Documents and the borrowing thereunder.

3.2.    <u>No Conflicts or Defaults</u>.  Borrower's entry into this Loan Agreement and the other Loan Documents will not immediately, or with the passage of time, the giving of notice, or both, (a) violate the provisions of the Articles of Incorporation or Bylaws of Borrower; (b) violate any governmental laws or regulations applicable to Borrower; (c) result in a material default under any material contract, agreement, or instrument to which Borrower is a party; or (d) result in the creation or imposition of any security interest in, or lien, charge, or encumbrance on, any of Borrower's assets (other than any such security interest or lien created by the Loan Documents).

3.3.    <u>Litigation</u>.  Borrower is not subject to any order of, or written agreement or memorandum of understanding with, any governmental authority.  As of the date hereof, except as previously disclosed to Lender in writing, to the best of Borrower's knowledge, there are no actions, suits, claims, investigations, or proceedings pending at law or in equity or before or by any governmental authority or threatened in writing against Borrower or any of its assets or properties or the transactions contemplated by this Loan Agreement.

3.4.    <u>Validity, Binding Nature, and Enforceability of the Loan Documents</u>.  The Loan Documents executed by Borrower constitute the legal, valid, and binding obligations of Borrower and are enforceable against Borrower in accordance with their terms, except as limited by bankruptcy, insolvency, or other laws of general application relating to the enforcement of creditors' rights.

3.5    <u>No Liens on Borrower Assets</u>.  The Borrower and each and every subsidiary of Borrower whose assets secure the Additional Loan as more fully set forth in the Amended Security Agreement (collectively, the "Securing Entities") is the direct legal and beneficial owner of record of all of the Securing Entities' assets as of the date of this Loan Agreement.

**ARTICLE IV**
**BORROWER'S COVENANTS**

4.1.    <u>Affirmative Covenants</u>.  Borrower covenants and agrees, during the Term of the Additional Loan and while any Obligations are outstanding and unpaid, to perform all the acts and promises required by the Loan Documents and all the acts and promises set forth in Articles 4.1(a) through 4.1(d).

(a)    <u>Payment and Performance</u>.  Borrower shall pay and perform all Obligations in full when and as due under the terms of the Loan Documents (taking into account notice requirements and applicable grace periods, if any), time being strictly of the essence.

(b)  Maintenance of Status.  Borrower shall take all necessary steps to preserve its existence as a corporation, including, but not limited to, the payment and discharge of all taxes, assessments, and other governmental charges on Borrower or its assets before the date on which interest and penalties attach thereto.  Borrower shall not materially change, dissolve, or liquidate the corporation, or the nature of its Business or operations during the Term of the Additional Loan as such Business and operations exist as of the Effective Date, without the prior written consent of Lender and except as previously disclosed to Lender in writing.

(c)  Financial Statements and Other Information.  During the Term of the Additional Loan, Borrower shall furnish to Lender (1) as soon as available, but in any event within 45 days after the close of each quarter, other than the last quarter of the fiscal year of Borrower, commencing with the quarter ending June 30, 2024, unaudited condensed consolidated balance sheets of Borrower and its subsidiaries as of the end of such quarter, together with the related unaudited condensed consolidated statements of comprehensive income, stockholders' equity and cash flows for such quarter and for the period from the beginning of the fiscal year to the end of such quarter, which financial statements shall be certified by the Chief Financial Officer of Borrower as presenting fairly in all material respects, to the best of his or her knowledge, the financial condition and results of operations of the Borrower and its subsidiaries on a consolidated basis in accordance with GAAP, subject to year-end adjustments and the absence of footnotes; and (2) as soon as available, but in any event within 90 days after the end of each fiscal year of Borrower, the audited consolidated balance sheets of the Borrower as at the end of such fiscal year, together with the related audited consolidated statements of comprehensive income, stockholders' equity and cash flows for such fiscal year, with the report of the Company's independent registered public accounting firm of recognized standing, which financial statements shall be certified by the Chief Financial Officer of the Borrower as presenting fairly in all material respects, to the best of his or her knowledge, the financial condition and results of operations of the Borrower and its subsidiaries on a consolidated basis in accordance with GAAP; provided, however, that (i) the foregoing obligations shall not apply until the Company has completed the restatement previously disclosed to the Lender in writing and is current with respect to the filing with the Commission of all Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K and (ii) the certification by the Chief Financial Officer referenced above shall not be required with respect to financial statements filed with the Commission.

(d)  Further Assurances.  Borrower agrees to execute such other and further documents as may from time to time in the reasonable opinion of Lender be necessary to perfect, confirm, establish, reestablish, continue, or complete the purposes and intentions of this Loan Agreement.

4.2.  Negative Covenants.  The Borrower covenants and agrees that, without the Lender's prior written consent, from and after the Effective Date and until all the Obligations are paid in full:

(a)  Fundamental Changes.  Borrower shall not, directly or indirectly, by operation of law or otherwise, merge or consolidate with any Person, liquidate, wind-up, or dissolve itself (or suffer any liquidation or dissolution), or sell, assign, lease, or otherwise

Docusign Envelope ID: 4A0792F2-B561-4315-8F60-5BED9FFEEFC9

Case 25-40412 Document 26 Filed 04/23/25 Entered 04/23/25 17:20:12 Desc Exhibit 27 - Proof of Claim of EdgeCo LLC Page 17 of 86

dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any Person (it being acknowledged and agreed that any transaction previously disclosed to Lender in writing shall not constitute a sale of all or substantially all of Borrower's assets); provided that (1) subsidiaries of Borrower may merge with and into Borrower; and (2) subsidiaries of Borrower may merge with and into other subsidiaries of Borrower, provided that the surviving subsidiary assumes the obligations of such non-surviving subsidiary under this Loan Agreement, if applicable.  For purposes of this Article 4.2(a), "Person" means an individual, corporation, business trust, estate, trust, partnership, association, joint venture, or other legal or commercial entity.

(b)    Acquisitions.  Borrower shall not acquire any businesses other than corporations or other entities in the same or similar business and Borrower shall be the parent or surviving corporation after giving effect to such acquisition.  Notwithstanding the foregoing, (i) Borrower shall not make any acquisition if an Event of Default has occurred and is continuing hereunder at the time of such acquisition and (ii) the Target Acquisition is permitted by the Loan Documents.

(c)    Indebtedness.  Borrower shall not, directly or indirectly, create or suffer to exist any direct, indirect, fixed, or contingent liability for, or incur, any Indebtedness in excess of $50,000 in the aggregate other than (1) accounts payable arising in the ordinary course of business; (2) other Indebtedness as disclosed to and approved by Lender; (3) the Obligations; (4) deferred taxes; (5) Indebtedness arising in the ordinary course of business not in respect of borrowed money (e.g., letters of credit, workers' compensation, health, disability or other employee benefits, insurance premiums, rent expense, operating leases); (6) intercompany Indebtedness; (7) Indebtedness existing on the date hereof; or (8) Indebtedness of subsidiaries organized outside the U.S.

(d)    Liens.  There are no currently existing or promised, and the Securing Entities shall not create or permit to exist in the future any, lien on any of their respective properties or assets to secure Indebtedness for borrowed money except (1) presently existing or subsequently created liens securing the Obligations, or (2) liens granted to secure Indebtedness permitted by Article 4.2(c) hereof.

(e)    Restricted Payment.  Borrower shall not (1) declare any cash dividend; (2) incur any other payment or distribution of cash or other property or assets in respect of the capital stock of Borrower other than stock dividends on common stock; or (3) make any payment on account of the purchase, redemption, or other retirement of the capital stock of the Borrower; provided, however, that the foregoing shall not prevent or prohibit Borrower from (i) purchasing shares of the common stock held by its employees, directors, or consultants on termination of their service with or to Borrower, for an amount not in excess of the price specified in the agreements entered into with such employees, directors, and consultants; (ii) purchasing its own shares after issuance thereof after the Effective Date in an aggregate amount equal to or less than the aggregate net proceeds from the issuance of such shares, provided that Borrower shall be in compliance with all of the covenants set forth in Article 4 hereof; (iii) repurchasing its own shares deemed to occur upon exercise of stock options or warrants if such repurchased shares represent a portion of the exercise price of such options or warrants; or (iv) repurchases of shares

deemed to occur upon the withholding of a portion of the shares granted or awarded to a current or former officer, director, employee or consultant to pay for the taxes payable by such person upon such grant or award (or upon vesting thereof).

        (f)     <u>Other Agreements</u>. Except in connection with the prepayment in full of the Obligations, Borrower shall not enter into any agreement containing any provision that would be violated or breached by the performance of its obligations under this Loan Agreement, the Initial Loan Agreement, or under any of the other Loan Documents.

<h2 style="text-align:center"><u>ARTICLE V</u><br><u>REQUIRED DOCUMENTS</u></h2>

    As a condition precedent to all duties and obligations of Lender under the Loan Documents, Borrower shall have delivered to Lender the following:

    5.1.    <u>Authorizations</u>. A certified copy of any consents and authorizations adopted by Borrower and its Board of Directors in a form reasonably acceptable to Lender, authorizing the transactions contemplated by this Loan Agreement and appointing an authorized signatory or signatories to execute all Loan Documents and any other documents connected with the Loan.

    5.2.    <u>Governing Documents</u>. A copy of the Borrower's Restated Certificate of Incorporation certified by the Secretary of State of Delaware, with any amendments thereto, and a copy of Borrower's Bylaws, with any amendments thereto, certified by the President or Secretary of Borrower

    5.3.    <u>Officers' Incumbency</u>. A certificate of incumbency for the officers of the Borrower.

    5.4.    <u>Executed Loan Documents</u>. Executed original of the Amended Promissory Note, the Amended Security Agreement, and all other Loan Documents being executed in connection with this Loan Agreement, in form and substance satisfactory to Lender.

    5.5.    <u>Executed Securities Documents</u>. Executed original of the 2024 Warrant Agreement and the Amended Registration Rights Agreement.

    5.6.    <u>Other Documents</u>. Such other documents as Lender reasonably may require.

<h2 style="text-align:center"><u>ARTICLE VI</u><br><u>EVENTS OF DEFAULT</u></h2>

In addition to any occurrences described as an Event of Default in the other Loan Documents, the matters described in Articles 6.1 through 6.8 shall constitute Events of Default and shall entitle Lender to exercise the rights and remedies under Article 7 and under the other Loan Documents.

Docusign Envelope ID: 4A07805B-B591-431F-8F91-5BBED9EEEFC0

Case 25-40211 Claim 20 Filed 04/24/25 Desc Main Document Page 18 of 85 Exhibit
27 - Proof of Claim of EdgeCo LLC    Page 19 of 86

6.1.    <u>Failure to Pay</u>.  Borrower's failure to pay any sum of money owed to Lender in connection with the Obligations, whether principal, interest, penalty, premium, fee, charge, or assessment, as provided in the Loan Documents, on or before the close of business for Lender on the tenth Business Day after the date when due, time being strictly of the essence.

6.2.    <u>Failure of Warranty or Representation to be True</u>.  The failure of any representation or warranty provided by Borrower in the Loan Documents to be materially true.

6.3.    <u>Failure to Perform Affirmative Covenants; Violation of Negative Covenants</u>. Borrower's failure to perform any of the affirmative covenants provided in Article 4.1 or Borrower's violation of any of the negative covenants set forth in Article 4.2; provided that such failure has continued for 30 Business Days after receipt of written notice thereof from Lender.

6.4.    <u>Default Under Loan Documents</u>.  Borrower's breach of any of the material terms, covenants, or conditions set forth in the Loan Documents; provided that such breach has continued for 30 Business Days after receipt of written notice thereof from Lender.  The parties expressly understand and agree that a breach or default by Borrower under any of the Loan Documents and the expiration of all applicable cure periods shall be a breach or default by Borrower under all of the Loan Documents.

6.5.    <u>Judgments</u>.  Borrower's suffering uninsured final judgments for payment of money in a material amount (considering Borrower's then current financial condition and the amount of the Principal Balance then outstanding), individually or in the aggregate, and Borrower's failure to discharge the same within a period of 60 days, unless execution has been effectively stayed, whether by appeal, the posting of a bond, or otherwise.

6.6.    <u>Borrower's Involuntary Bankruptcy</u>.  Entry of a decree or order for relief, by a court having jurisdiction, against or with respect to Borrower in an involuntary case (or the failure of any such case to be dismissed within 90 days of its commencement) under federal bankruptcy laws or any state insolvency or similar laws requiring (a) the liquidation of Borrower; (b) a reorganization of Borrower or the Business; or (c) the appointment of a receiver, liquidator, assignee, custodian, trustee, or similar official for Borrower.

6.7.    <u>Borrower's Voluntary Bankruptcy</u>.  Borrower's (a) commencement of a voluntary case under federal bankruptcy laws or any state insolvency or similar laws; (b) consent to the appointment for taking possession by a receiver, liquidator, assignee, custodian, trustee, or similar official for Borrower of any of its property; (c) making any assignment for the benefit of creditors; or (d) failing generally to pay its debts as they become due, either as to the amount of such debts or the number of such debts.

6.8.    <u>Dissolution</u>.  Borrower's commencement or becoming the subject of any dissolution proceedings; undertaking any action for the purpose of dissolving and winding up Borrower; or resolving to take or taking any action for the purpose of surrendering any right, license, franchise, or other incident of Borrower's existence.

Docusign Envelope ID: 44079BF2-8591-4315-8E60-5ABED99EEEF0

## ARTICLE VII
## REMEDIES

7.1.    Lender's Specific Rights and Remedies.  Upon the occurrence and during the continuance of any Event of Default, Lender, in addition to any and all rights provided by law or equity, may:

(a)    Accelerate and call due the unpaid Principal Balance of the Loan and Additional Loan, and all accrued interest and other sums due thereunder;

(b)    File suit against Borrower or any other party to any of the Loan Documents; and

(c)    Exercise all other rights and remedies provided by this Loan Agreement or the other Loan Documents.

7.2.    Collection Costs.  If suit or action is instituted to enforce any of the terms of this Loan Agreement or of any other Loan Documents, the prevailing party shall be entitled to recover from the other party its attorneys' fees and costs in addition to all other sums provided by law.

7.3.    Notice of Default.  Lender shall provide Borrower with (a) ten Business Days' prior written notice and an opportunity to cure any default arising from Borrower's failure to satisfy a payment obligation under the Loan Documents, and (b) 30 Business Days' prior written notice and an opportunity to cure any other act or omission constituting an Event of Default under the Loan Documents.  Notwithstanding anything to the contrary stated herein, Borrower shall not be entitled to any notice or opportunity to cure any of the Events of Default described in Articles 6.6, 6.7, and 6.8.

## ARTICLE VIII
## RIGHT OF FIRST REFUSAL

8.1.    Right of First Refusal.  During the Term, if Borrower decides that it requires additional debt financing of up to $15,000,000 for additional operating capital, then Borrower shall provide Lender with written notice (the "Offer Notice") of such debt financing requirements.  Lender shall have 30 Business Days from the date of the Offer Notice to accept or reject the Offer Notice (the "Offer Period").  If Lender fails to accept or reject the Offer Notice in writing within the Offer Period, then Lender shall be deemed to have waived its right to provide such additional debt financing to Borrower.  If Lender advises Borrower in writing that it desires to provide such additional debt financing, then Lender shall fund such debt financing within 7 Business Days following the written acceptance by Lender of the Offer Notice, and on Borrower's delivery to Lender of such negotiated loan documentation substantially similar to the Loan Documents (except for changes necessary to make such documents reflect the financial terms as set forth in the Offer Notice).

## ARTICLE IX
## SECURITIES

9.1.  <u>Subscription for Warrant</u>.  The Lender is purchasing the Warrant on the terms set forth in the 2024 Warrant Agreement.

9.2.  <u>Preemptive Rights</u>.  In the event that Borrower decides to offer for sale additional unregistered shares of Common Stock or securities exchangeable or exercisable for, or convertible into, shares of unregistered Common Stock either through a debt or equity offering before December 31, 2028, Borrower shall first provide written notice thereof to Lender, including the proposed terms and conditions of the offering, and Lender shall have a ten (10) Business Day first right of refusal to agree to purchase not less than 25% of such shares or other securities in any such offering on the same terms and conditions described in such notice.  If Lender does not exercise such right of first refusal during such ten (10) Business Day period, Lender shall not be entitled to participate in such offering and Borrower shall be free to carry out such offering with any other purchaser or purchasers on substantially the same terms and conditions.

## ARTICLE X
## GENERAL PROVISIONS

10.1.  <u>Modifications</u>.  The Loan Documents may be amended, changed, or modified only as may be agreed in writing by Borrower and Lender from time to time.

10.2.  <u>Binding Effect</u>.  The Loan Documents shall be binding on the parties and their successors and assigns.  The obligations, rights, and benefits under the Loan Documents may not be assigned by Borrower without the prior written consent of the Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion.  Lender may not assign its rights or benefits under the Loan Documents to (i) any natural person, (ii) any competitor (or any holding company of a competitor) of Borrower or any of its subsidiaries, or (iii) to any Person that, if Borrower were to make a payment to such Person, could reasonably be expected to result in Borrower violating any applicable law, regulation or order of any relevant governmental authority (including, without limitation, relevant sanctions and anti-money laundering laws, regulations and orders).

10.3.  <u>Entire Agreement</u>.  The Loan Documents embody the entire agreement of the parties relating to the Loan and Additional Loan.  There are no promises, terms, conditions, obligations, or warranties other than those contained in the Loan Documents.  The Loan Documents supersede all prior communications, representations, or agreements, verbal or written, between the parties relating to the Loan and Additional Loan.

10.4.  <u>Governing Law</u>.  The validity, meaning, enforceability, and effect of the Loan Documents and the rights and liabilities of the parties shall be determined in accordance with the laws of the State of California.  All parties acknowledge and hereby stipulate for the purpose of any future proceedings that the Loan Documents and all subsequent writings or documents relating or pertaining thereto are to be considered for all purposes, including, but not limited to, choice of law determinations, to have been executed and delivered by all parties within the actual

Docusign Envelope ID: 4407302F2B561431E8F60-52BED9EEEF6C

Case 25-40212 Doc 20-6 Filed 04/23/25 Entered 04/23/25 17:20:12 Desc Exhibit
27 - Proof of Claim of EdgeCo LLC Page 22 of 86

geographic boundaries of California, even if such loan documents were, in fact, executed and delivered elsewhere.

10.5.  <u>Incorporation by Reference</u>.  All documents, instruments, attachments, exhibits, and other writings executed with, referred to in, or attached to this Loan Agreement are incorporated by reference into this Loan Agreement and are made a part of this Loan Agreement as if fully set out herein.  This Loan Agreement, before such incorporation, controls in the event of any conflict with the terms of the Loan Documents.

10.6.  <u>Jurisdiction and Venue</u>.  Borrower consents to the venue and jurisdiction of any court, state or federal, located in the Orange County, California.  Borrower agrees that any action, proceeding, or other matter arising directly or indirectly under this Loan Agreement may be brought by Lender in its sole discretion in any such court.  Borrower agrees to that venue for any action, proceeding, or other matter properly placed in any such court located in Orange County, California.  Borrower consents and agrees that any service of process may be made on Borrower wherever Borrower can be located or by certified mail directed to Borrower at Borrower's address set forth in Article 10.7 (with a copy to Borrower's counsel at the most recent notice address).  This provision is permissive, not mandatory, and Lender reserves the right to bring any action, proceeding, or other matter arising directly or indirectly under this Loan Agreement against Borrower wherever either the Borrower or its properties might be found or might otherwise be subject to jurisdiction.

10.7.  <u>Notices</u>.  Any notice under the Loan Documents shall be in writing, without implying the obligation to provide such notice.  Any notice to be given or document to be delivered under the Loan Documents shall be deemed to have been duly received on (a) delivery, if delivered in person or by any expedited delivery service that provides proof of delivery; (b) electronically with confirmed receipt; or (c) the fifth Business Day after mailing, if mailed by certified mail, return receipt requested, postage prepaid, addressed to Lender or Borrower at the appropriate addresses.  The addresses for notices are those set forth below or such other addresses as may be hereafter specified by written notice by the parties:

| | |
|---|---|
| If to Lender: | EdgeCo, LLC |
| | Attn: Robert Binkele |
| | 3326 Aspen Grove Dr., Suite 400 |
| | Franklin, TN 37067 |
| | Email: rbinkele@myept.com |
| | |
| With Copy To: | FitzGerald Kreditor Bolduc Risbrough LLP |
| | 2 Park Plaza, Suite 850 |
| | Irvine, CA  92614 |
| | Attn: Lynne Bolduc, Esq. |
| | Email: lbolduc@fkbrlegal.com |

If to Borrower:        DZS Inc.
                        Attn: Charlie Vogt
                        5700 Tennyson Pkwy, Ste. 400
                        Plano, TX 75024
                        Email: charlie@dzsi.com

With Copy To:       Baker Botts L.L.P.
                        2001 Ross Avenue, Suite 900
                        Dallas, TX 75201
                        Attn:  Preston Bernhisel
                        Email: preston.bernhisel@bakerbotts.com

10.8.   <u>Relationship of the Parties</u>.  Neither Lender nor Borrower shall be deemed a partner, joint venturer, agent, or related entity of the other by reason of the Loan Documents.

10.9.   <u>Severability</u>.  If a court of competent jurisdiction finds any term or provision of this Loan Agreement, or the application thereof to any person or circumstance, to be invalid, void, or unenforceable to any extent, (a) such court may amend and/or interpret such term or provision so that it will be valid to the fullest extent possible under law; and (b) the remaining provisions of this Loan Agreement and any application thereof shall continue in full force and effect without being impaired or invalidated in any way.

10.10.  <u>Time</u>.  Time is of the essence under this Loan Agreement.

10.11.  <u>Usury</u>.  Borrower and Lender intend to comply with applicable usury laws. Accordingly, notwithstanding any provision in this Loan Agreement or in any other Loan Document to the contrary, neither this Loan Agreement nor any other Loan Document shall require the payment, or permit the collection, of interest in excess of the maximum amount permitted by law. If compliance with this Loan Agreement or any other Loan Document would result in a violation of applicable usury law, the amount of the payment obligation imposed by this Loan Agreement or any other Loan Document shall be reduced to the maximum amount permitted by law.

10.12.  <u>Waivers</u>.  Lender may at any time or from time to time waive all or any rights under any of the Loan Documents, but any waiver or indulgence at any time or from time to time shall not constitute, unless specifically so expressed by Lender in writing, a future waiver by Lender of performance by Borrower.

10.13.  <u>Counterparts</u>.  This Loan Agreement may be executed in multiple counterparts, all of which together shall constitute one instrument.

**[SIGNATURE PAGE IMMEDIATELY FOLLOWS]**

IN WITNESS WHEREOF, Borrower and Lender have executed this Loan Agreement as of the Effective Date.

**LENDER:**
EdgeCo, LLC,
a Wyoming limited liability company

By: Robert Binkele
Its: Manager

**BORROWER:**
DZS Inc.,
a Delaware corporation

By: Justin Ferguson
Its: Chief Legal Officer

[Signature Page to Loan Agreement]

Docusign Envelope ID: 440709E8 8561 4815 8F61 5ABED9BEEE4C

Case 25-40212 Doc 10-20   Filed 04/23/25   Entered 04/23/25 17:20:12   Desc Exhibit
27 - Proof of Claim of EdgeCo   LLC   Page 25 of 86

IN WITNESS WHEREOF, Borrower and Lender have executed this Loan Agreement as of the Effective Date.

**LENDER:**
EdgeCo, LLC,
a Wyoming limited liability company

By: Robert Binkele
Its: Manager

**BORROWER:**
DZS Inc.,
a Delaware corporation

By: Justin Ferguson
Its: Chief Legal Officer

Docusign Envelope ID: 4407B9F8-8561-431E-8E80-5ABED98FEE10

## EXHIBIT A

**AMENDED AND RESTATED PROMISSORY NOTE**

*EXECUTION VERSION*

## AMENDED AND RESTATED SECURED PROMISSORY NOTE

$30,000,000                                                                                    May 31, 2024

For value received DZS Inc., a Delaware corporation ("Payor"), promises to pay to EdgeCo, LLC, a Wyoming limited liability company, or its registered assign(s) (the "Holder"), the principal sum of US$30,000,000 (the "Principal Balance") on the terms set forth below. Interest on the outstanding principal amount shall accrue at the rate of 13% per annum. Interest shall commence on the date hereof and shall continue on the outstanding principal until paid in full. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed.

RECITALS

WHEREAS, this amended secured promissory note (this "Amended Note") is issued pursuant to the terms of that certain Loan Agreement dated December 29, 2023, and that certain Loan Agreement dated as of even date herewith (together, the "Loan Agreements"), between Payor and Holder;

WHEREAS, this Amended Note shall amend, restate and replace in its entirety the December 29, 2023, Secured Promissory Note issued pursuant to that certain Loan Agreement dated December 29, 2023, which existing Secured Promissory Note is solely owned by EdgeCo, LLC, a Wyoming limited liability company, with no other individual, corporation, business trust, estate, trust, partnership, association, joint venture, or other legal or commercial entity having any right, title or interest therein; and

WHEREAS, this Amended Note shall be secured by Payor's grant of a security interest and lien to Holder of all of Payor's assets that can be perfected by the filing of a financing statement as more fully set forth in that certain Amended Security Agreement by and between Payor and Holder (and incorporated herein by reference the "Amended Security Agreement").

1.    Definitions. The following terms shall have the meanings herein specified:

"Event of Default" means an event specified in Section 3 hereof.

"Holder" means EdgeCo, LLC, a Wyoming limited liability company, and each endorsee, pledgee, assignee, owner, and holder of this Amended Note, as such; and any consent, waiver or agreement in writing by the then Holder with respect to any matter or thing in connection with this Amended Note, whether altering any provision hereof or otherwise, shall bind all subsequent Holders. Notwithstanding the foregoing, Payor may treat the registered holder of this Amended Note as Holder for all purposes.

2.    Payment of the Amended Note – Principal and Interest

a.    Term. All Principal Balance and all unpaid accrued interest above shall be due and payable on the 36th month anniversary of the date of this Amended Note (the "Maturity Date"). The Maturity Date may be extended by Holder, at the option of Holder and in its sole

Docusign Envelope ID: 44072DF2-B561-431F-9F80-54BED9EFEEFC

discretion, effective upon notice of such extension by Holder to Payor not less than 15 calendar days prior to the original Maturity Date. At any time after the Maturity Date (as it may be extended pursuant to this Section 2(a)), Holder may proceed to collect such outstanding Principal Balance and accrued interest. All payments shall be in lawful money of the United States of America and shall be made to Holder. All payments shall be applied first to accrued interest, and thereafter to the Principal Balance.

    b. <u>Interest Rate</u>. The Principal Balance of all monies advanced by Holder under this Amended Note shall bear interest at a rate equal to 13% per annum compounded annually on the basis of a 365-day year (the "Interest Rate").

    c. <u>Calculation of Interest</u>. Interest shall accrue on the Loan on the basis of a 365-day year. Payor agrees that any calculation of amounts accruing hereunder at the Interest Rate shall in each instance be made by Holder and shall, if determined in good faith, be conclusive and binding on Borrower in the absence of manifest error.

    d. <u>Payment</u>. Prior to the Maturity Date, payments shall be interest only payments, payable monthly in arrears starting on May 31, 2024, at the calculated Interest Rate, and the Principal Balance shall be due and payable on the Maturity Date.

    e. <u>Payment on Event of Default.</u> If any Event of Default occurs hereunder, then, at the option and upon the declaration of Holder of this Amended Note and upon written notice to Payor (which election and notice shall not be required in the case of an Event of Default under Section 3(c) or 3(d)) and Payor's subsequent failure to cure any such Event of Default under Section 3(d) within 30 days following receipt of such written notice, this Note shall accelerate and all unpaid principal and accrued interest shall become due and payable, and, at any time thereafter, Holder may proceed to collect such outstanding principal and accrued interest.

    f. <u>Default Interest</u>. In the event Payor fails to pay the entire unpaid principal balance when due, Payor shall pay a default penalty (the "Default Penalty") in an amount equal to 4% of the then outstanding principal and accrued and outstanding interest under this Amended Note and the entire unpaid principal balance, accrued and outstanding interest, and the Default Penalty (if not paid) shall thereafter bear interest at a default interest rate equal to the higher of 20% per annum or the highest rate permitted by law, until such defaulted payment has been paid to Lender.

    g. <u>Prepayment</u>. Payor shall have the right to prepay all or any portion of the Principal Balance outstanding at any time; <u>provided</u>, <u>however</u>, if such prepayment is prior to the 18 month anniversary of the effective date of this Amended Note, Payor shall pay Holder a prepayment premium equal to 18 months' calculated interest with any such prepayment, *minus* the amount of interest actually paid prior to such prepayment, in each case in respect of the principal amount prepaid.

    h. <u>Attorney's Fees</u>. If an Event of Default shall occur hereunder, Payor shall pay all reasonable attorneys' fees and court costs incurred by Holder in enforcing and collecting this Amended Note.

Docusign Envelope ID: 4A7332F2-8591-431F-9F60-5ABED98EEF1C

    i.    <u>Late Fee</u>. If any regular monthly installment of interest payable under this Amended Note is more than ten calendar days late, Payor agrees to pay Holder a late charge equal to 5% of any such late payment of interest (the "Late Fee"). The provisions of this Amended Note establishing a Late Fee shall not be deemed to extend the time for any payment due or to constitute a "grace period" giving Payor a right to cure such default.

    3.    <u>Events of Default</u>. The occurrence of any one or more of the following, if uncured within 30 days from written notice thereof with respect to subsections (a) and (b) only and only in the first instance of such failure or breach and any instance thereafter, upon the occurrence, shall constitute an "Event of Default":

    a.    Payor fails to pay timely any of the principal amount due under this Amended Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Amended Note on the date the same becomes due and payable;

    b.    Payor breaches any of its representations, warranties, covenants, or agreements set forth in the Loan Agreements, the Amended Security Agreement, this Amended Note, or any other Loan Document;

    c.    Payor files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; or

    d.    An involuntary petition is filed against Payor under any bankruptcy statute now or hereafter in effect, unless such petition is dismissed or discharged within 60 days thereafter, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody, or control of any property of Payor.

    4.    <u>Transfer</u>. Holder may transfer or assign this Amended Note without Payor's prior consent; provided, however, Holder, or its duly authorized representative, shall provide Payor a copy of an assignment duly executed by Holder.

    5.    <u>Loss or Mutilation of Amended Note</u>. Upon receipt by Payor of evidence reasonably satisfactory to Payor of the loss, theft, destruction, or mutilation of this Amended Note, together with an indemnity reasonably satisfactory to Payor, in the case of loss, theft, or destruction, or the surrender and cancellation of this Amended Note, in the case of mutilation, Payor shall execute and deliver to Holder a new Amended Note of like tenor and denomination as this Amended Note.

    6.    <u>Amendment and Restatement of Existing Secured Promissory Note; Waiver or Amendment of this Amended Note</u>. This Amended Note amends, restates and replaces in its entirety the December 29, 2023, Secured Promissory Note issued pursuant to that certain Loan Agreement dated December 29, 2023, which existing Secured Promissory Note is solely owned by EdgeCo, LLC, a Wyoming limited liability company, with no other individual, corporation, business trust, estate, trust, partnership, association, joint venture, or other legal or commercial entity having any right, title or interest therein. Any term of this Amended Note may be amended or waived with the written consent of Payor and Holder. The failure of Holder to

enforce at any time any of the provisions of this Amended Note shall not, absent an express written waiver signed by Holder specifying the provision being waived, be construed to be a waiver of any such provision, nor in any way to affect the validity of this Amended Note or any part hereof or the right of Holder thereafter to enforce each and every such provision.  No waiver of any breach of this Amended Note shall be held to be a waiver of any other or subsequent breach.

7.      Compliance with Usury Laws.  It is the intention of the parties to conform strictly to the applicable usury laws, whether pursuant to state, federal or other applicable law, that are applicable to this Amended Note.  All agreements between Payor and Holder, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no event, shall the amount paid or agreed to be paid to Holder under this Amended Note, exceed the maximum amount permissible under applicable usury laws.  If, under any circumstances, fulfillment of any provision hereof at the time performance of such provision shall be due, shall involve exceeding the limit of validity prescribed by law, then the obligation to be fulfilled shall be reduced to the limit of such validity; and if under any circumstances Holder shall ever receive an amount deemed interest by applicable law, which would exceed the highest lawful rate, such amount that would be excessive interest under applicable usury laws shall be applied to the reduction of the principal amount owing hereunder and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal and such other indebtedness, the excess shall be deemed to have been a payment made by mistake and shall be refunded to the Payor.  The terms and provisions of this Section 7 shall control and supersede every other provision of this Amended Note, as applicable.

8.      Notices.  Any notice under this Amended Note shall be in writing, without implying the obligation to provide such notice.  Any notice to be given or document to be delivered under this Amended Note shall be deemed to have been duly received on (a) delivery, if delivered in person or by any expedited delivery service that provides proof of delivery; (b) electronically with confirmed receipt; or (c) the fifth Business Day after mailing, if mailed by certified mail, return receipt requested, postage prepaid, addressed to Lender or Borrower at the appropriate addresses.  The addresses for notices are those set forth below or such other addresses as may be hereafter specified by written notice by the parties:

| | |
|---|---|
| If to Holder: | EdgeCo, LLC<br>Attn: Robert Binkele<br>3326 Aspen Grove Dr., Suite 400<br>Franklin, TN 37067<br>Email: rbinkele@myept.com |
| With Copy To: | FitzGerald Kreditor Bolduc Risbrough LLP<br>2 Park Plaza, Suite 850<br>Irvine, CA  92614<br>Attn: Lynne Bolduc, Esq.<br>Email: lbolduc@fkbrlegal.com |

Docusign Envelope ID: 440720F2 8561 4315 8F60 52BED95EEFC9

| | |
|---|---|
| If to Payor: | DZS Inc. |
| | Attn: Charlie Vogt |
| | 5700 Tennyson Pkwy, Ste. 400 |
| | Plano, TX 75024 |
| | Email: charlie@dzsi.com |
| | |
| With Copy To: | Baker Botts L.L.P. |
| | 2001 Ross Avenue, Suite 900 |
| | Dallas, TX 75201 |
| | Attn: Preston Bernhisel |
| | Email: preston.bernhisel@bakerbotts.com |

9.     <u>Headings</u>.  The titles and headings to the Sections herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Amended Note.  This Amended Note shall be construed without regard to any presumption or other rule requiring construction hereof against the party causing this Amended Note to be drafted.

10.     <u>Governing Law</u>.  The validity, meaning, enforceability, and effect of this Amended Note and the rights and liabilities of the parties shall be determined in accordance with the laws of the State of California.   All parties acknowledge and hereby stipulate for the purpose of any future proceedings that this Amended Note and all subsequent writings or documents relating or pertaining thereto are to be considered for all purposes, including, but not limited to, choice of law determinations, to have been executed and delivered by all parties within the actual geographic boundaries of California, even if such loan documents were, in fact, executed and delivered elsewhere.

11.     <u>Counterparts</u>.  This Amended Note may be executed in multiple counterparts, all of which together shall constitute one instrument.

**[SIGNATURE PAGE IMMEDIATELY FOLLOWS]**

Docusign Envelope ID: 440789F8-8561-4315-8E60-57BED99EEE4C

Case 25-40712 Doc 140-20 Filed 04/23/25 Entered 04/23/25 17:20:12 Page 31 of 85 Exhibit
27 - Proof of Claim of EdgeCo LLC Page 32 of 86

IN WITNESS WHEREOF, the Payor has executed this Amended Note as of the date first written above.

**PAYOR:**
DZS Inc.,
a Delaware corporation

By: Justin Ferguson
Its: Chief Legal Officer


**ACKNOWLEDGED BY HOLDER:**
EdgeCo, LLC,
a Wyoming limited liability company


_____

By: Robert Binkele
Its: Manager

[Signature Page to Amended and Restated Secured Promissory Note]

IN WITNESS WHEREOF, the Payor has executed this Amended Note as of the date first written above.

**PAYOR:**
DZS Inc.,
a Delaware corporation

_____

By: Justin Ferguson
Its: Chief Legal Officer

**ACKNOWLEDGED BY HOLDER:**
EdgeCo, LLC,
a Wyoming limited liability company

_____

By: Robert Binkele
Its: Manager

[Signature Page to Amended and Restated Secured Promissory Note]

Docusign Envelope ID: 44072F2 8561 4315 8F24 5ABED98EFE1C

Case 25-10212 Doc 110-7 Filed 04/23/25 Entered 04/23/25 17:20:12 Desc Exhibit
27 - Proof of Claim of EdgeCo LLC Page 34 of 86

## <u>EXHIBIT B</u>

## AMENDED AND RESTATED SECURITY AGREEMENT

## AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT (this "Amended Security Agreement") is made as of May 31, 2024, by and between DZS Inc., a Delaware corporation (the "Company") and EdgeCo, LLC, a Wyoming limited liability company (the "Secured Party") (collectively, the "Parties").

## RECITALS

WHEREAS, this Amended Security Agreement is issued pursuant to the terms of that certain Loan Agreement dated as of December 29, 2023, and that certain Loan Agreement dated as of even date herewith (together, the "Loan Agreements"), between the Parties; and

WHEREAS, this Amended Security Agreement shall amend, restate and replace in its entirety the Security Agreement dated as of December 29, 2023, between the Parties.

The Parties hereto agree as follows:

1.      Security Interest.  In consideration of those certain loans (together, the "Loans") issued pursuant to the terms of the Loan Agreements, and the financial accommodation made or extended by the Secured Party to or for the account of the Company, directly or indirectly, as principal, guarantor or otherwise, specifically the obligation evidenced by that certain Amended Secured Promissory Note (the "Amended Note") between the Parties executed on even date herewith, the terms of which are incorporated herein by reference, the Company hereby grants to Secured Party a first priority and continuing security interest in the Collateral described in Paragraph 2, to secure the prompt payment, performance and observance of any and all indebtedness, liabilities, obligations and agreements of any kind of the Company to Secured Party arising under the Amended Note or the other loan documents referenced in conjunction with the Loans (the "Loan Documents"), however evidenced, whether as principal, surety, endorser, guarantor or otherwise, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, original, renewed or extended, whether arising under any guarantee, endorsement or undertaking which the Company may make or issue to others for the Secured Party's account, whether arising directly or acquired from others, and of all agreements, documents and instruments evidencing any of the foregoing or under which any of the foregoing may have been issued, created, assumed or guaranteed, including without limitation, charges, commissions, interests, expenses, fees, costs and reasonable attorney's fees chargeable to Secured Party in connection with any or all of the foregoing to the extent payable under the Loan Documents (all of the foregoing being herein referred to, jointly and severally, as the "Obligations").

2.      The Collateral.  The Collateral is described as follows and on any separate schedule(s) at any time or from time to time furnished by the Company to the Secured Party (all of which are hereby deemed part of this Amended Security Agreement):

Any and all assets of the Company and Company's North American, European, Australian, and New Zealand subsidiaries wherever located, whether now owned or hereafter acquired, including, but not limited to: (i) any and all assets of NetComm Wireless Pty. Ltd. (Administrators Appointed) as acquired by Company; (ii) all technology assets purchased from Adaptive Spectrum and Signal Alignment, Incorporated and owned by the Company, or any Company subsidiary, in whatever form; (iii) any and all cloud technology either owned, developed, licensed, or otherwise; (iv) all equipment, machinery, computer kiosks, vehicles, furniture, tools, dies, jigs, and fixtures, and all attachments, accessions and equipment now or hereafter affixed thereto or used in connection therewith, and all substitutions and replacements thereof (the "Equipment"); (v) all raw materials, work in process, finished goods, and all other inventory (as defined in the Uniform Commercial Code) of whatsoever kind or nature, and all wrapping, packaging, advertising and shipping materials, and any documents relating thereto, and all labels and other devices, names or marks affixed or to be affixed thereto for purposes of selling or of identifying the same or the seller or manufacturer thereof and all of the Company's right, title and interest therein and thereto, wherever located, whether now owned or hereafter acquired (the "Inventory"); (vi) all present and future accounts, contract rights, chattel paper, documents, instruments, trademarks, trade names, service names and general intangibles, whether now owned or hereafter acquired, the Company's interest in the goods represented thereby or described in copies of invoices delivered to the Company; all returned, reclaimed or repossessed goods with respect thereto; all rights and remedies of Debtor under or in connection with such collateral (the "Accounts"); (vii) all books, records and other property and general intangibles at any time relating to the Equipment, Inventory, and Accounts ("Records"); (viii) all source code and development flow charts; all existing content and HTML files; all graphics and logos; all agreements with content providers whether verbal or written; all scripts (Perl, Java, VB, etc.); all Information System Architecture, including all versions of all software being used; all domain names and URLs; any third party software licensed to the Company; any proprietary software and its source code; all branding and trademarks; any dedicated servers; and all contracts with advertisers and product distributors (the "Intellectual Property"); and (ix) all products and proceeds of the foregoing, in any form, including without limitation, any claims against third parties for loss or damage to or destruction of any or all of the Equipment, Inventory and Accounts (the "Proceeds"), in each case to the extent that (a) a security interest in the Collateral can be created under the Uniform Commercial Code as in effect in the State of California and (b) such security interest can be perfected by the filing of a UCC-1 financing statement under the Uniform Commercial Code as in effect in the Company's jurisdiction of organization.

3.     <u>Representations and Warranties</u>.  The Company warrants, represents and covenants that:

(a)  The chief executive office and jurisdiction of organization of the Company have been during the four-month period prior to the date hereof, located at the address set forth in the Loan Agreements and the Company will not change any of the same, or merge or consolidate with any person or change its name, without prior written notice to the Secured Party;

(b)  The Collateral is and will be used in the Company's business and not for personal, family, household, or farming use;

(c)  The Collateral is now, and at all times will be, owned by the Company free and clear of all liens, security interests, claims and encumbrances, except as permitted by the Loan Agreements;

(d)  Except as otherwise permitted by the Loan Agreements, the Company will not assign, sell, lease, transfer, or otherwise dispose of or abandon, nor will the Company suffer or permit any of the same to occur with respect to, any Collateral, without prior written notice to and consent of the Secured Party, except for the sale or lease from time to time in the ordinary course of business of such items of the Collateral as may constitute Inventory or Equipment, and the inclusion of "proceeds" of the Collateral under the security interest granted herein shall not be deemed a consent by the Secured Party to any sale or other disposition of any Collateral except as expressly permitted herein;

(e)  The Company has made, and will continue to make payment or deposit, or otherwise has provided and will provide for the payment, when due, of all taxes, assessments or contributions or other public or private charges which have been or may be levied or assessed against the Company, whether with respect to any Collateral, to any wages or salaries paid by the Company, or otherwise, and will deliver to the Secured Party, on demand, certificates or other evidence satisfactory to the Secured Party attesting thereto;

(f)  The Company will use the Collateral for lawful purposes only, with all reasonable care and caution and in conformity with all applicable laws, ordinances, and regulations;

(g)  The Company will keep the Collateral in first-class order, repair, running and marketable condition, at the Company's sole cost and expense;

(h)  The Secured Party shall at all times have the right of inspection of the Collateral and any records pertaining thereto (and the right to make extracts from and to receive from the Company originals or true copies of such records and any papers and instruments relating to any Collateral upon request therefore) and the Company hereby grants to the Secured Party a security interest in all such records, papers and instruments relating to any Collateral upon request therefore and the Company hereby grants to the Secured Party a security interest in all such records, papers instruments to secure the payment, performance and observance of the Obligations;

(i)  [Reserved;]

(j)  [Reserved;]

(k)  [Reserved;]

(l)  The Company will, at its sole cost and expense, perform all acts and execute all documents requested by the Secured Party from time to time to evidence, perfect, maintain or enforce Secured party's primary security interest granted herein or otherwise in furtherance of the provisions of this Amended Security Agreement;

Docusign Envelope ID: 4407391F2A8561A315A8F50A57BED88FEEFC

(m)  At any time and from time to time, the Company shall, at its sole cost and expense, execute and deliver to the Secured Party such financing statements pursuant to the Uniform Commercial Code ("UCC"), and the Company hereby authorizes the Secured Party file at any time and from time to time one or more financing statements with respect to the Collateral;

(n)  In their discretion, the Secured Party may, at any time and from time to time, upon the occurrence of a Default (as hereinafter defined) has occurred, in its name or the Company's or otherwise, notify any account debtor of the Company or obligor of any account, contract, document, instrument, chattel paper or general intangible included in the Collateral to make payment to the Secured Party;

(o)  In their discretion, the Secured Party may, at any time and from time to time, upon the occurrence of a Default, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable by the Secured Party with respect to, any Collateral, and/or extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, or release, any Collateral or Obligations, all without notice to or consent by the Company and without otherwise discharging or affecting the Obligations, the Collateral or the security interest granted herein;

(p)  In their discretion, the Secured Party may, at any time and from time to time, for the account of the Company, pay any amount or do any act required of the Company hereunder and which the Company fails to do or pay, and any such payment shall be deemed an advance by Secured party to the Company payable on demand together with interest at the highest rate then payable on any of the Obligations;

(q)  The Company will pay the Secured Party for any sums, costs, and expenses which the Secured Party may pay or incur pursuant to the provisions of this Amended Security Agreement or in negotiating, executing, perfecting, defending, protecting or enforcing this Amended Security Agreement or the security interest granted herein or in enforcing payment of the Obligations or otherwise in connection with the provisions hereof, including but not limited to court cost, collection charges, travel expense, and reasonable attorneys' fees, all of which, together with interest at the highest rate then payable on any of the Obligations, shall be part of the Obligations and be payable on demand;

(r)  After the occurrence of a Default, any proceeds of the Collateral received by the Company shall not be commingled with other property of the Company, but shall be segregated, held by the Company in trust for the Secured Party, and upon Secured Party's written request, immediately delivered to the Secured Party in the form received, duly endorsed in blank where appropriate to effectuate the provisions hereof, the same to be held by the Secured Party as additional Collateral hereunder or, at the Secured Party's option, to be applied to payment of the Obligations, whether or not due and in any order; and

(s)  In their sole discretion, the Secured Party may, at any time and from time to time, assign, transfer or deliver to any transferee of any Obligations, an assignment of their security interest in the Collateral, whereupon the Secured Party shall be fully discharged from all responsibility and the transferee shall be vested with all powers and rights of the Secured Party hereunder with respect thereto, but the Secured Party shall retain all rights and powers with respect to any security interest not assigned, transferred or delivered.

4.     Events of Default.  Any Event of Default (as defined in the Loan Agreements) shall constitute an event of default ("Default") under this Amended Security Agreement.

5.     Remedies Upon Default.  Upon a determination by the Secured Party that a Default shall have occurred and at any time thereafter, a holder may, without notice to or demand upon the Company, declare any Obligations immediately due and payable and the Secured Party shall have the following rights and remedies (to the extent permitted by applicable law) in addition to all rights and remedies of a secured party under the UCC or of the Secured Party under the Obligations, all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively or concurrently: (a) the Secured Party may at any time and from time to time, with or without judicial process or the aid and assistance of others, enter upon any premises in which any Collateral may be located and, without resistance or interference by the Company, take possession of the Collateral; and/or dispose of any Collateral on any such premises; and/or (b) require the Company to assemble and make available to the Secured Party at the expense of the Company any Collateral at any place and time designated by the Secured Party which is reasonably convenient to both parties; and/or remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof; and/or sell, resell, lease, assign and deliver or otherwise dispose of any Collateral in its then condition or following any commercially reasonable preparation or processing, at public or private sale or proceedings or otherwise, by one or more contracts, in one or more parcels, at the same or different times, with or without having the Collateral at the place of sale or other disposition, for cash and/or credit, and upon any terms, at such place(s) and time(s) and to such person(s) as the Secured Party deem best, all without demand, notice or advertisement whatsoever except that where an applicable statute requires reasonable notice of sale or other disposition the Company hereby agrees that the sending of ten days' notice by ordinary mail, postage prepaid, to any address of the Company set forth in this Amended Security Agreement shall be deemed reasonable notice thereof. If any Collateral is sold by the Secured Party upon credit or for delivery, the Secured Party shall not be liable for the failure of the purchaser to pay for same and in such event the Secured Party may resell such Collateral. The Secured Party may buy any Collateral at any public sale and, if any Collateral is of a type customarily sold in a recognized market or is of the type which is the subject of widely distributed standard price quotations, the Secured Party may buy such Collateral at private sale and in each case may make payment therefore by any means. The Secured Party may apply the cash proceeds actually received from any sale or other disposition to the reasonable expenses of retaking, holding, preparing for sale, selling, leasing and the like, to reasonable attorneys' fees and all legal, travel and other expenses which may be incurred by the Secured Party in attempting to collect the Obligations or enforce this Amended Security Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Amended Security Agreement; and then to the Obligations in such order and as to principal or interest as the Secured Party may desire; and the Company shall remain

5

liable and will pay the Secured Party on demand any deficiency remaining, together with interest thereon at the highest rate then payable on the Obligations and the balance of any expenses unpaid, with any surplus to be paid to the Company, subject to any duty of the Secured Party imposed by law to the holder of any subordinate security interest in the Collateral known to the Secured Party. The Secured Party may appropriate, set off and apply to the payment of the Obligations, any Collateral in or coming into the possession of the Secured Party or its agents, without notice to the Company and in such manner as the Secured Party may in its discretion determine.

6.      Power of Attorney.  To effectuate the terms and provisions hereof, the Company hereby designates and appoints the Secured Party and each of their designees or agents as attorney-in-fact of the Company, irrevocably and with power of substitution, with authority, after and during the continuance of an Event of Default, to: receive, open and dispose of all mail addressed to the Company and notify the Post Office authorities to change the address for delivery of mail addressed to the Company to such address as the Secured Party may designate; endorse the name of the Company on any notes, acceptances, checks; drafts, money orders, instruments or other evidences of Collateral that may come into the Secured Party's possession; sign the name of the Company on any invoices, documents, drafts against and notices to account debtors or Obligors of the Company, assignments and requests for verification of accounts; execute proofs of claim and loss; execute endorsements, assignments or other instruments of conveyance or transfer; adjust and compromise any claims under insurance policies or otherwise; execute releases; and do all other acts and things necessary or advisable in the sole discretion of the Secured Party to carry out and enforce this Amended Security Agreement or the Obligations. All acts done under the foregoing authorization are hereby ratified and approved and neither the Secured Party nor any designee or agent thereof shall be liable for any acts of commission or omission, for any error of judgment or for any mistake of fact or law.  This power of attorney being coupled with an interest is irrevocable while any Obligations shall remain unpaid.

7.      Miscellaneous.  The Secured Party shall have the duty to exercise reasonable care in the custody and preservation of any Collateral in their possession, which duty shall be fully satisfied if the Secured Party maintains safe custody of such Collateral.  The Secured Party shall not be deemed to assume any other responsibility for, or obligation or duty with respect to, any Collateral, or its use, of any nature or kind, or any matter or proceedings arising out of or relating thereto, including, without limitation, any obligation or duty to take any action to collect, preserve or protect their or the Company's rights in the Collateral or against any prior parties thereto, but the same shall be at the Company's sole risk and responsibility at all times.  The Secured Party's prior recourse to any Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of the Obligations.  No act, omission or delay by the Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise.  No single or partial waiver by the Secured Party of any Default or right or remedy which it may have shall operate as a waiver of any other Default, right or remedy or of the same Default, right or remedy on a future occasion.  The Company hereby waives presentment, notice of dishonor and protest of all instruments included in or evidencing any Obligations or Collateral, and all other notices and demands whatsoever (except as expressly provided herein.) In the event of any litigation with respect to any matter connected with this Amended Security Agreement, the Obligations or the Collateral, the Company hereby waives the right to a trial by jury.  The

Docusign Envelope ID: 440799F2-8591-4315-8F60-5FBED9EEEFC9

Case 25-40712 Doc 20 Filed 04/23/25 Entered 04/23/25 17:20:12 Page 40 of 85
27 - Proof of Claim of EdgeCo LLC Page 41 of 86

Company hereby irrevocably consents to the jurisdiction of the Courts of the State of California, County of Orange, and of any Federal Court located in such State and County in connection with any action or proceeding arising out of or relating to the Obligations, this Amended Security Agreement or the Collateral, or any document or instrument delivered with respect to any of the Obligations, this Amended Security Agreement or the Collateral, or any document or instrument delivered with respect to any of the Obligations. The Company hereby waives personal service of any process in connection with any such action or proceeding and agrees that the service thereof may be made by certified or registered mail directed to the Company at any address of the Company set forth in this Amended Security Agreement. The Company so served shall appear or answer to such process within thirty days after the mailing thereof. Should the Company so served fail to appear or answer within said thirty-day period, the Company shall be deemed in default and judgment may be entered by the Secured Party against the Company for the amount or such other relief as may be demanded in any process so served. In the alternative, in its discretion the Secured Party may effect service upon the Company in any other form or manner permitted by law. All terms herein shall have the meanings as defined in the UCC, unless the context otherwise requires. No provision hereof shall be modified, altered, or limited except by a written instrument expressly referring to this Amended Security Agreement and to such provision, and executed by the party to be charged. The execution and delivery of this Amended Security Agreement has been authorized by the Board of Directors of the Company. This Amended Security Agreement and all Obligations shall be binding upon the heirs, executors, administrators, successors, or assigns of the Company and shall, together with the rights and remedies of the Secured Party hereunder, inure to the benefit of the Secured Party, its successors, endorses and assigns. This Amended Security Agreement and the Obligations shall be governed in all respects by the laws of the State of California applicable to contracts executed and to be performed in such State. If any term of this Amended Security Agreement shall be held to be invalid, illegal, or unenforceable, the validity of all other terms hereof shall in no way be affected thereby.

8. <u>Releases</u>. Upon payment in full of the Obligations, (i) this Agreement shall automatically terminate and the lien and security interest granted hereby shall automatically terminate and (ii) Secured Party, at the written request and expense of the Company, shall promptly release, reassign and transfer the Collateral to the Company pursuant to a customary payoff letter. Upon the sale of any Collateral in a transaction permitted by this Agreement, (i) such property shall automatically cease to constitute Collateral and the lien and security interest in such property shall automatically terminate and (ii) Secured Party, at the written request and expense of the Company, shall promptly execute and deliver to the Company such releases as requested by the Company.

9. <u>Amendment and Restatement</u>. This Amended Security Agreement amends, restates and replaces in its entirety the Security Agreement, dated as of December 29, 2023, between the Company and the Secured Party.

**[SIGNATURE PAGE IMMEDIATELY FOLLOWS]**

Docusign Envelope ID: 4407925E8-B591-4315-8E63-5ABED88EEE1C

Case 25-40712 Doc 20 Filed 04/24/25 Entered 04/24/25 17:20:12 Page 41 of 85

Case 25-40712 Doc 20 Filed 04/24/25 Entered 04/24/25 17:20:12 Desc Exhibit
27 - Proof of Claim of EdgeCo LLC Page 42 of 86

IN WITNESS WHEREOF, the undersigned have executed or caused this Amended Security Agreement to be executed as of the date first above set forth.

**COMPANY:**

DZS Inc.,
a Delaware corporation

By: Justin Ferguson
Its: Chief Legal Officer

**SECURED PARTY:**

EdgeCo, LLC,
a Wyoming limited liability company

By: Robert Binkele
Its: Manager

[Signature Page to Amended and Restated Security Agreement]

IN WITNESS WHEREOF, the undersigned have executed or caused this Amended Security Agreement to be executed as of the date first above set forth.

**COMPANY:**
DZS Inc.,
a Delaware corporation

_____

By: Justin Ferguson
Its: Chief Legal Officer

**SECURED PARTY:**
EdgeCo, LLC,
a Wyoming limited liability company

_____

By: Robert Binkele
Its: Manager

[Signature Page to Amended and Restated Security Agreement]

Docusign Envelope ID: 440799F8-8561-431E-8EA4-5ABED99EFEFC

Case 25-40212 Doc 20-26 Filed 04/23/25 Entered 04/23/25 17:20:12 Desc Exhibit
27 - Proof of Claim of EdgeCo LLC Page 44 of 86

## **<u>EXHIBIT C</u>**

## **2024 WARRANT AGREEMENT**

*EXECUTION VERSION*

**THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO (i) AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND ANY APPLICABLE STATE LAWS, (ii) TO THE EXTENT APPLICABLE, RULE 144 UNDER THE ACT (OR ANY SIMILAR RULE UNDER THE ACT RELATING TO THE DISPOSITION OF SECURITIES), OR (iii) AN OPINION OF COUNSEL, IF SUCH OPINION SHALL BE REASONABLY SATISFACTORY TO COUNSEL TO THE ISSUER, THAT AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE LAW IS AVAILABLE.**

This Warrant Agreement (this "Warrant") has been issued pursuant to that certain Loan Agreement dated May 31, 2024, (the "Loan Agreement") between the Company and the holder of the Warrant hereunder. Capitalized terms not otherwise defined herein shall have the meaning set forth in the Loan Agreement, the provisions of which are incorporated herein by reference.

**DZS INC.**
**a Delaware Corporation**

**WARRANT AGREEMENT**
**To Purchase Shares of Common Stock**

Issue Date: May 31, 2024

THIS CERTIFIES that, for value received, EDGECO, LLC, a Wyoming limited liability company, or its permitted assigns (the "Holder"), is entitled, upon the terms and subject to the conditions hereinafter set forth, at any time on or after the date hereof, to subscribe for and purchase from, DZS INC., a Delaware corporation (the "Company"), 6,100,000 of the fully paid, non-assessable shares of the Company's common stock, $0.001 par value ("Common Stock"), at the Exercise Price (as defined below), provided that such right will terminate, if not terminated earlier in accordance with the provisions hereof, at 5:00 p.m. (Pacific time) on the five (5) year anniversary of the Issue Date (the "Expiration Date"). The purchase price and the number of shares for which this Warrant is exercisable are subject to adjustment, as provided herein.

As used herein the following terms, unless the context otherwise requires, have the following respective meanings:

(a)     The term "Company" shall include DZS Inc. and any entity which shall succeed or assume the obligations of DZS Inc. hereunder.

(b)     The term "Warrant Shares" includes (i) the Company's common stock and (ii) any other securities into which or for which any of the Common Stock may be converted or exchanged pursuant to a plan of recapitalization, reorganization, merger, sale of assets or otherwise.

1

(c)     The term "Other Securities" refers to any stock (other than Common Stock) and other securities of the Company or any other Person which the Holder at any time shall be entitled to receive, or shall have received, on the exercise of the Warrant, in lieu of or in addition to Common Stock, or which at any time shall be issuable or shall have been issued in exchange for or in replacement of Common Stock or Other Securities.

(d)     The term "Exercise Price" shall be an exercise price equal to $0.9095, which represents 85% of the closing price for the Company's Common Stock as reflected on Nasdaq.com as of April 18, 2024.

(e)     The term "Issue Date" shall mean the date of this Warrant.

1.  Number of Shares Issuable upon Exercise.

Unless sooner terminated in accordance herewith, from and after the date hereof through and including the Expiration Date, the Holder shall be entitled to receive, upon exercise of this Warrant in whole or in part, the number of Warrant Shares set forth on the first page of this Warrant, subject to adjustment pursuant hereto, by delivery of an original or fax copy of the exercise notice attached hereto as Annex A (the "Notice of Exercise") along with payment to the Company of the Exercise Price, as set forth in Section 2 hereof.

2.  Exercise of Warrant.

(a)     The purchase rights represented by this Warrant are exercisable by the registered Holder hereof, in whole at any time or in part from time to time by delivery of the Notice of Exercise duly completed and delivered to the office of the Company, and upon payment of the Exercise Price of the shares thereby purchased (in the manner provided in Section 2(d) hereof); whereupon the Holder of this Warrant shall be entitled to receive, at its election, either (i) a certificate for the number of Warrant Shares so purchased or (ii) the issuance of such uncertificated shares in the amount of the applicable Warrant Shares through a book entry transfer; provided that the Company will place on each certificate, or apply to such book entry, a legend substantially the same as that appearing on this Warrant, in addition to any legend required by any applicable state or federal law. If this Warrant is exercised in part, the Company will issue to the Holder hereof a new Warrant upon the same terms as this Warrant but for the balance of Warrant Shares for which this Warrant remains exercisable.  The Company agrees that upon exercise of this Warrant the Holder shall be deemed to be the record owner of the Warrant Shares issued upon exercise as of the close of business on the date on which this Warrant shall have been exercised as aforesaid. This Warrant will be surrendered at the time of exercise or if lost, stolen, misplaced, or destroyed, the Holder will comply with Section 9 below.

(b)     If applicable, certificates for Warrant Shares purchased hereunder shall be delivered to the Holder hereof within a reasonable time after the date on which this Warrant shall have been exercised as aforesaid.

(c)     The Company covenants that all Warrant Shares which may be issued upon the exercise of rights represented by this Warrant will, upon exercise of the rights represented by this Warrant, be fully paid and nonassessable and free from all preemptive rights, taxes, liens, and

Docusign Envelope ID: 44070FF8-B561-431F-9F50-53BED95FEE4C

charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue which shall be paid by the Company in accordance with Section 4 below); provided that such Warrant Shares shall be subject to restrictions on transfer as set forth in the legend described herein.

(d)     In order to exercise this Warrant with respect to all or any part of the Warrant Shares for which this Warrant is at the time exercisable, Holder must take the following actions:

(i)     Execute and deliver to the Company a written notice of exercise stating the number of Warrant Shares being purchased (in whole shares only) and such other information set forth on the form of Notice of Exercise attached hereto as Annex A; and

(ii)     Pay the applicable aggregate Exercise Price for the Warrant Shares by cash, wire transfer, or a certified or cashier's check made payable to the order of the Company.

3.     No Fractional Shares.

The Company shall not be required to issue fractional Warrant Shares upon the exercise of this Warrant or to deliver Warrant Certificates which evidence fractional Warrant Shares. In the event that a fraction of a Warrant Share would, except for the provisions of this Section 3, be issuable upon the exercise of this Warrant, the Company shall round the fraction down to the next whole number of the Warrant Share.

4.     Charges, Taxes, and Expenses.

Issuance of certificates for Warrant Shares upon the exercise of this Warrant shall be made without charge to the Holder hereof for any issue or transfer tax or other incidental expense in respect of the issuance of such certificate, all of which taxes and expenses shall be paid by the Company, and such certificates shall be issued in the name of the Holder of this Warrant, or in such name or names as may be directed by the Holder of this Warrant; provided, however, that in the event certificates for Warrant Shares are to be issued in a name other than the name of the Holder of this Warrant, (i) the Company may require, as a condition thereto, that the transferee execute an appropriate investment representation as may be reasonably required by the Company and (ii) the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate, or a book entry, in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate, or make such book entry, unless and until the Person or Persons requesting the issue or entry thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid or is not payable.

5.     No Rights as Shareholders.

This Warrant does not entitle the Holder hereof to any voting rights or other rights as a shareholder of the Company prior to the exercise hereof.

6. <u>Securities Law Representations</u>.

Holder represents and warrants to Company as follows:

(a)    Holder acknowledges that the Warrant Shares have not been registered under the Act will initially be "restricted securities" (as such term is defined in Rule 144 promulgated under the Act) ("Rule 144") and that the certificates evidencing the Warrant Shares will include this legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO (i) AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND ANY APPLICABLE STATE LAWS, (ii) TO THE EXTENT APPLICABLE, RULE 144 UNDER THE ACT (OR ANY SIMILAR RULE UNDER THE ACT RELATING TO THE DISPOSITION OF SECURITIES), OR (iii) AN OPINION OF COUNSEL, IF SUCH OPINION SHALL BE REASONABLY SATISFACTORY TO COUNSEL TO THE ISSUER, THAT AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE LAW IS AVAILABLE."

Holder further acknowledges that the Warrant Shares cannot be sold unless registered with the United States Securities and Exchange Commission (the "Commission") and qualified by appropriate state securities regulators, or unless Holder obtains written consent from Company and otherwise complies with an exemption from such registration and qualification (including, without limitation, compliance with Rule 144).  Holder represents that it is knowledgeable with respect to Rule 144, including the provisions of Rule 144 which permit resale of securities purchased in a private placement subject to the satisfaction of certain conditions, including, among other things, the availability of certain current public information about the Company.  Holder understands that such current public information is not available as of the date of this Warrant.  Holder acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time Holder wishes to transfer the Warrant Shares, and that, in such event, the Holder may be precluded from transferring the Warrant Shares under Rule 144 for an extended period of time and potentially may not ever be permitted to transfer the Warrant Shares under Rule 144, even if the other applicable requirements of Rule 144 have been satisfied.  Holder acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Act or an exemption from registration will be required for any disposition of the Warrant Shares.

(b)    Holder has adequate means of providing for current needs and contingencies, has no need for liquidity in the investment, and is able to bear the economic risk of an investment in the Warrant and Warrant Shares offered by Company of the size contemplated.  Holder represents that Holder is able to bear the economic risk of the investment and at the present time can afford a complete loss of such investment.  Holder has had a full opportunity to inspect the books and records of the Company and to make any and all inquiries of Company officers and directors regarding the Company and its business as Holder has deemed appropriate, including with respect

to (i) the determination by the Audit Committee of the Company's Board of Directors that the Company's previously issued (A) unaudited condensed consolidated financial statements as of and for each of the three months ended March 31, 2023, the three months ended March 31, 2022, the three and six months ended June 30, 2022 and the three and nine months ended September 30, 2022 and (B) audited condensed consolidated financial statements as of and for the year ended December 31, 2022, should no longer be relied upon and should be restated due to accounting errors, (ii) the Company's intention to restate the foregoing financial statements and the notes thereto in amendments to the Company's Annual Report on Form 10-K for the year ended December 31, 2022 and the Company's Quarterly Reports on Form 10-Q for the three months ended March 31, 2023, the three months ended March 31, 2022, the three and six months ended June 30, 2022 and the three and nine months ended September 30, 2022, and amend among other related disclosures, its Management's Discussion and Analysis of Financial Condition and Results of Operations for the applicable periods in the foregoing reports, and (iii) the review by the Audit Committee of the Company's Board of Directors of the Company's accounting for revenue recognition and the extent to which these matters affect the Company's internal controls over financial reporting, in each case as described in the Company's filings with the Commission, including the Current Report on Form 8-K filed with the Commission on November 9, 2023.

(c)     Holder is an "Accredited Investor" as defined in Regulation D of the Act. Holder, either alone or with Holder's professional advisers who are unaffiliated with, have no equity interest in and are not compensated by Company or any affiliate or selling agent of Company, directly or indirectly, has sufficient knowledge and experience in financial and business matters that Holder is capable of evaluating the merits and risks of an investment in the Warrant and Warrant Shares offered by Company and of making an informed investment decision with respect thereto and has the capacity to protect Holder's own interests in connection with Holder's proposed investment in the Warrant and Warrant Shares. Neither (i) Holder, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of any of the Company's Common Stock held by Holder is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Act, except as set forth in Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Act and disclosed, reasonably in advance of the acceptance of this Warrant, in writing in reasonable detail to the Company.

(d)     Holder is acquiring the Warrant and Warrant Shares solely for Holder's own account as principal, for investment purposes only and not with a view to the resale or distribution thereof, in whole or in part, and no other person or entity has a direct or indirect beneficial interest in such Warrant or Warrant Shares. Holder understands that the Warrant and Warrant Shares are being offered and sold in reliance on a transactional exemption from the registration requirements of federal and state securities laws and that the Company is relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgments and understandings of Holder set forth herein in order to determine the applicability of such exemptions and the suitability of Holder to acquire the Warrants and Warrant Shares.

7. <u>Rule 144 Opinions</u>.

If requested by Holder, the Company will, at its own expense, provide or cause its counsel to provide any and all legal opinions required for the removal of any restrictive legend from any stock certificates representing Warrant Shares under Rule 144; provided, however, that all applicable requirements of Rule 144 have been satisfied. The Company will not unreasonably withhold any legal opinion required for the removal of the restrictive legend from any certificates representing the Warrant Shares pursuant to Rule 144 and will process such request within ten business days of receipt of such request. If Company fails to process such request within ten business days, Company shall pay liquidated damages equal to any decrease in the closing bid price of the Company's common stock between day six of the failure to process such request and the date such removal is actually received by the Company.

8. <u>Exchange and Registry of Warrant</u>.

This Warrant is exchangeable, upon the surrender hereof by the registered Holder at the office of the Company, for a new Warrant or Warrants aggregating the total Warrant Shares of the surrendered Warrant of like tenor and dated as of such exchange. The Company shall maintain at its office a registry showing the name and address of the registered Holder of this Warrant. This Warrant may be surrendered for exchange, transfer, or exercise, in accordance with its terms, at such office of the Company, and the Company shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

9. <u>Loss, Theft, Destruction, or Mutilation of Warrant</u>.

Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction, or mutilation of this Warrant, and in case of loss, theft, or destruction, of indemnity reasonably satisfactory to it, and upon reimbursement to the Company of all reasonable expenses incidental thereto, and upon surrender and cancellation of this Warrant, if mutilated, the Company will make and deliver a new Warrant of like tenor (but with no additional rights or obligations) and dated as of such cancellation, in lieu of this Warrant.

10. <u>Saturdays, Sundays, Holidays, etc.</u>

If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday or a Sunday or shall be a legal holiday, then such action may be taken or such right may be exercised on the next succeeding day not a Saturday, Sunday, or legal holiday.

11. <u>Cash Distributions</u>.

No adjustment on account of cash dividends or interest on the Company's Common Stock or Other Securities that may become purchasable hereunder will be made to the Exercise Price under this Warrant.

Docusign Envelope ID: 4A0799F2-8591-4315-8F80-57BED98FEEFC

12. <u>Consolidation, Merger, or Sale of the Company</u>.

If the Company is a party to a consolidation, merger, or transfer of assets pursuant to which the shares of Common Stock are converted into or exchanged for securities of another Person, cash or other assets, the successor corporation (or corporation controlling the successor corporation or the Company, as the case may be) shall by operation of law assume the Company's obligations under this Warrant. Upon consummation of such transaction, the Warrants shall automatically become exercisable for the kind and amount of securities, cash, or other assets which the holder of a Warrant would have owned immediately after the consolidation, merger, or transfer if the holder had exercised the Warrant immediately before the effective date of such transaction. As a condition to the consummation of such transaction, the Company shall arrange for the Person obligated to issue securities or deliver cash or other assets upon exercise of the Warrant to, concurrently with the consummation of such transaction, assume the Company's obligations hereunder by executing an instrument so providing and further providing for adjustments which shall be as nearly equivalent as may be practical to the adjustments provided for in this Section 12.

13. <u>Adjustments for Stock Splits, Combinations, etc.</u>

The number of shares and class of capital stock purchasable under this Warrant are subject to adjustment from time to time as set forth in this Section 13.

    (a)    Adjustment for change in capital stock. If the Company:

        (i)    pays a dividend or makes a distribution on its Common Stock, in each case, in shares of its Common Stock;

        (ii)    subdivides its outstanding shares of Common Stock into a greater number of shares;

        (iii)    combines its outstanding shares of Common Stock into a smaller number of shares;

        (iv)    makes a distribution on its Common Stock in shares of its capital stock other than Common Stock; or

        (v)    issues by reclassification of its shares of Common Stock any shares of its capital stock;

then the number and classes of shares purchasable upon exercise of each Warrant in effect immediately prior to such action shall be adjusted so that the holder of any Warrant thereafter exercised may receive the number and classes of shares of capital stock of the Company which such holder would have owned immediately following such action if such holder had exercised the Warrant immediately prior to such action.

For such a dividend or distribution, the adjustment shall become effective immediately after the record date for the dividend or distribution. For such a subdivision, combination, or reclassification, the adjustment shall become effective immediately after the effective date of the subdivision, combination, or reclassification.

If after an adjustment the Holder, upon exercise of a Warrant, may receive shares of two or more classes of capital stock of the Company, the Board of Directors of the Company shall in good faith determine the allocation of the adjusted Exercise Price between or among the classes of capital stock. After such allocation, that portion of the Exercise Price applicable to each share of each such class of capital stock shall thereafter be subject to adjustment on terms comparable to those applicable to Common Stock in this Warrant. Notwithstanding the allocation of the Exercise Price between or among shares of capital stock as provided by this Section 13(a), a Warrant may only be exercised in full by payment of the entire Exercise Price currently in effect.

(b)     The Company will not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue, or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Section 13 and in the taking of all such action as may be necessary or appropriate in order to protect the exercise rights of the Holder of this Warrant against impairment.

14. Certificate as to Adjustments.

In each case of any adjustment or readjustment in the shares of Common Stock (or Other Securities) issuable on the exercise of the Warrant, the Company at its expense will promptly cause its Chief Financial Officer or other appropriate designee to compute such adjustment or readjustment in accordance with the terms of the Warrant and prepare a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based, including a statement of (a) the consideration received or receivable by the Company for any additional shares of Common Stock (or Other Securities) issued or sold or deemed to have been issued or sold, (b) the number of shares of Common Stock (or Other Securities) outstanding or deemed to be outstanding, and (c) the Exercise Price and the number of shares of Common Stock to be received upon exercise of this Warrant, in effect immediately prior to such adjustment or readjustment and as adjusted or readjusted as provided in this Warrant. The Company will forthwith mail a copy of each such certificate to the Holder of the Warrant and any Warrant agent of the Company.

15. Reservation of Stock Issuable on Exercise of Warrant.

The Company will at all times reserve and keep available, solely for issuance and delivery on the exercise of the Warrant, shares of Common Stock (or Other Securities) from time to time issuable on the exercise of the Warrant.

16. Assignment; Exchange of Warrant.

This Warrant, and the rights evidenced hereby, may not be transferred without the prior written consent of the Company which may be withheld in the sole and absolute discretion of the Company and compliance with applicable securities laws. As a condition precedent to the Company considering whether to consent to a transfer, the Holder shall deliver to the Company a legal opinion from the Holder's counsel that such transfer is exempt from the registration requirements of applicable securities laws at the Holder's expense. If the Company consents to the proposed transfer, upon surrender for exchange of this Warrant, together with evidence reasonably

satisfactory to the Company demonstrating compliance with applicable securities laws  and payment by the Holder of any applicable transfer taxes, the Company will issue and deliver to or on the order of the Holder a new Warrant of like tenor, in the name of the Holder and/or the transferee(s) specified (each a "Transferee"), calling in the aggregate on the face or faces thereof for the number of Warrant Shares called for on the face or faces of the Warrant so surrendered by the Holder; and provided further, that upon any such transfer, the Company may require, as a condition thereto, that the Transferee execute an appropriate investment representation as may be reasonably required by the Company.

17. Notices.

Any notice, request, instruction, or other document required by the terms of this Note, or deemed by any of the Parties hereto to be desirable, to be given to any other Party hereto shall be in writing and shall be given by personal delivery, overnight delivery, mailed by registered or certified mail, postage prepaid, with return receipt requested, or sent by electronic transmission to the addresses of the Parties set forth in the Loan Agreement.  The persons and addresses set forth in the Notice provision of the Loan Agreement may be changed from time to time by a notice sent as aforesaid. If notice is given by mail in accordance with the provisions of this Section, such notice shall be conclusively deemed given upon receipt and delivery or refusal.  If notice is given by electronic mail transmission in accordance with the provisions of this Section, such notice shall be conclusively deemed given at the time of delivery if between the hours of 9:00 a.m. and 5:00 p.m. Pacific time on a business day ("business hours") and if not during business hours, at 9:00 a.m. on the next business day following delivery, provided a delivery confirmation is obtained by the sender.

18. Notices of Record Date.

In case,

(a)     The Company takes a record of the holders of its Common Stock for the purpose of entitling them to subscribe for or purchase any shares of stock of any class or to receive a dividend, distribution, or any other rights;

(b)     There is any capital reorganization of the Company, reclassification of the capital stock of the Company (other than a subdivision or combination of its outstanding shares of Common Stock), or consolidation or merger of the Company with or into another corporation which does not constitute a sale of the Company; or

(c)     There is a voluntary or involuntary dissolution, liquidation, or winding up of the Company;

then, and in any such case, the Company shall cause to be mailed to the Holder, at least 10 business days prior to the date hereinafter specified, a notice stating the date on which (i) a record is to be taken for the purpose of such dividend, distribution or rights, or (ii) such reclassification, reorganization, consolidation, merger, dissolution, liquidation, or winding up is to take place and the date, if any is to be fixed, as of which holders of Common Stock of record shall be entitled to

Docusign Envelope ID: 440739F2-8591-431E-9F80-57BED98FEEFC

Case 25-40211 Doc 120 Filed 04/23/25 Entered 04/23/25 17:20:12 Desc Exhibit 27 - Proof of Claim of EdgeCo LLC Page 54 of 86

exchange their shares of Common Stock for securities or other property deliverable upon such reclassification, reorganization, consolidation, merger, dissolution, liquidation, or winding up.

19. <u>Amendments and Supplements</u>.

The Company may from time to time supplement or amend this Warrant without the approval of any Holder in order to cure any ambiguity or to correct or supplement any provision contained herein which may be defective or inconsistent with any other provision, or to make any other provisions in regard to matters or questions herein arising hereunder which the Company may deem necessary or desirable and which shall not materially adversely affect the interest of the Holder. All other supplements or amendments to this Warrant must be signed by the party against whom such supplement or amendment is to be enforced.

20. <u>Investment Intent</u>.

Holder represents and warrants to the Company that Holder is acquiring the Warrants for investment and with no present intention of distributing or reselling any of the Warrants.

21. <u>Miscellaneous</u>.

    (a)    This Warrant shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. The Company and the Holder hereby submit to the exclusive jurisdiction of any federal or state court located within the State of Delaware for the resolution of all legal disputes arising under the terms of this Warrant. The Company and the Holder agree to waive trial by jury.

    (b)    If any action or proceeding is brought by the Company on the one hand or by the Holder on the other hand to enforce or continue any provision of this Warrant, the prevailing party's costs and expenses, including its reasonable attorneys' fees, in connection with such action or proceeding shall be paid by the other party.

    (c)    In the event that any provision of this Warrant is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Warrant.

    (d)    The headings in this Warrant are for purposes of reference only and shall not limit or otherwise affect any of the terms hereof.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have caused this Warrant to be executed by its officer thereunto duly authorized as of the date first written above.

**COMPANY:**

**DZS Inc.,**
a Delaware corporation

By: Justin Ferguson
Its: Chief Legal Officer

**HOLDER:**

**EDGECO, LLC,**
a Wyoming limited liability company

_____

By: Robert Binkele
Its: Manager

[Signature Page to Warrant Agreement]

Docusign Envelope ID: 440709F8-8561-4315-8F84-5ABED89EFE4C

**IN WITNESS WHEREOF**, the parties hereto have caused this Warrant to be executed by its officer thereunto duly authorized as of the date first written above.

COMPANY:

**DZS Inc.**,
a Delaware corporation

_____

By: Justin Ferguson
Its: Chief Legal Officer

**HOLDER:**

**EDGECO, LLC,**
a Wyoming limited liability company

_____

By: Robert Binkele
Its: Manager

[Signature Page to Warrant Agreement]

Docusign Envelope ID: 44072CF2 8561-4315-8F80-5ABED99EFEFC

Case 25-10321 Doc 40-26 Filed 04/23/25 Entered 04/23/25 17:20:12 Desc Exhibit
27 - Proof of Claim of EdgeCo LLC Page 57 of 86

# ANNEX A

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF CERTAIN STATES, AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO (i) AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND ANY APPLICABLE STATE LAWS, (ii) TO THE EXTENT APPLICABLE, RULE 144 UNDER THE ACT (OR ANY SIMILAR RULE UNDER THE ACT RELATING TO THE DISPOSITION OF SECURITIES), OR (iii) AN OPINION OF COUNSEL, IF SUCH OPINION SHALL BE REASONABLY SATISFACTORY TO COUNSEL TO THE ISSUER, THAT AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE LAW IS AVAILABLE.

## NOTICE OF EXERCISE

The undersigned hereby elects irrevocably to exercise the within Warrant and to purchase _____ shares of Common Stock of DZS Inc. and hereby makes payment of $_____ (at a per share exercise price equal to the last closing price for DZS Inc.'s common stock as reflected on Nasdaq.com as of the Issue Date of the Warrant) in payment of the Exercise Price pursuant hereto. Please issue the shares as to which this Warrant is exercised in accordance with the instructions given below.

## INSTRUCTIONS FOR REGISTRATION OF SHARES

Name (print) _____

Address (print) _____

Address (print) _____

## ASSIGNMENT

FOR VALUE RECEIVED, _____ does hereby sell, assign, and transfer unto_____, the right to purchase _____ shares of Common Stock of DZS Inc., evidenced by the within Warrant, and does hereby irrevocably constitute and appoint _____ attorney to transfer such right on the books of DZS Inc., with full power of substitution on the premises.

Dated: _____, 20___

Signature: _____

Notice: The signature of Notice of Exercise or Assignment must correspond with the name as written upon the face of the within Warrant in every particular without alteration or enlargement or any change whatsoever.

Docusign Envelope ID: 440799F8-8591-4315-8F60-5A8ED9BEEF1C

# **EXHIBIT D**

## **AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT**

*EXECUTION VERSION*

**AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT**

THIS AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT (this "**Agreement**") is made and entered into as of May 31, 2024 (the "**Effective Date**"), by and among DZS Inc., a Delaware corporation (the "**Company**"), and the persons identified on Schedule A hereto (collectively, the "**Investors**" and each individually, an "**Investor**").

WHEREAS, the Company and the Investors are parties to a Warrant Agreement, dated as of December 29, 2023, and a Warrant Agreement, dated as of May 31, 2024 (collectively, the "**Warrant Agreements**"), pursuant to which the Investors are subscribed for, in the aggregate, 12,200,000 shares of Common Stock (as defined below) of the Company;

WHEREAS, on December 29, 2023, the Company and the Investor entered into that certain Registration Rights Agreement (the "**Original Registration Rights Agreement**"); and

WHEREAS, in connection with the consummation of the transactions contemplated by the Warrant Agreements, and pursuant to the terms of the Warrant Agreements, the parties desire to enter into this Agreement in order to grant certain registration rights to the Investors as set forth below.

NOW, THEREFORE, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1. <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings:

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Board**" means the board of directors of the Company (and any successor governing body of the Company or any successor of the Company).

"**Commission**" means the Securities and Exchange Commission or any other federal agency administering the Securities Act and the Exchange Act at the time.

"**Common Stock**" means the common stock, of the Company and any other common equity securities issued by the Company, and any other shares of stock issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, distribution, recapitalization, merger, consolidation or other corporate reorganization).

1

Docusign Envelope ID: 4A07295B-8591-4315-8E60-5ABED95EEFC9

"**Company**" has the meaning set forth in the preamble and includes the Company's successors by merger, acquisition, reorganization or otherwise.

"**Demand Registration**" has the meaning set forth in **Section 2(a)**.

"**DNI Holder**" means a holder of DNI Registrable Securities.

"**DNI Registrable Securities**" means shares of Common Stock that are registrable under the DNI Registration Rights Agreement.

"**DNI Registration Rights Agreement**" means that certain Registration Rights Agreement, dated as of September 9, 2016, between the Company and DASAN Networks, Inc., a company incorporated under the laws of Korea, as such agreement may be amended, restated or amended and restated from time to time, including to add additional holders of registrable securities thereunder.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Investors**" has the meaning set forth in the preamble.

"**Long-Form Registration**" has the meaning set forth in **Section 2**.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Piggyback Registration**" has the meaning set forth in **Section 3(a)**.

"**Prospectus**" means the prospectus or prospectuses included in any Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and by all other amendments and supplements to the prospectus, including post-effective amendments and all material incorporated by reference in such prospectus or prospectuses.

"**Warrant Agreement**" has the meaning set forth in the recitals.

"**Registrable Securities**" means (a) any shares of Common Stock held by the Investors, which shares were received upon the exercise of a Warrant under the Warrant Agreements, or

2

Case 25-10140-LSS Claim 27 Filed 04/24/25 Desc Main Document Page 61 of 86

Case 25-10140-LSS Claim 27-1 Part 2 Filed 04/23/25 Entered 04/23/25 17:20:12 Desc Exhibit 27 - Proof of Claim of EdgeCo LLC Page 61 of 86

Docusign Envelope ID: 44079DF8-8561-431E-8F60-5FBED98FEEFC

shares of Common Stock issuable upon the exercise of a Warrant under the Warrant Agreements with respect to any remaining Warrant Shares (as defined in the Warrant Agreements) by the Investors at any time, and (b) any shares of Common Stock issued or issuable with respect to any shares described in subsection (a) above by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization (it being understood that for purposes of this Agreement, a Person shall be deemed to be a holder of Registrable Securities whenever such Person has the right to then acquire or obtain from the Company any Registrable Securities, whether or not such acquisition has actually been effected). As to any particular Registrable Securities, such securities shall cease to be Registrable Securities when (i) a Registration Statement covering such securities has been declared effective by the Commission and such securities have been disposed of pursuant to such effective Registration Statement, (ii) such securities are sold under circumstances in which all of the applicable conditions of Rule 144 (or any similar provisions then in force) under the Securities Act are met, (iii) such securities are otherwise transferred and such securities may be resold without subsequent registration under the Securities Act, or (iv) such securities shall have ceased to be outstanding.

"**Registration Statement**" means any registration statement of the Company which covers any of the Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus, amendments and supplements to such Registration Statement, including post-effective amendments, all exhibits and all materials incorporated by reference in such Registration Statement.

"**Restatement**" means collectively, (a) the review by the Audit Committee of the Company's Board of Directors of the Company's accounting for revenue recognition and the extent to which these matters affect the Company's internal controls over financial reporting, in each case as described in the Company's filings with the Commission, including the Current Report on Form 8-K filed with the Commission on November 9, 2023, (b) the determination by the Audit Committee of the Board of Directors that the Company's previously issued (i) unaudited condensed consolidated financial statements as of and for each of the three months ended March 31, 2023, the three months ended March 31, 2022, the three and six months ended June 30, 2022 and the three and nine months ended September 30, 2022 and (ii) audited condensed consolidated financial statements as of and for the year ended December 31, 2022, should no longer be relied upon and should be restated due to accounting errors, and (c) the Company's restatement of the foregoing financial statements and the notes thereto in amendments to the Company's Annual Report on Form 10-K for the year ended December 31, 2022 and the Company's Quarterly Reports on Form 10-Q for the three months ended March 31, 2023, the three months ended March 31, 2022, the three and six months ended June 30, 2022 and the three and nine months ended September 30, 2022, and amendment of, among other related disclosures, its Management's Discussion and Analysis of Financial Condition and Results of Operations for the applicable periods in the foregoing reports, together with any other restatement determined by the Audit Committee of the Board of Directors pursuant to the review described in paragraph (a) hereof.

"**Rule 144**" means Rule 144 promulgated under the Securities Act or any successor rule thereto or any complementary rule thereto (such as Rule 144A).

3

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect from time to time.

"**Selling Expenses**" means all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel for any holder of Registrable Securities, except for the reasonable fees and disbursements of counsel for the holders of Registrable Securities required to be paid by the Company pursuant to **Section 6**.

"**Short-Form Registrations**" has the meaning set forth in **Section 2(a)**.

2. <u>Demand Registration</u>. Following request by the Investors, which request shall not be earlier than ten days after the date on which (i) the Company shall have completed the Restatement and (ii) is current with respect to the filing with the Commission of all Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, the Company will be obligated to file a registration statement on (1) Form S-3, if the Company is eligible to file a registration statement on Form S-3 or (2) if the Company is not eligible to file a registration statement on Form S-3, on Form S-1 or any other available registration statement form covering the public sale of Registrable Securities, and the Company will cause such shares to be registered under the Securities Act in accordance with the following provisions of this **Section 2** (such registration statement contemplated by this clause (2), a "**Long-Form Registration**"); <u>provided, however</u>, that if the Investors request a Long-Form Registration, each Investor included in the applicable Registration Statement shall bear and promptly reimburse the Company for such Investor's pro rata share (based on the number of Registrable Securities held by such Investor compared to the Registrable Securities of all Investors included in the applicable Registration Statement) of the Company's legal, auditor, financial printer and Commission registration fees and expenses; <u>provided, further</u>, that (A) the Investors shall not be responsible for any auditor fees for audited financial statements or otherwise to the extent required separately by the Company's particular reporting requirements that are not related to the requirements involved in the preparation or filing of the applicable Form S-1 or other registration statement, (B) the Investors' reimbursement of fees of the Company's legal counsel shall not exceed $50,000, and (C) the Investors shall be entitled to engage, at their sole cost and expense, separate legal counsel to represent the Investors in connection with the review of the Form S-1 or other registration statement.

(a)       The Company shall use its reasonable best efforts to qualify and remain qualified to register securities under the Securities Act pursuant to a Registration Statement on Form S-3 or any successor form thereto. At such time as the Company shall have qualified for the use of a Registration Statement on Form S-3, the holders of Registrable Securities shall have the right to request an unlimited number of registrations of their Registrable Securities on Form S-3 or any similar short-form registration (each a "**Short-Form Registration**" and, together with each Long-Form Registration, a "**Demand Registration**"); <u>provided, however</u>, that the Company shall in no event be required to effect more than (i) two Short-Form Registrations in any 12-month period or (ii) one Long-Form Registration. Each request for a Short-Form Registration shall specify the approximate number of Registrable Securities requested to be registered. Upon receipt of any such request, the Company shall promptly (but in no event later than 10 days following receipt thereof) deliver notice of such request to all other holders of Registrable

4

Securities who shall then have 10 days from the date such notice is given to notify the Company in writing of their desire to be included in such registration. The Company shall cause a Registration Statement on Form S-3 (or any successor form) to be filed within 45 days after the date on which the initial request is given and shall use its reasonable best efforts to cause such Registration Statement to be declared effective by the Commission as soon as practicable thereafter.

(b)      The Company shall not be obligated to effect any Demand Registration within 30 days after the effective date of a previous Demand Registration or a previous Piggyback Registration in which holders of Registrable Securities were permitted to register Registrable Securities and sold all of the Registrable Securities requested to be included therein. The Company may postpone for up to 45 days during any period of 12 consecutive months the filing or effectiveness of a Registration Statement for a Demand Registration, or otherwise suspend the registration rights of the Investors hereunder and/or require the Investors to suspend use of any resale prospectus included in any registration statement if the Company's Board determines in its reasonable good faith judgment that such Demand Registration, registration rights or use of any such prospectus would (i) materially interfere with a significant acquisition, corporate organization or other similar transaction involving the Company; (ii) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or Exchange Act; provided, that in such event the holders of a majority of the Registrable Securities initiating such Demand Registration shall be entitled to withdraw such request and, if such request is withdrawn, such Demand Registration shall not count as one of the permitted Demand Registrations hereunder and the Company shall pay all registration expenses in connection with such registration. The Company may delay a Demand Registration hereunder only once in any period of 12 consecutive months.

(c)      If the holders of the Registrable Securities initially requesting a Demand Registration elect to distribute the Registrable Securities covered by their request in an underwritten offering, they shall so advise the Company as a part of their request made pursuant to **Section 2(a)**, and the Company shall include such information in its notice to the other holders of Registrable Securities. If a requested Demand Registration involves an underwritten offering, the holders of a majority of the Registrable Securities initially requesting such Demand Registration shall select the investment banking firm or firms to act as the managing underwriter or underwriters in connection with such offering; provided, that such selection shall be subject to the consent of the Company, which consent shall not be unreasonably withheld or delayed.

(d)      Except for DNI Registrable Securities, the Company shall not include in any Demand Registration any securities which are not Registrable Securities without the prior written consent of the holders of a majority of the Registrable Securities included in such registration, which consent shall not be unreasonably withheld or delayed. If a Demand Registration involves an underwritten offering and the managing underwriter of the requested Demand Registration advises the Company and the holders of Registrable Securities in writing that in its opinion the number of shares of Common Stock proposed to be included in the Demand Registration, including all Registrable Securities and all other shares of Common Stock proposed to be included in such underwritten offering, exceeds the number of shares of Common Stock which can be sold in such underwritten offering and/or the number of shares of Common Stock

5

proposed to be included in such registration would adversely affect the price per share of the Registrable Securities proposed to be sold in such underwriting offering, the Company shall include in such Demand Registration (i) first, the number of shares of Common Stock that the holders of Registrable Securities and the DNI Holders propose to sell, allocated pro rata among all such holders on the basis of the number of Registrable Securities or DNI Registrable Securities owned by each such holder (on a fully diluted, as converted basis) or in such manner as they may otherwise agree, and (ii) second, the number of shares of Common Stock proposed to be included therein by any other Persons (including shares of Common Stock to be sold for the account of the Company and/or other holders of Common Stock) allocated among such Persons in such manner as they may agree. If the managing underwriter determines that less than all of the Registrable Securities proposed to be sold can be included in such offering, then the Registrable Securities that are included in such offering shall be allocated pro rata among the respective holders thereof on the basis of the number of Registrable Securities owned by each such holder.

3. <u>Piggyback Registration</u>.

(a)     Whenever the Company proposes to register any shares of its Common Stock under the Securities Act (other than a registration effected solely to implement an employee benefit plan or a transaction to which Rule 145 of the Securities Act is applicable, or a Registration Statement on Form S-4, S-8 or any successor form thereto or another form not available for registering the Registrable Securities for sale to the public), whether for its own account or for the account of one or more stockholders of the Company and the form of Registration Statement to be used may be used for any registration of Registrable Securities (a "**Piggyback Registration**"), the Company shall give prompt written notice (in any event no later than twenty (20) days prior to the filing of such Registration Statement) to the holders of Registrable Securities of its intention to effect such a registration and, subject to **Section 3(b)** and **Section 3(c)**, shall include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion from the holders of Registrable Securities after the Company's notice has been given to each such holder. A Piggyback Registration shall not be considered a Demand Registration for purposes of **Section 2** of this Agreement.

(b)     If a Piggyback Registration is initiated as an underwritten offering on behalf of the Company and the managing underwriter advises the Company and the holders of Registrable Securities (if any holders of Registrable Securities have elected to include Registrable Securities in such Piggyback Registration) in writing that in its opinion the number of shares of Common Stock proposed to be included in such registration, including all Registrable Securities and all other shares of Common Stock proposed to be included in such underwritten offering, exceeds the number of shares of Common Stock which can be sold in such offering and/or that the number of shares of Common Stock proposed to be included in any such registration would adversely affect the price per share of the Common Stock to be sold in such offering, the Company shall include in such registration (i) first, the number of shares of Common Stock that the Company proposes to sell; (ii) second, the number of shares of Common Stock requested to be included therein by any Persons having contractual, incidental registration rights pursuant to an agreement which is not this Agreement, including the DNI Holders, and the holders of Registrable Securities pursuant to this Agreement, allocated pro rata among all such holders on

6

the basis of the number of Registrable Securities or other registrable securities, including the DNI Registrable Securities, owned by each such holder (on a fully diluted, as converted basis) or in such manner as they may otherwise agree; and (iii) third, the number of shares of Common Stock requested to be included therein by holders of Common Stock (other than Persons with such contractual, incidental registration rights), allocated among such holders in such manner as they may agree.

(c)     If any Piggyback Registration is initiated as a primary underwritten offering on behalf of the Company, the Company shall select the managing underwriter or underwriters in connection with such offering.

4.  Lock-up Agreement. Each holder of Registrable Securities agrees that in connection with any public offering of the Company's Common Stock or other equity securities, and upon the request of the managing underwriter in such offering, such holder shall not, without the prior written consent of such managing underwriter, during the 30 days prior to the effective date of such registration and ending on the date specified by such managing underwriter, (a) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into, exercisable for or exchangeable for shares of Common Stock held immediately before the effectiveness of the registration statement for such offering, or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise. The foregoing provisions of this **Section 4** shall not apply to sales of Registrable Securities to be included in such offering pursuant to **Section 2(a)** or **Section 3(a)**, and shall be applicable to the holders of Registrable Securities only if all officers and directors of the Company and all stockholders owning more than 10% of the Company's outstanding Common Stock are subject to the same restrictions. Each holder of Registrable Securities agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriter which are consistent with the foregoing, or which are necessary to give further effect thereto. Notwithstanding anything to the contrary contained in this **Section 4**, each holder of Registrable Securities shall be released, pro rata, from any lock-up agreement entered into pursuant to this **Section 4** in the event and to the extent that the managing underwriter or the Company permits any discretionary waiver or termination of the restrictions of such lock-up agreement pertaining to any officer, director or holder of greater than 10% of the outstanding Common Stock.

5.  Registration Procedures. If and whenever the holders of Registrable Securities request that any Registrable Securities be registered pursuant to the provisions of this Agreement, the Company shall use its reasonable best efforts to effect the registration and the sale of such Registrable Securities in accordance with the intended method of disposition thereof, and pursuant thereto the Company shall as soon as practicable:

(a)     Subject to **Section 2(a)**, prepare and file with the Commission a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective;

Docusign Envelope ID: 44079953-8561-4315-8F60-53BED90FEEF0

Case 25-40745-bpc Claim 26 Filed 04/23/25 Desc Main Document Page 66 of 86 Exhibit 27 - Proof of Claim of EdgeCo LLC Page 66 of 86

(b)      Prepare and file with the Commission such amendments, post-effective amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for a period of not less than 180 days, or if earlier, until all of such Registrable Securities have been disposed of and to comply with the provisions of the Securities Act with respect to the disposition of such Registrable Securities in accordance with the intended methods of disposition set forth in such Registration Statement;

(c)      Within a reasonable time before filing such Registration Statement, Prospectus or amendments or supplements thereto, furnish to one counsel selected by holders of a majority of such Registrable Securities copies of such documents proposed to be filed, which documents shall be subject to the review, comment and approval of such counsel;

(d)      Notify each selling holder of Registrable Securities, promptly after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed;

(e)      Furnish to each selling holder of Registrable Securities such number of copies of the Prospectus included in such Registration Statement (including each preliminary Prospectus) and any supplement thereto (in each case including all exhibits and documents incorporated by reference therein) and such other documents as such seller may request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(f)      Use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or "blue sky" laws of such jurisdictions as any selling holder requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such holders to consummate the disposition in such jurisdictions of the Registrable Securities owned by such holders; provided, that the Company shall not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this **Section 5(f)**;

(g)      Notify each selling holder of such Registrable Securities, at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement contains an untrue statement of a material fact or omits any fact necessary to make the statements therein in the light of the circumstances under which they were made not misleading, and, at the request of any such holder, the Company shall prepare a supplement or amendment to such Prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such Prospectus shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(h)      Make available for inspection by any selling holder of Registrable Securities, any underwriter participating in any disposition pursuant to such Registration Statement and any attorney, accountant or other agent retained by any such holder or underwriter (collectively, the "**Inspectors**"), all financial and other records, pertinent corporate documents and properties of

the Company, and cause the Company's officers, directors and employees to supply all information requested by any such Inspector in connection with such Registration Statement;

(i)  Provide a transfer agent and registrar (which may be the same entity) for all such Registrable Securities not later than the effective date of such registration;

(j)  Use its reasonable best efforts to cause such Registrable Securities to be listed on each securities exchange on which the Common Stock is then listed or, if the Common Stock is not then listed, on a national securities exchange selected by the holders of a majority of such Registrable Securities;

(k)  In connection with an underwritten offering, enter into such customary agreements (including underwriting and lock-up agreements in customary form) and take all such other customary actions as the holders of such Registrable Securities or the managing underwriter of such offering request in order to expedite or facilitate the disposition of such Registrable Securities (including, without limitation, making appropriate officers of the Company available to participate in "road show" and other customary marketing activities (including one-on-one meetings with prospective purchasers of the Registrable Securities);

(l)  Otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the Commission and make available to its stockholders an earnings statement (in a form that satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder) no later than thirty (30) days after the end of the 12-month period beginning with the first day of the Company's first full fiscal quarter after the effective date of such Registration Statement, which earnings statement shall cover said 12-month period, and which requirement will be deemed to be satisfied if the Company timely files complete and accurate information on Forms 10-Q, 10-K and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(m)  Furnish to each selling holder of Registrable Securities and each underwriter, if any, with (i) a legal opinion of the Company's outside counsel, dated the effective date of such Registration Statement (and, if such registration includes an underwritten public offering, dated the date of the closing under the underwriting agreement), in form and substance as is customarily given in opinions of the Company's counsel to underwriters in underwritten public offerings; and (ii) a "comfort" letter signed by the Company's independent certified public accountants in form and substance as is customarily given in accountants' letters to underwriters in underwritten public offerings;

(n)  Without limiting **Section 5(f)** above, use its reasonable best efforts to cause such Registrable Securities to be registered with or approved by such other governmental agencies or authorities as may be necessary by virtue of the business and operations of the Company to enable the holders of such Registrable Securities to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof;

(o)  Notify the holders of Registrable Securities promptly of any request by the Commission for the amending or supplementing of such Registration Statement or Prospectus or for additional information;

9

(p)     Advise the holders of Registrable Securities, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the Commission suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued;

(q)     Permit any holder of Registrable Securities which holder, in its sole and exclusive judgment, might be deemed to be an underwriter or a controlling person of the Company, to participate in the preparation of such Registration Statement and to require the insertion therein of language, furnished to the Company in writing, which in the reasonable judgment of such holder and its counsel should be included; and

(r)     Otherwise use its reasonable best efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

6.  Expenses. All expenses (other than Selling Expenses) incurred by the Company in complying with its obligations pursuant to this Agreement and in connection with the registration and disposition of Registrable Securities, including, without limitation, all registration and filing fees, underwriting expenses (other than fees, commissions or discounts), expenses of any audits incident to or required by any such registration, fees and expenses of complying with securities and "blue sky" laws, printing expenses, fees and expenses of the Company's counsel and accountants and fees and expenses of one counsel for the holders of Registrable Securities participating in such registration as a group (selected by, in the case of a registration under **Section 2(a)**, the holders of a majority of the Registrable Securities initially requesting such registration, and, in the case of all other registrations hereunder, the holders of a majority of the Registrable Securities included in the registration), shall be paid by the Company. All Selling Expenses relating to Registrable Securities registered pursuant to this Agreement shall be borne and paid by the holders of such Registrable Securities, in proportion to the number of Registrable Securities registered for each such holder.

7.  Indemnification.

(a)     The Company shall indemnify and hold harmless, to the fullest extent permitted by law, each holder of Registrable Securities, such holder's officers, directors, managers, members, partners, stockholders and Affiliates, each underwriter, broker or any other Person acting on behalf of such holder of Registrable Securities and each other Person, if any, who controls any of the foregoing Persons within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, against all losses, claims, actions, damages, liabilities and expenses, joint or several, to which any of the foregoing Persons may become subject under the Securities Act or otherwise, insofar as such losses, claims, actions, damages, liabilities or expenses arise out of or are based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, preliminary Prospectus, free writing prospectus (as defined in Rule 405 promulgated under the Securities Act) or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation or alleged violation by the Company of the Securities Act or any other similar federal or state

10

securities laws or any rule or regulation promulgated thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any such registration, qualification or compliance; and shall reimburse such Persons for any legal or other expenses reasonably incurred by any of them in connection with investigating or defending any such loss, claim, action, damage or liability, except insofar as the same are caused by or contained in any information furnished in writing to the Company by such holder expressly for use therein or by such holder's failure to deliver a copy of the Registration Statement, Prospectus, free-writing prospectus (as defined in Rule 405 promulgated under the Securities Act) or any amendments or supplements thereto (if the same was required by applicable law to be so delivered) after the Company has furnished such holder with a sufficient number of copies of the same prior to any written confirmation of the sale of Registrable Securities.

(b)      In connection with any registration in which a holder of Registrable Securities is participating, each such holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or Prospectus and, to the extent permitted by law, shall indemnify and hold harmless, the Company, each director of the Company, each officer of the Company who shall sign such Registration Statement, each underwriter, broker or other Person acting on behalf of the holders of Registrable Securities and each Person who controls any of the foregoing Persons within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act against any losses, claims, actions, damages, liabilities or expenses resulting from any untrue or alleged untrue statement of material fact contained in the Registration Statement, Prospectus, preliminary Prospectus, free writing prospectus (as defined in Rule 405 promulgated under the Securities Act) or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by such holder; provided, that the obligation to indemnify shall be several, not joint and several, for each holder and shall be limited to the net proceeds (after underwriting fees, commissions or discounts) actually received by such holder from the sale of Registrable Securities pursuant to such Registration Statement.

(c)      Promptly after receipt by an indemnified party of notice of the commencement of any action involving a claim referred to in this **Section 7**, such indemnified party shall, if a claim in respect thereof is made against an indemnifying party, give written notice to the latter of the commencement of such action. The failure of any indemnified party to notify an indemnifying party of any such action shall not (unless such failure shall have a material adverse effect on the indemnifying party) relieve the indemnifying party from any liability in respect of such action that it may have to such indemnified party hereunder. In case any such action is brought against an indemnified party, the indemnifying party shall be entitled to participate in and to assume the defense of the claims in any such action that are subject or potentially subject to indemnification hereunder, jointly with any other indemnifying party similarly notified to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after written notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof; provided, that if (i) any indemnified party shall have reasonably concluded that there may be one or more legal or equitable defenses available to such indemnified party which are additional to or conflict

11

Docusign Envelope ID: 44079DF8-B591-431F-8F80-54BED8EFEEF0

with those available to the indemnifying party, or that such claim or litigation involves or could have an effect upon matters beyond the scope of the indemnity provided hereunder, or (ii) such action seeks an injunction or equitable relief against any indemnified party or involves actual or alleged criminal activity, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party without such indemnified party's prior written consent (but, without such consent, shall have the right to participate therein with counsel of its choice) and such indemnifying party shall reimburse such indemnified party and any Person controlling such indemnified party for that portion of the fees and expenses of any counsel retained by the indemnified party which is reasonably related to the matters covered by the indemnity provided hereunder. If the indemnifying party is not entitled to, or elects not to, assume the defense of a claim, it shall not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. In such instance, the conflicting indemnified parties shall have a right to retain one separate counsel, chosen by the holders of a majority of the Registrable Securities included in the registration, at the expense of the indemnifying party.

(d)     If the indemnification provided for hereunder is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, claim, damage, liability or action referred to herein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amounts paid or payable by such indemnified party as a result of such loss, claim, damage, liability or action in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the statements or omissions which resulted in such loss, claim, damage, liability or action as well as any other relevant equitable considerations; provided, that the maximum amount of liability in respect of such contribution shall be limited, in the case of each holder of Registrable Securities, to an amount equal to the net proceeds (after underwriting fees, commissions or discounts) actually received by such seller from the sale of Registrable Securities effected pursuant to such registration. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The parties agree that it would not be just and equitable if contribution pursuant hereto were determined by pro rata allocation or by any other method or allocation which does not take account of the equitable considerations referred to herein. No Person guilty or liable of fraudulent misrepresentation shall be entitled to contribution from any Person.

8.    Participation in Underwritten Registrations. No Person may participate in any registration hereunder which is underwritten unless such Person (a) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Person or Persons entitled hereunder to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements; provided, that no holder of Registrable Securities included in any underwritten registration shall be required to make any representations or

warranties to the Company or the underwriters (other than representations and warranties regarding such holder, such holder's ownership of its shares of Common Stock to be sold in the offering and such holder's intended method of distribution) or to undertake any indemnification obligations to the Company or the underwriters with respect thereto, except as otherwise provided in **Section 7**.

9. Rule 144 Compliance. With a view to making available to the holders of Registrable Securities the benefits of Rule 144 under the Securities Act and any other rule or regulation of the Commission that may at any time permit a holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3 (or any successor form), from and after the date on which (i) the Company shall have completed the Restatement and (ii) is current with respect to the filing with the Commission of all Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, the Company shall:

(a) Make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act;

(b) Use reasonable best efforts to file with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act, at any time after the Company has become subject to such reporting requirements; and

(c) Furnish to any holder so long as the holder owns Registrable Securities, promptly upon request, a written statement by the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act and of the Securities Act and the Exchange Act, a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed or furnished by the Company as such holder may request in connection with the sale of Registrable Securities without registration.

10. Preservation of Rights. Except with respect to the DNI Registration Rights Agreement, the Company shall not (a) grant any registration rights to third parties which are more favourable than or inconsistent with the rights granted hereunder, or (b) enter into any agreement, take any action, or permit any change to occur, with respect to its securities that violates or subordinates the rights expressly granted to the holders of Registrable Securities in this Agreement.

11. Termination. This Agreement shall terminate and be of no further force or effect when there shall no longer be any Registrable Securities outstanding; provided, that the provisions of **Section 6** and **Section 7** shall survive any such termination.

12. Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at

the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 12**).

|  |  |
|---|---|
| If to the Company: | DZS Inc.<br>5700 Tennyson Pkwy, Ste. 400<br>Plano, TX 75024<br>Attention: Justin Ferguson<br>Email: justin.ferguson@dzsi.com |
| With a copy to: | Baker Botts L.L.P.<br>2001 Ross Avenue<br>Dallas, Texas 75201-2980<br>Attention: Preston Bernhisel<br>Email: preston.bernhisel@bakerbotts.com |

If to any Investor, to such Investor's address as set forth in the register of stockholders maintained by the Company.

13. <u>Entire Agreement</u>. This Agreement, together with the Warrant Agreements and any related exhibits and schedules thereto, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. Notwithstanding the foregoing, in the event of any conflict between the terms and provisions of this Agreement and those of the Warrant Agreements, the terms and conditions of this Agreement shall control.

14. <u>Successor and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Each Investor may assign its rights hereunder to any purchaser or transferee of Registrable Securities; <u>provided</u>, that such purchaser or transferee shall, as a condition to the effectiveness of such assignment, be required to execute a counterpart to this Agreement agreeing to be treated as an Investor whereupon such purchaser or transferee shall have the benefits of, and shall be subject to the restrictions contained in, this Agreement as if such purchaser or transferee was originally included in the definition of an Investor herein and had originally been a party hereto.

15. <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

16. <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17. <u>Amendment, Modification and Waiver</u>. Except as otherwise provided herein, the provisions of this Agreement may only be amended, modified, supplemented or waived with the prior written consent of the Company and the holders of a majority of the Registrable Securities. No waiver by any party or parties shall operate or be construed as a waiver in respect of any

failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

18. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19. <u>Remedies</u>. Each holder of Registrable Securities, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of its rights under this Agreement. The Company acknowledges that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Agreement and the Company hereby agrees to waive the defense in any action for specific performance that a remedy at law would be adequate.

20. <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

21. <u>Waiver of Jury Trial</u>. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of any other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action, (b) such party has considered the implications of this waiver, (c) such party makes this waiver voluntarily, and

Docusign Envelope ID: 4407382F8-8561-4315-8F60-5ABED9FEEF0C

(d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this **Section 21**.

22. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23. <u>Amendment and Restatement</u>.  This Agreement amends and restates in its entirety the Original Registration Rights Agreement, which shall be of no further force or effect as of the date hereof.

**[SIGNATURE PAGE FOLLOWS]**

Docusign Envelope ID: 440700F8A561-4315-8F04-57BED98FEEFC

Case 25-40712 Doc 170    Filed 04/23/25    Entered 04/23/25 17:20:12    Page 74 of Exhibit
27 - Proof of Claim of EdgeCo    LLC    Page 75 of 86

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Registration Rights Agreement on the Effective Date.

**INVESTOR:**

EdgeCo, LLC,
a Wyoming limited liability company

_____

By: Robert Binkele
Its: Manager


**COMPANY:**

DZS Inc.,
a Delaware corporation

_____

By: Justin Ferguson
Its: Chief Legal Officer

[Signature Page to Amended and Restated Registration Rights Agreement]

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Registration Rights Agreement on the Effective Date.

**INVESTOR:**

EdgeCo, LLC,
a Wyoming limited liability company

_____

By: Robert Binkele
Its: Manager

**COMPANY:**

DZS Inc.,
a Delaware corporation

_____

By: Justin Ferguson
Its: Chief Legal Officer

[Signature Page to Amended and Restated Registration Rights Agreement]

Docusign Envelope ID: 440709F8-0561-4315-8F90-5ABED99EFEEIC

**<u>SCHEDULE A</u>**

**INVESTOR LIST**

1.   EdgeCo, LLC, a Wyoming limited liability company

Docusign Envelope ID: 440708E8-8561-4315-8E60-5ABED8BFEEC0

Case 25-40212 Doc 20 Filed 04/23/25 Entered 04/23/25 17:20:12 Desc Exhibit 27 - Proof of Claim of EdgeCo LLC Page 78 of 86

# EXHIBIT 3

Docusign Envelope ID: 440790F2-R591-425F-8F6A-5ABED89FFF4C
Case 8:24-bk-12674-SC    Claim 20    Filed 04/23/25    Desc Main Document    Page 89 of 96
27 - Proof of Claim of EdgeCo    LLC    Page 79 of 86
U240047071529

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT AMENDMENT (UCC 3)**

California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U240047071529 |
| Date Filed: 6/6/2024 |

| Submitter Information: | |
| --- | --- |
| Contact Name | |
| Organization Name | FitzGerald Kreditor Bolduc Risbrough LLP |
| Phone Number | (949) 788-8900 |
| Email Address | |
| Address | 2 Park Plaza, Suite 850<br>Irvine, CA 92614 |

| Amendment Action Information: | |
| --- | --- |
| Initial Financing Statement File Number | U240000591214 |
| Date Filed | 01/03/2024 |
| Amendment Action | Collateral Amendment |
| Collateral Change | Restate Collateral |

| Indicate how documentation of Collateral is provided: | Attached in a File |
| --- | --- |

Upload PDF as Collateral:
Collateral.pdf

☐ Check this box to see additional UCC Collateral options.

Name of Secured Party of Record Authorizing This Amendment:

☐ If this Amendment is authorized by a Debtor, check this box and select the name of the Authorizing Debtor below.

| Authorizing Secured Party Name | EDGECO, LLC |
| --- | --- |

Optional Filer Reference Information:

Miscellaneous Information:

Docusign Envelope ID: 4A0739F8-0561-4315-8E91-57BED98FEE4C

Any and all assets of the Debtor and Debtor's North American, European, Australian, and New Zealand subsidiaries (wherever located, whether now owned or hereafter acquired, including, but not limited to: (i) any and all assets of NetComm Wireless Pty. Ltd. (Administrators Appointed) as acquired by Debtor; (ii) all technology assets purchased from Adaptive Spectrum and Signal Alignment, Incorporated and owned by the Debtor, or any Debtor subsidiary, in whatever form; (iii) any and all cloud technology either owned, developed, licensed, or otherwise; (iv) all equipment, machinery, computer kiosks, vehicles, furniture, tools, dies, jigs, and fixtures, and all attachments, accessions and equipment now or hereafter affixed thereto or used in connection therewith, and all substitutions and replacements thereof (the "Equipment"); (v) all raw materials, work in process, finished goods, and all other inventory (as defined in the Uniform Commercial Code) of whatsoever kind or nature, and all wrapping, packaging, advertising and shipping materials, and any documents relating thereto, and all labels and other devices, names or marks affixed or to be affixed thereto for purposes of selling or of identifying the same or the seller or manufacturer thereof and all of the Debtor's right, title and interest therein and thereto, wherever located, whether now owned or hereafter acquired (the "Inventory"); (vi) all present and future accounts, contract rights, chattel paper, documents, instruments, trademarks, trade names, service names and general intangibles, whether now owned or hereafter acquired, the Debtor's interest in the goods represented thereby or described in copies of invoices delivered to the Debtor; all returned, reclaimed or repossessed goods with respect thereto; all rights and remedies of Debtor under or in connection with such collateral (the "Accounts"); (vii) all books, records and other property and general intangibles at any time relating to the Equipment, Inventory, and Accounts ("Records"); (viii) all source code and development flow charts; all existing content and HTML files; all graphics and logos; all agreements with content providers whether verbal or written; all scripts (Perl, Java, VB, etc.); all Information System Architecture, including all versions of all software being used; all domain names and URLs; any third party software licensed to the Debtor; any proprietary software and its source code; all branding and trademarks; any dedicated servers; and all contracts with advertisers and product distributors (the "Intellectual Property"); and (ix) all products and proceeds of the foregoing, in any form, including without limitation, any claims against third parties for loss or damage to or destruction of any or all of the Equipment, Inventory and Accounts (the "Proceeds").

B2796-3650  06/06/2024  3:24 PM  Received by California Secretary of State

Docusign Envelope ID: 4A0720F8-8561-4315-85A0-54BED905EEE0

Case 24-11967-JKS   Doc 2620   Filed 04/24/25   Entered 04/24/25 17:20:12   Desc Exhibit
27 - Proof of Claim of EdgeCo   LLC   Page 81 of 86

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
(949) 788-8900

**B. E-MAIL CONTACT AT FILER** (optional)
SECURITIES@FKBRLEGAL.COM

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

FITZGERALD KREDITOR BOLDUC RISBROUGH LLP

2 PARK PLAZA, SUITE 850

IRVINE, CA 92614

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 06:37 PM 06/06/2024**
**U.C.C. Initial Filing No: 2024 0062099**
**Amendment No: 2024 3817275**
**Service Request No:   20242802949**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE NUMBER**
**2024006 2099**

**1b.** [ ] This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

**2.** [ ] **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** [ ] **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** [ ] **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** [ ] **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                    **AND** Check one of these three boxes to:

[ ] This Change affects [ ] Debtor or [ ] Secured Party of record

[ ] CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c   [ ] ADD name: Complete item 7a or 7b, and item 7c   [ ] DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:**   Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**8.** [✔] **COLLATERAL CHANGE:** Also check one of these four boxes: [ ] ADD collateral   [ ] DELETE collateral   [✔] RESTATE covered collateral   [ ] ASSIGN collateral

Indicate collateral:
**Collateral Description - please see attached**

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR**, check here [ ] and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | EDGECO, LLC | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

**10. OPTIONAL FILER REFERENCE DATA:**

Docusign Envelope ID: 44073DF2-B561-431F-8F51-57BED9EEEFC9

Any and all assets of the Debtor and Debtor's North American, European, Australian, and New Zealand subsidiaries (wherever located, whether now owned or hereafter acquired, including, but not limited to: (i) any and all assets of NetComm Wireless Pty. Ltd. (Administrators Appointed) as acquired by Debtor; (ii) all technology assets purchased from Adaptive Spectrum and Signal Alignment, Incorporated and owned by the Debtor, or any Debtor subsidiary, in whatever form; (iii) any and all cloud technology either owned, developed, licensed, or otherwise; (iv) all equipment, machinery, computer kiosks, vehicles, furniture, tools, dies, jigs, and fixtures, and all attachments, accessions and equipment now or hereafter affixed thereto or used in connection therewith, and all substitutions and replacements thereof (the "Equipment"); (v) all raw materials, work in process, finished goods, and all other inventory (as defined in the Uniform Commercial Code) of whatsoever kind or nature, and all wrapping, packaging, advertising and shipping materials, and any documents relating thereto, and all labels and other devices, names or marks affixed or to be affixed thereto for purposes of selling or of identifying the same or the seller or manufacturer thereof and all of the Debtor's right, title and interest therein and thereto, wherever located, whether now owned or hereafter acquired (the "Inventory"); (vi) all present and future accounts, contract rights, chattel paper, documents, instruments, trademarks, trade names, service names and general intangibles, whether now owned or hereafter acquired, the Debtor's interest in the goods represented thereby or described in copies of invoices delivered to the Debtor; all returned, reclaimed or repossessed goods with respect thereto; all rights and remedies of Debtor under or in connection with such collateral (the "Accounts"); (vii) all books, records and other property and general intangibles at any time relating to the Equipment, Inventory, and Accounts ("Records"); (viii) all source code and development flow charts; all existing content and HTML files; all graphics and logos; all agreements with content providers whether verbal or written; all scripts (Perl, Java, VB, etc.); all Information System Architecture, including all versions of all software being used; all domain names and URLs; any third party software licensed to the Debtor; any proprietary software and its source code; all branding and trademarks; any dedicated servers; and all contracts with advertisers and product distributors (the "Intellectual Property"); and (ix) all products and proceeds of the foregoing, in any form, including without limitation, any claims against third parties for loss or damage to or destruction of any or all of the Equipment, Inventory and Accounts (the "Proceeds").

**UCC FINANCING STATEMENT AMENDMENT**

**FOLLOW INSTRUCTIONS**

| **A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)** |
|---|
| FitzGerald Kreditor Bolduc Risbrough LLP 949-788-8900 |

**B. E-MAIL CONTACT AT SUBMITTER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

FitzGerald Kreditor Bolduc Risbrough LLP
2 PARK PLAZA, SUITE 850
Irvine, CA 92614-92614
USA

**SEE BELOW FOR SECURED PARTY CONTACT INFORMATION**

**FILING NUMBER: 24-00356014**
**FILING DATE:** 06/06/2024    06:18 PM
**DOCUMENT NUMBER:** 1370258450003
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

---

1a. INITIAL FINANCING STATEMENT FILE NUMBER

**24-0000389349**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of the Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b and address of Assignee in item 7c and also name of Assignor in item 9.
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes. This Change affects ☐ Debtor or ☐ Secured Party of record. AND Check one of these three boxes to:

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| OR | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 7b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

8. **COLLATERAL CHANGE:** Check only one box: ☐ ADD collateral   ☐ DELETE collateral   ☑ RESTATE covered collateral   ☐ ASSIGN collateral

Indicate collateral:

Any and all assets of the Debtor and Debtor's North American, European,
Australian, and New Zealand subsidiaries (wherever located, whether now owned or
hereafter acquired, including, but not limited to: (i) any and all assets of
NetComm Wireless Pty. Ltd. (Administrators Appointed) as acquired by Debtor;
(ii) all technology assets purchased from Adaptive Spectrum and Signal
Alignment, Incorporated and owned by the Debtor, or any Debtor subsidiary, in
whatever form; (iii) any and all cloud technology either owned, developed,
licensed, or otherwise; (iv) all equipment, machinery, computer kiosks,
vehicles, furniture, tools, dies, jigs, and fixtures, and all attachments,

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| OR | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **EdgeCo, LLC** | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

**UCC FINANCING STATEMENT AMENDMENT ADDENDUM**

**FOLLOW INSTRUCTIONS**

| 11. INITIAL FINANCING STATEMENT FILE NUMBER Same as item 1a on Amendment form |
|---|
| **24-0000389349** |

<table>
<tr><td rowspan="4">12. NAME of PARTY AUTHORIZING THIS AMENDMENT Same as item 9 on Amendment form<br><br>OR</td><td>12a. ORGANIZATION'S NAME<br>**EdgeCo, LLC**</td></tr>
<tr><td>12b. INDIVIDUAL'S SURNAME</td></tr>
<tr><td>FIRST PERSONAL NAME</td></tr>
<tr><td>ADDITIONAL NAME(S)/INITIAL(S)</td></tr>
</table>

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

---

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

<table>
<tr><td rowspan="2">OR</td><td colspan="4">13a. ORGANIZATION'S NAME</td></tr>
<tr><td>13b. INDIVIDUAL'S SURNAME</td><td>FIRST PERSONAL NAME</td><td>ADDITIONAL NAME(S)/INITIAL(S)</td><td>SUFFIX</td></tr>
</table>

---

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

accessions and equipment now or hereafter affixed thereto or used in connection therewith, and all substitutions and replacements thereof (the "Equipment"); (v) all raw materials, work in process, finished goods, and all other inventory (as defined in the Uniform Commercial Code) of whatsoever kind or nature, and all wrapping, packaging, advertising and shipping materials, and any documents relating thereto, and all labels and other devices, names or marks affixed or to be affixed thereto for purposes of selling or of identifying the same or the seller or manufacturer thereof and all of the Debtor's right, title and interest therein and thereto, wherever located, whether now owned or hereafter acquired (the "Inventory"); (vi) all present and future accounts, contract rights, chattel paper, documents, instruments, trademarks, trade names, service names and general intangibles, whether now owned or hereafter acquired, the Debtor's interest in the goods represented thereby or described in copies of invoices delivered to the Debtor; all returned, reclaimed or repossessed goods with respect thereto; all rights and remedies of Debtor under or in connection with such collateral (the "Accounts"); (vii) all books, records and other property and general intangibles at any time relating to the Equipment, Inventory, and Accounts ("Records"); (viii) all source code and development flow charts; all existing content and HTML files; all graphics and logos; all agreements with content providers whether verbal or written; all scripts (Perl, Java, VB, etc.); all Information System Architecture, including all versions of all software being used; all domain names and URLs; any third party software licensed to the Debtor; any proprietary software and its source code; all branding and trademarks; any dedicated servers; and all contracts with advertisers and product distributors (the "Intellectual Property"); and (ix) all products and proceeds of the foregoing, in any form, including without limitation, any claims against third parties for loss or damage to or destruction of any or all of the Equipment, Inventory and Accounts (the "Proceeds").

---

<table>
<tr><td>15. THIS FINANCING STATEMENT AMENDMENT:<br>☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing</td><td>17. Description of real estate:</td></tr>
<tr><td>16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest):</td><td></td></tr>
</table>

18. MISCELLANEOUS:

**FILING OFFICE COPY**

**docusign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 4A0709F8-2E61-421E-8F61-5ADED8BEFE1C | | Status: Completed |
| Subject: #DS00366818 - EdgeCo Proof of Claim | | |
| Source Envelope: | | |
| Document Pages: 83 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | AkermanSign |
| AutoNav: Enabled | | 495 N Keller Rd Ste 300 |
| EnvelopeId Stamping: Enabled | | Maitland,  32751-8656 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | AkermanSign@akerman.com |
| | | IP Address: 208.66.86.110 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: AkermanSign | Location: DocuSign |
| 4/4/2025 10:18:09 AM | AkermanSign@akerman.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Robert Binkele | DocuSigned by: | Sent: 4/4/2025 10:18:09 AM |
| rbinkele@myept.com | ~149CD354FC8E4F5... | Viewed: 4/4/2025 10:18:27 AM |
| Security Level: Email, Account Authentication (None) | | Signed: 4/4/2025 10:20:45 AM |
| | Signature Adoption: Drawn on Device | |
| | Using IP Address: 146.75.154.0 | |
| | Signed using mobile | |
| **Electronic Record and Signature Disclosure:** | | |
| Accepted: 4/4/2025 10:18:27 AM | | |
| ID: a1e9a719-14ce-4b99-961d-1d2b7d092007 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Teresa Barrera | COPIED | Sent: 4/4/2025 10:18:10 AM |
| teresa.barrera@akerman.com | | Viewed: 4/4/2025 10:21:36 AM |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** | | |
| Not Offered via Docusign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/4/2025 10:18:10 AM |
| Certified Delivered | Security Checked | 4/4/2025 10:18:27 AM |
| Signing Complete | Security Checked | 4/4/2025 10:20:45 AM |
| Completed | Security Checked | 4/4/2025 10:20:45 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**