IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE:<br><br>    DZS Inc.,[1]<br><br>    Debtor. | (CHAPTER 7)<br><br>CASE NO. 25-40712 |

**LIMITED OBJECTION OF DASAN NETWORK SOLUTIONS INC. TO TRUSTEE'S MOTION FOR AN ORDER APPROVING SALE OF CERTAIN PROPERTY OF THE ESTATE FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES**

Creditor Dasan Network Solutions Inc. ("DNS") files this limited objection ("Objection") to the *Trustee's Motion For An Order Approving Sale Of Certain Property Of The Estate Free And Clear Of All Liens, Claims And Encumbrances And Assumption And Assignment Of Executory Contracts And Leases* [D.I. 26] (the "Sale Motion") filed by Michelle H. Chow (the "Trustee"), the chapter 7 trustee of DZS Inc. ("DZS") and the other above-captioned debtors (collectively, the "Debtors"). In support of the Objection, DNS respectfully states as follows:

**Introduction[2]**

1.  DNS objects to the Sale Motion because it appears the Trustee is seeking to sell approximately $8.5 million of DNS Materials and Products that belong to DNS, not DZS. The Trustee's exact intentions are not clear because the Trustee redacted the APA Schedule that defines "Acquired Assets." The Trustee has also filed a notice of executory contracts that *may* be assumed and assigned by the Trustee, which lists several of the contracts between DNS and DZS and reflects a cure amount that appears to include the $8.5 million of DNS Materials and Products. But, the

---

[1] The Debtors in these Chapter 7 cases, along with the last four digits of each Debtor's Federal Tax Identification Number, include: DZS Inc. (9099), DZS Services Inc. (3763) and DZS California Inc. (3221). The location of the Debtors' service address is: 5700 Tennyson parkway, Suite 400, Plano, TX 75024.
[2] Capitalized terms in this Introduction shall have the definitions provided below.

Trustee has not filed final notices designating which contracts are being assumed so there is no clarity on whether the Trustee and proposed Buyer will ultimately seek to assume the contracts and obligations related to the DNS Materials and Products.  DNS is also filing a concurrent objection to the notice of proposed assumption challenging the proposed cure costs and the Trustee's ability to assume and assign those agreements, so it is possible those agreements may not be assumed at all.

2. What is true in all of this confusion is that the DNS Materials and Products were never property of DZS.  The DNS Materials and Products have always been owned by DNS, and the related transactions are part of an ordinary course of business that predates the SPA Transaction and the MSA.  Thus, the Trustee cannot sell the DNS Materials and Products because they are not property of the estate.  Absent some agreement between DNS, the Trustee and the Buyer, the Sale Motion should be denied with respect to any sale of DNS Materials and Products, and the APA should be amended to remove the DNS Materials and Products from the list of assets being sold by the Trustee.

3. Further, it is critical that the Court determine ownership of the DNS Materials and Products <u>before</u> the Trustee is allowed to sell them.  DNS will be significantly damaged if the Court allows the sale to proceed, subject only to a later determination on who is entitled to the proceeds (e.g., DNS or the secured lender).  DNS can use the DNS Materials for products for other customers that will generate more revenue or sell the DNS Materials and Products on the market on its own for a higher purchase price.  DNS cannot do that if the sale proceeds.  There will also no doubt be an allocation dispute if the DNS Materials and Products are sold are part of the propose sale since the sale involves assets other than the DNS Materials and Products.  Administrative expenses related to the sale will also effectively reduce the amount of sale proceeds.  The sale

should not proceed until the ownership issue is resolved, otherwise DNS will be irreparably harmed.

## Factual Background

4. DNS is a global leader in the Giga internet and telecommunication network solutions space. DNS produces and procures a wide range of hardware and software network equipment, such as FTTH, Mobile Backhaul, Copper, Ethernet Switch to Wi-Fi, and SDN/NFV solutions for telecommunications operators, municipalities and enterprise customers (collectively, the "Products"). DNS also operates global research and development centers around the world meeting local customers' requirements as well as leading development and deployment of the world's best network solutions and services (the "Services").

5. DNS and DZS have a long business history. At one time, DNS was a wholly owned subsidiary of DZS. On April 5, 2024, DZS sold DNS to non-debtor Dasan Networks Inc. (the "SPA Transaction"). DNS is no longer a subsidiary of DZS. DNS is 100% owned by non-debtor Dasan Networks Inc., which also owns 23.38% of DZS.

### A. DNS Provides Contract Product Manufacturing For DZS

6. For many years prior to the Petition Date, DNS provided contract product manufacturing and engineering services to DZS. Before the SPA Transaction, while DNS was a subsidiary of DZS, the parties operated without many formal written agreements but subject to a joint understanding of the terms and ordinary practices governing the parties' relationship. In connection with the SPA Transaction, because DNS would no longer be a wholly owned subsidiary of DZS, the parties executed a Master Supply Agreement dated April 5, 2024 (the "MSA") to memorialize the course of dealing the parties had been operating under pre-SPA Transaction.

7. Per the parties' ordinary course of business and the terms of the MSA, DZS is required to provide DNS with monthly 15-month rolling production forecasts ("Production Forecasts") that project the anticipated types and quantities of Products that DZS expects to purchase over the next 15 months. (MSA § 2.2.) DZS is also required to provide DNS with a rolling 3-month build plan ("Build Plan") and delivery schedule of the types and quantities of Products required. (MSA § 2.3.) DNS purchased parts, components and materials (the "Materials") sufficient to manufacture the Products ordered by DZS. DNS is required to purchase Materials sufficient to manufacture the Products in accordance with the Production Forecasts and Build Plan, and to build Products in accordance with the Build Plan.

8. Per the parties' ordinary course of business and the terms of the MSA, DZS issued blanket purchase orders (the "Purchase Orders") to DNS when DZS wished to purchase Products in accordance with DZS's Production Forecasts and Build Plans. (MSA §§ 1.2, 2.2, 5.) DZS did not usually want all Products delivered at once. Instead, DZS would notify DNS via e-mail when it wanted to receive periodic shipments of Products identified in the Purchase Order. DZS could take months or years to direct shipment of all Products covered by one blanket Purchase Order. For example, DZS might issue a blanket Purchase Order for 100 units but not request production or delivery of any units at that time. One month later, DZS might email DNS asking DNS to produce 10 of the units identified in the Purchase Order. After those 10 units were produced, DZS might instruct DNS to only deliver 5 of the 10 units that were produced, leaving 5 units that were produced by DNS but never delivered to DZS. Title to and ownership of finished Products only passes from DNS to DZS upon delivery of the Products EXW (Incoterms2020) to DNS's designated carrier at the DNS facility. (MSA §§ 1.1, 1.2, 4, 6.)

9. In practice, DZS always projected more Materials or Product in its Production Forecasts and Build Plans than DZS ordered during the Production Forecast or Build Plan period. These excess Materials and Products are the DNS Materials and Products at issue now. DNS stores the DNS Materials and Products in its warehouse in Korea. Title and ownership of the DNS Materials and Products does not pass to DZS until the Products are delivered EXW to DZS per the terms of the MSA.

10. The gap between DZS's blanket Purchase Orders and the amount of Materials and Product DZS took delivery of grew over time. On April 5, 2024, in connection with the SPA Transaction, DNS and DZS reached an agreement, via e-mail, on the amount of Product, Material, and open blanket Purchase Orders as between the parties. At that time, DNS was holding and owned (because DNS had not yet delivered) $1.7 million in Products, $3.6 million in Materials, and approximately $7.6 million in blanket Purchase Orders that were still open and still had items that had not been ordered for production and delivery by DZS. Under the April 5, 2024 agreement, DZS agreed to take shipment of approximately $7.6 million in Materials and Products under the open blanket Purchase Orders by no later than June 30, 2024. DZS did not so do and breached that agreement.

11. After several months of limited communication on this issue, on January 21, 2025, DZS sent DNS an amended Purchase Order in the amount of $8,589,541, including $5,571.042 in Materials and $3,018,499 in Products (the "January 2025 PO"). The January 2025 PO included the amounts that were still open under all prior open Purchase Orders, including the $7.6 million identified on April 5, 2024. After receiving this request, DNS contacted DZS about the need for payments and contracts as next steps to proceed with the January 2025 PO. DZS did not respond to DNS and took no further action. Since DZS had not moved forward with the January 2025 PO,

- 5 -

DNS did not deliver any of the DNS Materials or Products. All DNS Materials and Products continued to be owned by DNS.

### B. The Trustee's Sale Motion and the APA

12. The online data room created in connection with the Trustee's potential sale of DZS's assets includes a "Net Inventory – DZS Inc." list of DZS's inventory that the Trustee is seeking to sell (the "Net Inventory List"). The Net Inventory List includes the DNS Materials and Products, with the designation "disputed" next to it as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| South Korea | Seoul | DNS, Janghowon, Gyeonggi | $ 2,444,469 | $ 574,030 | $ 5,571,042 | $ 8,589,541 | *disputed |

13. On April 4, 2025, the Trustee filed the Sale Motion seeking to sell substantially all of the business assets of DZS, subject to terms set forth generally in the Letter of Intent attached as an exhibit to the Sale Motion ("LOI"). (*See* Sale Motion, D.I. 26; LOI, D.I. 26-1.)

14. Per the LOI, the assets being sold include "all inventory of [DZS] (including, without limitation, all finished goods, work in progress, raw materials, component parts and other items customarily forming part of the inventory of DZS)." (LOI, D.I. 26-1 p. 4.)

15. On April 22, 2025, the Trustee filed the proposed Asset Purchase Agreement ("APA") executed by the Trustee and the proposed buyer, Fibre Acquisition Corporation ("Buyer"). The APA proposes to sell to Buyer the "Acquired Assets," which is defined to include the property and assets set forth on Schedule 1.1 to the APA. (APA, D.I. 75 p. 1.) However, the Trustee redacted all of the Schedules to the APA, including the list of Acquired Assets, so DNS cannot confirm whether the Trustee is attempting to sell the DNS Materials and Products.

16. DNS contacted the Trustee after the bankruptcy case was filed and after the Sale Motion was filed to open a dialogue but has not received a response. Since DNS has not seen the

list of Acquired Assets and does not know whether the Trustee is seeking to sell the DNS Materials and Products, DNS files this Objection.

### Legal Argument

17. A bankruptcy court may not allow the sale of property as "property of the estate" without first determining whether the debtor in fact owns the property. *See In re Worcester Country Club Acres,* LLC, 655 B.R. 41, 46-47 (Bankr. D. Mass 2023) ("Accordingly, [i]mplicit within the statutory grant of authority to sell property under section 363…is the requirement that the estate actually have an interest in the property to be sold.") Simply put, "[a] bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property." *Id.* (citing *Warnick v. Yassain (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 609 (9th Cir. 2004); *see also In re Goli Nutrition Inc.*, No. 24-10438, 2024 WL 1748460, *6 (Bankr. D. Del. Apr. 23, 2024).

18. Section 363(f) permits a sale of property free and clear of an interest or a bona fide dispute, but only to the extent that the property may be sold under subsections (b) or (c). *See* 11 U.S.C. § 363(f) ("The trustee may sell property *under subsection (b)( or (c)* of this section free and clear of any interest in such property of an entity other than the estate, only if…") (emphasis added). In turn, subsections (b)( and (c) authorize the sale of property *only* if the property is "property of the estate." *See* 11 U.S.C. § 363(b)(1), (c)(1).

19. The requirement that property being sold must be estate property cannot be circumvented by concerns about loss of value, even if legitimate. As noted in *In re Worcester Country Club Acres, LLC*: "The Debtor also implores this Court to allow a sale quickly, as the value of the property interests may decline with the passage of time (or may expire, in the case of the Development Rights). The Court sympathizes with the Debtor's appeal to expediency.

However, while in many cases § 363(f)(4) may allow the sale of property expeditiously and without the need for final adjudication of certain liens and interests in property, the Court cannot circumvent the plan text of the Bankruptcy Code (i.e. that only property of the estate may be sold) in the pursuit of that expediency." 655 B.R. at 47 (*citing Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)).

20. Section 541(b) of the Bankruptcy Code provides that the bankruptcy estate includes "all interests of the debtor…as of the commencement of the case." 11 U.S.C. § 541(a)(2). What constitutes property of a bankruptcy estate is a federal question governed by Section 541, but whether and to what extent a debtor has a legal or equitable interest in specific property as of the petition date is determined by applicable state or other law. A trustee has no greater rights in estate property than the debtor possessed outside of bankruptcy prior to the petition date. *See In re Robertson*, 203 F.3d 855, 859 (5th Cir. 2000).

21. In the case of property rights governed by contract, the choice of law provisions of the contract dictate which jurisdiction's law applies. In this case, the MSA is governed by the Laws of the Republic of Korea, without applicable conflict of law principals and without application of the United National Convention on Contracts for the International Sale of Goods, so Korean law interpreting the MSA applies. (MSA § 28.)

22. Here, the Trustee has not met her burden of proving that the DNS Materials and Products are property of the estate. On the contrary, the Trustee's own data room materials admit that DZS's alleged ownership of the DNS Materials and Products is in dispute. Further, as described in detail above, the parties' course of dealing and the terms of the MSA are clear that Materials purchased by DNS belong to DNS and that title to Products only passes from DNS to DZS upon delivery of the Products EXW (Incoterms2020) to DNS's designated carrier at the DNS

facility. (MSA §§ 1.1, 1.2, 4, 6.) The DNS Materials and Products were never delivered to DZS, so the DNS Materials and Products are still owned by DNS. DNS also has warehouse materialmen's lien rights under Korean law that preclude the Trustee from selling them. They are not property of the estate, the trustee cannot sell them, and the Sale Motion should be denied with respect to the DNS Materials and Products.

23. DNS respectfully submits that it is critical for the Court to determine ownership of the DNS Materials and Products <u>before</u> a sale closes. DNS will not be made whole for the sale of its Materials and Products if the Court allows the sale to proceed with the rights of the parties attaching to the sale proceeds. The amount of sale proceeds will be no more than the APA purchase price. Outside of a forced sale process, DNS can use the DNS Materials for products for other customers that will generate more revenue or sell the DNS Materials and Products on the market on its own for a higher purchase price. In addition, there will no doubt be a purchase price allocation dispute between DNS, the secured lender, and other creditors since the sale involves assets other than the DNS Materials and Products. The APA purchase price will be reduced by the amount of these administrative expenses for the sale and DNS will incur additional fees and expenses it would not otherwise have to spend if it sold its assets outside of this case. The sale should not proceed until the ownership issue is resolved.

## **Conclusion**

For the reasons set forth above, DNS respectfully requests that the Court (a) deny the Sale Motion with respect to the sale of the DNS Materials and Products and (b) grant such other and further relief as the Court deems just and proper.

Dated: April 25, 2025

Respectfully submitted,

BAKER & HOSTETLER LLP

By:   */s/ Alexis C. Beachdell*
     Alexis C. Beachdell (*admitted pro hac vice*)
     (Ohio Bar No. 0083642)
     Key Tower
     127 Public Square, Suite 2000
     Cleveland, OH 44114-1214
     Telephone: 216.621.0200
     Email: abeachdell@bakerlaw.com

*Attorneys for Dasan Network Solutions Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 25, 2025, a true copy of the foregoing *Limited Objection of Dasan Network Solutions Inc. to Trustee's Motion for an Order Approving Sale of Certain Property of the Estate Free and Clear of all Liens, Claims and Encumbrances and Assumption and Assignment of Executory Contracts and Leases* should be served electronically by a Notice of Electronic Filing on all persons receiving notices via the Court's CM/ECF system.

          */s/ Alexis C. Beachdell*
          Alexis C. Beachdell