IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE:<br><br>DZS Inc.,[1]<br><br>Debtor. | (CHAPTER 7)<br><br>CASE NO. 25-40712 |

**OBJECTION OF DASAN NETWORK SOLUTIONS INC. TO TRUSTEE'S FIFTH NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED, PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE, IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE ESTATES' ASSETS, AND THE PROPOSED CURE AMOUNTS**

Creditor Dasan Network Solutions Inc. ("DNS") files this objection ("Objection") to the *Fifth Notice of Executory Contracts and Unexpired Leases That May Be Assumed And Assigned Pursuant To Section 365 Of The Bankruptcy Code, In Connection With The Sale Of Substantially All Of The Estate's Assets, And The Proposed Cure Amounts* [D.I. 51] (the "Notice") filed by Michelle H. Chow (the "Trustee"), the chapter 7 trustee of DZS Inc. ("DZS") and the other above-captioned debtors (collectively, the "Debtors"). In support of the Objection, DNS respectfully states as follows:

**Introduction[2]**

1.      DNS and DZS have a long business history.  At one time, DNS was a wholly owned subsidiary of DZS.  In April 2024, DNS was sold and it is no longer a subsidiary of DZS, but the companies continue to do significant business with each other. When DNS was a subsidiary of DZS, the parties operated largely without formal written agreements but subject to a joint

---

[1] The Debtors in these Chapter 7 cases, along with the last four digits of each Debtor's Federal Tax Identification Number, include: DZS Inc. (9099), DZS Services Inc. (3763) and DZS California Inc. (3221).  The location of the Debtors' service address is: 5700 Tennyson parkway, Suite 400, Plano, TX 75024.
[2] Capitalized terms in this Introduction shall have the definitions provided below.

understanding of the terms and ordinary practices governing the parties' relationship. In connection with the SPA Transaction, the parties executed numerous agreements to memorialize the course of dealing DNS and DZS had been operating under pre-sale, including, but not limited to, a transition services agreement, a master supply agreement, an engineering services agreement, an intellectual property license agreement, and two reseller agreements.

2. By the Notice, the Trustee gave notice of her intent to potentially assume certain Agreements between DNS and DZS and assign those agreements to the Buyer in connection with the proposed sale of the Debtors' business assets pursuant to the terms of the APA. The Notice lists three separate proposed cure amounts that are not tied to any specific Agreement: a proposed trade payables cure amount of $1,348.123.75 (the "Proposed Trade Payable Cure Amount"),[3] a proposed "inventory" cure amount of $8,799,674.65 (the "Proposed Misidentified GRNI Cure Amount"), and a small intercompany balance cure amount of $71.00 (the "Proposed Intercompany Cure Amount," and together with the Proposed Trade Payable Cure Amount and Proposed Inventory Cure Amount, the "Total Proposed Cure Amount").

3. DNS objects to the potential assumption and assignment of the Agreements for two reasons. *First*, the Agreements cannot be assumed and assigned by the Trustee because the Agreements are contracts between affiliates, akin to personal services contracts, and applicable non-bankruptcy law prohibits such assignments without the consent of DNS. *Second*, the Total Proposed Cure Amount is incorrect. DNS is owed no less than $4,310,348.75 (the "Correct Trade Payable Cure Amount") for trade payables owed under the different Agreements. The Proposed Misidentified GRNI Cure Amount appears to be related to an $8.5 million blanket Purchase Order issued by DNZ for Materials and Products that were never delivered by DNS.. This issue is

---

[3] The Notice includes the number $1,348,123.75 twice, on two successive lines. This appears to be a scrivner's error.

addressed in DNS's objection to the Trustee's pending sale motion, filed concurrently with this Objection. It is unclear from the Notice what the Proposed Intercompany Cure Amount is supposed to cover.

4. Accordingly, DNS respectfully requests the Court enter an order denying the Trustee's assumption and assignment of the Agreements to Buyer. In the alternative, if assumption and assignment of the Agreements is approved, DNS requests that the Trustee (or the Buyer, per the terms of the APA) be required to pay the Correct Trade Payable Cure Amount immediately upon assumption of the Agreements.

**Factual Background**

5. DNS is a global leader in the Giga internet and telecommunication network solutions space. DNS produces and procures a wide range of hardware and software network equipment, such as FTTH, Mobile Backhaul, Copper, Ethernet Switch to Wi-Fi, and SDN/NFV solutions for telecommunications operators, municipalities and enterprise customers (collectively, the "Products"). DNS also operates global research and development centers around the world meeting local customers' requirements as well as leading development and deployment of the world's best network solutions and services (the "Services").

6. At one time, DNS was a wholly owned subsidiary of debtor DZS. On April 5, 2024, DZS sold DNS to non-debtor Dasan Networks Inc. (the "SPA Transaction"). DNS is no longer a subsidiary of DZS. DNS is 100% owned by non-debtor Dasan Networks Inc., which also owns 23.38% of DZS.

*A. The Agreements Between DNS and DZS*

7. For many years prior to the Petition Date, DNS and DZS operated mostly without formal written agreements but with a joint understanding of the terms and ordinary practices

- 3 -

governing the parties' relationship. In connection with the SPA Transaction, since DNS would no longer be a subsidiary of DZS, the parties executed numerous agreements to memorialize the course of dealing DNS and DZS had been operating under pre-SPA Transaction, all dated April 5, 2024. The following are some of those agreements identified by the Trustee for potential assumption and assignment:

  a. Two Assignment and Assumption Agreements, pursuant to which DNS and DZS assigned to each other and assumed various existing contracts between DNS or DZS and third parties;

  b. One Master Engineering Services Agreement, pursuant to which DNS provided DZS with certain engineering, research and development and other professional technology services;

  c. Two Master Service Agreements, pursuant to which DNS and DZS agreed to provide each other services, parts, and licensed software as required on data communications equipment within certain territories;

  d. One Master Supply Agreement, pursuant to which DNS agreed to provide DZS with contract product manufacturing and engineering services;

  e. Two Reseller Agreements, pursuant to which DNS and DZS agreed to the territory and terms for reselling each others' products;

  f. One Transition Services Agreement, pursuant to which DZS agreed to provide DNS with certain transition services following the SPA Transaction; and

  g. One Intellectual Property Agreement, pursuant to which DZS and its affiliates and DNS and its affiliates agreed to provide each other with perpetual, irrevocable, non-assignable, non-exclusive, worldwide, royalty-free, fully paid up licenses to certain of their intellectual property.

The Trustee also identified other agreements for potential assumption and assignment that name DNS's parent company, Dasan Networks Inc., but may also involve DNS, such as an "Email Agreement Regarding DZS's Purchase of Finished Goods, Raw Materials and [end of entry]." All agreements identified by the Trustee in the Notice are referred to herein collectively, the "Agreements."

**B. The Schedules, The Sale Motion, The Notice, and the Proposed Cure Amounts**

8.  The Debtors filed Schedules on the Petition Date [D.I. 2] (the "Schedules"). In the Debtor's Schedules, the Debtor scheduled the following amounts as owed to DNS, which clearly tie to the Proposed Cure Amounts:

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3.117 | DASAN NETWORK SOLUTIONS INC | | DASAN TOWER | 49 DAEWANGPANGYO-RO 644 BEON-GIL | | SOUTH KOREA | | KOREA, REPUBLIC OF | Trade Payable | | No | 1,348,123.75 |
| 3.118 | DASAN NETWORK SOLUTIONS INC - INV | | DASAN TOWER | 49, DAEWANGPANGYO-RO 644BEON-GIL, BUNDANG-GU | | SEONGNAM-SI, GYEONGGI-DO | | REPUBLIC OF KOREA | GRNI Claim | X X | No | 8,799,674.65 |
| 3.119 | DASAN NETWORK SOLUTIONS, INC.(KOREA) | | DASAN TOWER | 49, DAEWANGPANGYO-RO 644BEON-GIL, BUNDANG-GU | | SEONGNAM-SI, GYEONGGI-DO | | REPUBLIC OF KOREA | Intercompany Receivable Credit | | No | 71.00 |

DNS disputes that the ~$8.7 million amount listed as a "GRNI Claim" in the Schedules (the "Misidentified GRNI Assets") is a claim for GRNI. "GRNI" stands for "Goods Received Not Invoiced." As described in DNS's concurrently filed objection to the Trustee's Sale Motion (defined below), the Misidentified GRNI Assets were never delivered to DZS so they are not goods received by DZS and are not DZS's inventory. The Misidentified GRNI Assets are materials and products for which title never passed to DZS, meaning those materials and products have always been owned by DNS and are still owned by DNS.

9.  Separately, the online data room created in connection with the Trustee's proposed sale of DZS's assets includes a "Net Inventory – DZS Inc." list of DZS's inventory that the Trustee is seeking to sell. That Net Inventory List identifies ~$8.5 million in "inventory" allegedly owned by DZS. DNS has tied this "disputed inventory" to the Misidentified GRNI Assets listed as a "GRNI Claim" in the Debtors' Schedules.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| South Korea | | Seoul | DNS, Janghowon, Gyeonggi | $ 2,444,469 | $ 574,030 | $ 5,571,042 | | $ 8,589,541 *disputed |

10. On April 4, 2025, the Trustee filed a motion seeking to sell substantially all of the business assets of DZS (the "Sale Motion"). (*See* Sale Motion, D.I. 26.) On April 22, 2024, the Trustee filed the proposed Asset Purchase Agreement executed by the Trustee and the proposed

buyer, Fibre Acquisition Corporation ("Buyer") [D.I. 75] (the "APA"). The Sale Motion and the APA contemplate that the Buyer may want to assume certain executory contracts of the Debtors and will pay the cure amounts due under those contracts as part of the consideration for the sale. The APA contemplates that the Buyer will have until May 12, 2025, to decide which contracts it wants to assume.

11. The Trustee filed the Notice in connection with the Sale Motion and the APA. The Notice identifies the following Agreements for potential assumption and assignment, along with the following Proposed Cure Costs:

| | | | | |
|---|---|---|---|---|
| 2.0881 | ASSIGNMENT AND ASSUMPTION | DASAN NETWORK SOLUTIONS, INC. | | |
| 2.0882 | ASSIGNMENT AND ASSUMPTION | DASAN NETWORK SOLUTIONS, INC. | | |
| 2.0883 | MASTER ENGINEERING SERVICES | DASAN NETWORK SOLUTIONS, INC. | | |
| 2.0884 | MASTER SERVICE AGREEMENT | DASAN NETWORK SOLUTIONS, INC. | $ | 71.00 |
| | | | $ | 1,348,123.75 |
| | | | $ | 1,348,123.75 |
| | | | $ | 8,799,674.65 |
| 2.0885 | MASTER SERVICE AGREEMENT | DASAN NETWORK SOLUTIONS, INC. | | |
| 2.0886 | MASTER SUPPLY AGREEMENT | DASAN NETWORK SOLUTIONS, INC. | | |
| 2.0887 | RESELLER AGREEMENT | DASAN NETWORK SOLUTIONS, INC. | | |
| 2.0888 | RESELLER AGREEMENT | DASAN NETWORK SOLUTIONS, INC. | | |
| 2.0889 | TRANSITION SERVICES AGREEMENT | DASAN NETWORK SOLUTIONS, INC. | | |
| 2.0890 | ASSIGNMENT AND OFFSET AGREEMENT | DASAN NETWORKS, INC. | | |
| 2.0891 | EMAIL AGREEMENT REGARDING DZS'S PURCHASE OF FINISHED GOODS, RAW MATERIALS AND | DASAN NETWORKS, INC. | | |
| 2.0892 | OFFSET, TRANSFER AND ASSUMPTION AGREEMENT | DASAN NETWORKS, INC. | | |
| 2.0893 | STOCK PURCHASE AGREEMENT | DASAN NETWORKS, INC. | | |
| 2.0894 | INTELLECTUAL PROPERTY LICENSE | DASAN NETWORKS, INC. | | |
| 2.0895 | ASSIGNMENT AND OFFSET AGREEMENT | DASAN NETWORKS, INC. | | |

12. Notably, the Proposed Cure Costs are identified in separate lines and are not tied to any particular Agreement. They are apparently tied to the amounts listed in the Schedules. The Proposed Trade Cure Amount matches the Schedules' "Trade Payables" amount, the Proposed Misidentified GRNI Cure Amount can be reconciled with the amount of the Schedules' Misidentified GRNI Assets, and the Proposed Intercompany Cure Amount matches the "Intercompany Receivable Credit" in the Schedules.

C. **The Proposed Trade Payable Cure Amount Is Incorrect**

13. The Schedules and the Notice do not explain how DZS calculated its Proposed Trade Payable Cure Amount of $1,348,123.75. The amount owed to DNS under the Agreements

is significantly higher. The total amount of trade payables owed to DNS under the Agreements is as follows:

| Category | Balance |
|---|---:|
| Owed under the Transition Services Agreement (IT) | 140,170.84 |
| Owed under the Engineering Services Agreement (R&D) | 2,027,255.62 |
| Owed Per Restatement PA | 96,510.20 |
| Owed For Sales Of Goods | 2,046,412.09 |
|  |  |
| Total Owed | 4,310,348.75 |
| Difference From Proposed Trade Payable Cure Amount | 2,962,225.00 |

14. With respect to the other proposed cure amounts, DNS agrees with the amount of the Proposed Misidentified GRNI Cure Amount, but disputes how the claim itself is characterized. From the Schedules, the Net Inventory List, the Sale Motion, the APA and the Notice, there is confusion as to whether the Trustee and Buyer are taking the position that the Misidentified GRNI Assets are inventory that was allegedly owned by DZS and is currently property of the estate, or whether the Misidentified GRNI Assets are a cure claim connected to an executory contract that needs to be assumed and cured for DZS to own. This confusion is compounded by the fact that the Trustee redacted all of the Schedules to the APA, including the list of Acquired Assets, so DNS cannot confirm whether the Trustee is attempting to sell or assume and assign the Misidentified GNRI Assets. DNS contacted the Trustee after the bankruptcy case was filed and after the Sale Motion was filed to open a dialogue but has not received a response. DNS is unclear what the Proposed Intercompany Cure Amount is related to and cannot take a position.

## Legal Argument

### A. The Agreements Cannot Be Assumed And Assigned Under Applicable Law

15. The Agreements cannot be assumed by DZS and assigned to the Buyer because the Agreements are contracts between affiliates, akin to personal services contracts given the close business relationship between DNS and DZS, which cannot be assigned under applicable law.

16. Section 365(c) provides that unless the counterparty to an executory contract consents, the contract cannot be assumed and assigned if "applicable law excuses a party, other than the debtor, to such contract…from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties[.]" 11 U.S.C. § 365(c)(1).

17. The Fifth Circuit has recognized that the reference to "applicable" law within section § 365(c)(1)(A) not limited to personal service contracts. As stated in *In re Braniff*, "It may well be that the *impetus* for Congress' enactment of § 365(c) was to preserve the pre-Code rule that 'applicable law' precluding assignment of personal service contracts is operative in bankruptcy. However, *the drafters actually codified a much broader principle*. Surely if Congress had intended to limit § 365(c) to personal service contracts, its members could have conceived of a more precise term than 'applicable law' to convey that meaning."  to 'applicable law' is more expansive than merely a veiled reference to 'applicable law' regarding only personal service contracts." 700 F.2d 935, 943 (5th Cir. 1983).

18. Here, some of the agreements are governed by Korean law and some are governed by California law. California law (like that of many states) holds that contracts involving obligations under which one party is specifically relying on the knowledge, expertise, and skill of the other party are unassignment. *See In re Health Plan of* Redwoods, 286 B.R. 407, 409 (Bankr. N.D. Cal. 2002) ("In California, as in most other states, the test is whether the contract involves a personal relation of confidence between the parties or relies on the character and personal ability of a party."); *see also EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 363-64 (Bankr. D. Del. 2008), *aff'd*, 400 B.R. 13 (rejecting the debtor's attempt to assume under Section 365 an agreement to provide online marketing and advertising services, explaining that applicable

state law would excuse the counterparty from accepting performance from a party other than the debtor because the party's "business relationship" under the contract "was founded on [the counterparty's] trust and confidence in [the debtor's] unique attributes, as well as its experience, all of which were relevant to [the debtor's] ability to serve the [counterparty's] Members" as required by the contact).

18.     As explained in detail above, the Agreements are examples of contracts that cannot be assigned by the Trustee under applicable U.S. law because they are contracts between affiliates that rely on the extensive, mutual, long-term relationship between DNS and DZS. The terms of the Agreements, such as margin and pricing, are favorable based on the parties' long-standing relationship. Applicable law does not require DNS to accept substitute performance from a stranger to the contract that DNS never selected as such an important business partner. Thus, the Trustee cannot assume and assign the Agreements under Section 365.

**B. If The Trustee Is Permitted To Assume And Assign The Agreements, All Outstanding Amounts Due And Owing To DNS Under The Agreements Must Be Paid As Cure.**

20.     In the alternative, if the Court finds that the Agreements may be assumed by the Trustee and assigned to the Buyer, then the Trustee (or the Buyer, per the terms of the APA) must pay all outstanding amounts due and owing to DNS under the Agreements, which is more than the Total Proposed Cure Amount.

21.     Section 365(b)(1) provides that if there has been a default by the debtor under an executory contract, then the debtor cannot assume the contact unless it first "cures…such default." Here, DZS is in default under the Agreements because amounts due and owing to DNS remain unpaid.  As discussed above, DZS owes DNS a total of $4,310,348.75 for trade payables.  If the Court determines that the Misclassified GNRI Assets relate to an Agreement that can be assumed

and assigned, which DNS disputes, DNS will be owed another $8,589,541 for those assets. All of those amounts must be paid to DNS immediately upon the assumption of the Agreements.

## Conclusion

For the reasons set forth above, DNS respectfully requests that the Court deny the Trustee's attempt to assume the Agreements and assign them to the Buyer. However, if such assumption and assignment is approved, then the Court should require the Trustee or the Buyer to first cure all defaults under the Agreements by paying all amounts currently due and owing to DNS, which amount greatly exceeds the Total Proposed Cure Amount listed in the Notice, and grant such other and further relief as the Court deems just and proper.

Dated: April 25, 2025

Respectfully submitted,

BAKER & HOSTETLER LLP

By: */s/ Alexis C. Beachdell*
Alexis C. Beachdell (*admitted pro hac vice*)
(Ohio Bar No. 0083642)
Key Tower
127 Public Square, Suite 2000
Cleveland, OH  44114-1214
Telephone: 216.621.0200
Email: abeachdell@bakerlaw.com

*Attorneys for Dasan Network Solutions Inc.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 25, 2025, a true copy of the foregoing *Objection of Dasan Network Solutions Inc. to Trustee's Fifth Notice of Executory Contracts and Unexpired Leases that may be Assumed and Assigned, Pursuant to Section 365 of the Bankruptcy Code, in Connection with the Sale of Substantially All of the Estates' Assets, and the Proposed Cure Amounts* should be served electronically by a Notice of Electronic Filing on all persons receiving notices via the Court's CM/ECF system.

                                                                 */s/ Alexis C. Beachdell*
                                                                  Alexis C. Beachdell