**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **(Chapter 7)** |
| | § | |
| **DZS INC.,**[1] | § | **CASE NO. 25-40712** |
| | § | |
| **DEBTOR.** | § | **(Jointly Administered)** |

---

**ORDER GRANTING TRUSTEE'S MOTION FOR AN ORDER
APPROVING SALE OF CERTAIN PROPERTY OF THE ESTATES
FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES**
[Docket No. 26]

---

Upon consideration of the *Motion for An Order Approving Sale of Certain Property of the Estates Free and Clear of All Liens, Claims, and Encumbrances and Assumption and Assignment of Executory Contracts and Leases* (the "Motion")[2] filed by Michelle H. Chow, the duly appointed Chapter 7 Trustee in the above-referenced Chapter 7 bankruptcy cases (the "Trustee"), the Court, having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; that this is a core proceeding pursuant to 28 U.S.C. §157(b)(2); that venue of these bankruptcy cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; having considered the Motion, the arguments of counsel and evidence presented at the hearing conducted on April 28, 2025 (the "Sale Hearing") and the entire record; that under the exigent circumstances the Trustee provided due and sufficient notice of the Motion and the Sale Hearing, and it appearing no other or further notice need be provided; having reviewed the Motion, the filings in support of the Motion, and all objections to the relief sought in the Motion, if any; having found that the sale of the Acquired Assets

---

[1]   The Debtors in these Chapter 7 cases, along with the last four digits of each Debtor's Federal Tax Identification Number, include: DZS Inc. (9099), DZS Services Inc. (3763) and DZS California Inc. (3221).  The location of the Debtors' service address is: 5700 Tennyson Parkway, Suite 400, Plano, TX 75024.

[2] Capitalized terms not defined herein shall have the meaning ascribed in the Motion, the Asset Purchase Agreement, and the Letter of Intent.

as defined in the Asset Purchase Agreement to Fibre Acquisition Corporation, now known as Zhone Technologies, Inc., Managed Network Systems, Inc. ("MNSi") and/or another appropriately designated entity (the "Purchaser") is in the best interest of the Debtors, their estates, their creditors, and other parties in interest (the "Sale Transaction"); and, after due deliberation and good sufficient case appearing therefor, **IT IS FOUND AND DETERMINED THAT:**

1.      The findings of fact and conclusions of law set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such.  Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are incorporated herein by reference, to the extent they are not inconsistent[9] with this Order.

2.      The statutory and legal bases for the relief requested in the Motion are sections 105(a), 363(b), 363(f), 363(m), 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 58(a).  Notwithstanding Rules 6004(h) and 6006(d) of the Bankruptcy Rules, and to any extent necessary under Rule 9014 of the Bankruptcy Rules and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth in this Order.

4.      As a result of the filing of these Chapter 7 Cases, on March 14, 2025 (the "Petition Date"), the value of the Debtors' business was immediately impaired.  As of the Petition Date, customers were not receiving goods and services critical to their operations, suppliers and vendors were not going to be paid millions of dollars, and employees immediately lost their jobs with no notice.  Customers began to seek other arrangements.  Vendors and suppliers stopped shipping. Product was trapped in customs.  Vital employees began seeking new jobs.  The landlords had locked the Debtors out of their leased premises.

5.      MNSi was a customer which could foresee the immediate impact on it and other customers from the Chapter 7 bankruptcy.  Within a few days after the filing of the bankruptcy cases, MNSi approached the Trustee and began due diligence in connection with a potential transaction.  Recognizing that time was indeed of the essence, MNSi and the Trustee also began negotiating a proposed transaction.

6.      The rapidly eroding value resulted in the Trustee, acting quickly with the consent and encouragement of MNSi, taking the unusual step of filing the Motion, based on a Letter of Intent (the "LOI"), in an attempt to provide some assurances to customers, suppliers, and former employees, and to slow down the "melting."  The filing of the Motion at an early stage also allowed the Trustee to obtain the April 28, 2025 hearing date, which was then sent to all creditors and parties in interest on twenty-four (24) days notice.

7.      MNSi and the Trustee recognized that there was a business necessity to move in an expedited fashion towards a Sale Hearing and closing.  As a result, MNSi acted quickly and agreed to serve as a stalking horse bidder without the delay which would have been the result of additional hearings to seek Court approved bid protections. MNSi also agreed that the Trustee could seek higher and better offers, reserving the right to seek reimbursement of actual legal expenses up to a

cap of $750,000.000 in the event an Alternate Proposal (as defined in the LOI and APA) as described in the APA) is approved by this Court.  The Trustee provided access to information and data contained in a data room ("Data Room") to multiple third parties pursuant to non-disclosure agreements or similar agreements.

8.    The Acquired Assets and the equity securities of various subsidiaries including ASSIA S.R.L., DZS Canada Inc., DZS do Brasil LTDA, DZS GmbH, DZS International Inc., DZS International Ltd., DZS Italy S.R.L., DZS Solutions India Private Limited, DZS Solutions Spain S.L.U., NetComm Wireless Pty Ltd., Paradyne Corporation, Zhone Technologies Campus, LLC, Zhone Technologies SA, and Zhone Technologies PTE. Ltd. (collectively, the "DZS Subsidiaries"), rights under the non-disclosure agreements and any similar agreements executed by interested parties in connection with gaining access to the Data Room (the "NDAs")  constitute property of the Debtors' estates and title to the Acquired Assets is vested in the Debtors' estates, within the meaning of section 541(a) of the Bankruptcy Code.  The Acquired Assets means, to the extent assignable, all of the direct and indirect right, title and interest of Debtors in and to the following property and assets of Debtors:

i.    All of the property and assets of every kind and description and wheresoever situate of the Debtors of the following asset classes and categories:

1.    All customer contracts of the Debtors that are Assumed Contracts;

2.    All right, title and interest to any Owned Intellectual Property, including, without limitation, all Intellectual Property set out in the Intellectual Property Assignment Agreement;

3.    All Licensed Intellectual Property, including, without limitation, all of the Assumed Contracts providing any Seller with a license or

right to any third party intellectual property, and all agreements with

the following parties or their Affiliates:

- Fabrinet, including without limitation the (i) Master Supply Agreement between Fabrinet and DZS Inc., dated September 17, 2022; and (ii) the Statement of Work to the Master Supply Agreement between the parties, dated September 28, 2022.

- BoWei Technology Co., Ltd and Jiaxing Bowei Communication Technology Co. Ltd (BFW), including without limitation the (i) ODM Agreement between Zhone Technologies, Inc. and BoWei Technology Co., Ltd and Jiaxing Bowei Communication Technology Co. Ltd., effective November 6, 2014; (ii) the Memorandum of Understanding between DZS Inc. and Jiaxing Bowei Communication Technology Co., Ltd dated August 9, 2021; and (iii) the Memorandum of Understanding between DZS Inc. and Jiaxing Bowei Communication Technology Co., Ltd dated October 15, 2021.

- Shenzhen Gongjin Electronic (Hong Kong) Ltd. (T&W), including without limitation (i) the ODM Agreement between Zhone Technologies, Inc. and Shenzhen Gongjin Electronics Co. Ltd, effective February 9, 2011, and the October 12, 2017 amendment thereto; (ii) Assignment Agreement, assigning Shenzhen Gongjin Electronics Co., Ltd's rights in the ODM Agreement to Gongjin Electronic (Hong Kong) Limited, dated September 24, 2019; and (iii) Statement of Work between Shenzhen Gongjin Electronic (Hong Kong) Limited and DZS Inc., dated July 6, 2022.

- Broadcom Inc. (Avago Technologies International Sales Pte. Limited), including without limitation the (i) Letter of Intent between Zhone Technologies, Inc. and Broadcom Corporation revised July 7, 2015; (ii) Software License Agreement between Avago Technologies International Sales Pte. Limited and Dasan Network Solutions, effective July 21, 2021 and the March 9, 2022 amendment to same; (iii) Support Services Agreement between Avago Technologies International Pte. Limited and DZS Inc., effective December 6, 2021; and (iv) the Software License Agreement between Broadcom Corporation and Zhone Technologies Inc. effective January 27, 2017 and the January 12, 2022 amendment to same.

- YumaWorks, Inc., including without limitation (i) the YumaPro Binary License Agreement between YumaWorks, Inc. and DZS Inc. from December 2021; (ii) the YumaPro SDK Server + yp-shell + Development Tools Source License Agreement between the parties from December 2021; and (iii) the YumaPro Support License Agreement between the parties from December 2021.

- Atlassian Pty Ltd., including without limitation the Atlassian Customer Agreement and all related purchase orders, order forms and other agreements.

- Adaptive Spectrum and Signal Alignment, Incorporated, including without limitation the (i) Domain Name Assignment Agreement between Adaptive Spectrum and Signal Alignment, Incorporated and DZS Inc., dated May 27, 2022; (ii) Patent Assignment Agreements between Adaptive Spectrum and Signal Alignment, Incorporated, ASSIA SPE LLC and DZS Inc., dated May 27, 2022; (iii) Retained Patents License Agreements between Adaptive Spectrum and Signal Alignment, Incorporated, ASSIA EAL, S.L. and DZS Inc., dated May 27, 2022; (iv) Trademark Assignment Agreement between Adaptive Spectrum and Signal Alignment, Incorporated and DZS Inc., dated May 27, 2022; (v) Transferred Patents License Agreement between DZS Inc. and Adaptive Spectrum and Signal Alignment, Incorporated, dated May 27, 2022; (vi) Transition Services Agreement between DZS Inc. and Adaptive Spectrum and Signal Alignment, dated May 27, 2022; and (vii) Asset Purchase Agreement and all related amendments between DZS Inc. and Adaptive Spectrum and Signal Alignment, Incorporated dated April 29, 2022.

- Axon Networks Inc., including without limitation the (i) Asset Purchase Agreement between DZS Inc. and AXON Networks Inc dated October 16, 2024; (ii) Patent Assignment Agreements between the parties dated October 25, 2024 and January 14, 2025; (iii) Trademark Assignment Agreement between the parties dated October 25, 2024; (iv) Domain Name Assignment Agreement between the parties dated October 25, 2024; (v) Patents Sublicense Agreement between the parties dated October 25, 2024; (vi) Transferred Patents License Agreement between the parties dated October 25, 2024; (vii) EDGE SKD License Agreement

between the parties dated October 25, 2024; and (viii) Transition Services Agreement between the parties dated October 25, 2024.

- Salesforce.com, Inc., including without limitation the Master Subscription Agreement and all related purchase orders, order forms and other agreements.

- Dasan Network Solutions, including without limitation the (i) Master Engineering Services Agreement between Dasan Network Solutions Inc., Dasan India Private Limited, DZS Vietnam Company Limited and DZS Inc., effective April 5, 2024; (ii) Transition Services Agreement between Dasan Network Solutions Inc., D-Mobile Limited, DZS Vietnam Company Limited, Dasan India Private Limited, DZS Japan, Inc and DZS Inc, dated April 5, 2024; (iii) Intellectual Property License Agreement between DZS Inc., DZS California, Inc. and Dasan Networks, Inc (Korea) dated April 5, 2024; (iv) Reseller Agreements between Dasan Network Solutions, Inc. and DZS Inc., dated April 5, 2024; (v) Master Service Agreement between DZS Inc. and Dasan Network Solutions, Inc., dated April 5, 2024; and (vi) Master Supply Agreement between DZS Inc. and Dasan Network Solutions Inc dated April 5, 2024.

- Amazon Web Services, Inc., including without limitation the AWS Customer Agreement and all related purchase orders, order forms and other agreements.

- Coherent Corp., including without limitation the Terms and Conditions of Sale – North America and all related purchase orders, order forms and other agreements.

- Four J's Development Tools Ltd., including without limitation the OEM End User License Agreement and all related purchase orders, order forms and other agreements.

- JFrog, Inc., including without limitation the JFrog Subscription Agreement – Self-Hosted and all related purchase orders, order forms and other agreements, including without limitation PO# US1002761.

- Microchip Technology Incorporated, including without limitation the Microchip License Agreement and Microchip Non-Exclusive Software License Agreement and all related purchase orders, order forms and other agreements.

- Redis Inc., including without limitation the Redis Software Agreement (Also known as the Redis EULA) and all related purchase orders, order forms and other agreements.

- Gurock Software GmbH, including without limitation the Master Software Subscription License Agreement and all related purchase orders, order forms and other agreements.

- IP Infusion Inc., including without limitation the ZebOS Software License Agreement For Hardware OEMs signed March 23, 2002 and all amendments made thereto.

- Accelink Technologies Co., Ltd., including without limitation the Technical Services Agreement NO. Accelink-01 signed November 23, 2023.

- Cisco Systems, Inc., including without limitation the standard component terms and conditions and all related purchase orders, order forms and other agreements.

- Daitan Labs Soluções em Tecnologia S/A, including without limitation the Master Services Agreement effective June 28, 2021 and all related statements of work and other agreements, including without limitation Statement of Work No. 2 with an effective date of June 23, 2022.

- Wind River Systems, Inc., including without limitation the (i) Titanium Server Software Validation License Agreement Object Code Only signed January 8, 2017; and (ii) Enterprise License Agreement signed July 29, 2004, and all exhibits and amendments relating thereto.

- Rift Inc., including without limitation the Technology Alliance and Collaboration Agreement effective December 17, 2018.

- Alcatel-Lucent USA Inc., including without limitation the Interoperability Services Agreement dated March 20, 2012 and all related statements of work and other agreements, including without limitation the statements of work signed March 20, 2012 and July 9, 2012.

Notwithstanding anything to the contrary in this order, no contract with the Debtors with Oracle Credit Corporation, Oracle America, Inc. and any of its affiliates, predecessor entities or partners (jointly "Oracle")

will be assumed and/or assigned without (1) Oracle's prior written consent or a subsequent court order entered on or before May 12, 2025 or such other date as approved by Court based on an extension of time; (2) cure of any default under such contract; (3) provision to Oracle of satisfactory adequate assurance of future performance by the assignee and (4) execution by the Trustee and the assignee of an Oracle assignment agreement. Pending resolution of Oracle's filed Objection as to which Oracle reserves all rights and notwithstanding anything to the contrary contained in this Order, no contract between the Debtors and Oracle shall be an Assumed Contract or an Acquired Asset, nor shall it otherwise be assumed, assigned, or transferred to the Purchaser nor shall the Purchaser be allowed access by the Trustee to Oracle licensed software absent a separate agreement with Oracle or following further order of the Court.  The Court set a hearing on  Oracle's objection to assumption on May 8, 2025 at 130 pm with a joint witness and exhibit list to be filed by May 6, 2025.

4.     The following leases or other agreements relating to real property of

Debtors:

- Lease Agreement regarding Suite 425, Legacy Place II, 5700 Tennyson Parkway, Plano, Texas dated September 10, 2020 between IPXI Legacy Place Investors, LLC and DZS Inc., as amended from time to time.

- Sublease Agreement regarding Suite200, Legacy Place II, 5700 Tennyson Parkway, Plano, Texas datedJune 4,, 2024, between Parler Cloud Technologies, LLC and DZS Inc. (formerly Dasan Zhone Solutions, Inc.), as amended from time to time.

- Sublease Agreement regarding Suite 425, Legacy Place II, 5700 Tennyson Parkway, Plano, Texas dated February 24, 2020, between Futurewei Technologies Inc. and DZS Inc. (formerly Dasan Zhone Solutions, Inc.), as amended from time to time.

- Lease Agreement regarding Suite No. 4000-4300, 12821 Starkey Road, Largo, Florida dated March 4, 2024 between Starkey Owner, L.P. and DZS Inc., as amended from time to time.

5.      All leases or other agreements relating to equipment or personal property of the Debtors;

6.      All rights to any and all avoidance actions of the Debtors currently held by the Trustee related to the Assumed Contracts, as mutually agreed by the Parties following the Effective Date (the "Assigned Avoidance Actions");

7.      All of the Debtors rights under warranties, indemnities and all similar rights against third parties to the extent related to any Acquired Assets or Assumed Contracts;

8.      All accounts receivable of the Debtors and all notes receivable or other debts due or accruing due to the Debtors pursuant to or related to the Acquired Assets or the Assumed Contracts, and the full benefit of all security for such accounts receivable (the "Acquired Receivables"); *provided, however,* that notes receivable or other evidences of indebtedness between any Debtor and any Subsidiary or Affiliate of such Debtor (collectively, the "Intercompany Accounts") shall not be an Acquired Asset, shall be retained by such the Debtors, shall be deemed an Excluded Asset; and each Party waives any and all rights it may have to assert any rights or claims for amount due under an Intercompany Account against any other Party or an Affiliate of any Party;

9.      All prepaid expenses and deposits of the Debtors, to the extent that they relate to any of the Acquired Assets or Assumed Contracts;

10. All inventory of the Debtors (including, without limitation, all finished goods, work in progress, raw materials, component parts, new and unused production, packing and shipping supplies, all other materials and supplies on hand to be used or consumed in connection with the manufacture, packing or shipping of finished goods and other items customarily forming part of the inventory of the Debtors);

11. All permits, authorizations, and licenses of the Debtors;

12. To the extent not consistent with other provisions of this Order, allequipment, vehicles, machinery, fixtures, tools, furniture, furnishings, office supplies, information technology assets and all other items of tangible personal property of the Debtors;

13. All rights of Sellers to the Guaranteed Closing Payment[3];

14. The goodwill of the Debtors, including all right, title and interest of the Debtors in, to and in respect of all elements which contribute to the goodwill of the Debtors, including the goodwill represented by packaging, labelling, advertising and promotional materials, and the right to use the name "DZS;"

ii. The Assumed Contracts, including the NDA's;

iii. The Books and Records and NDAs; and,

iv. The option (the "Option") to acquire all of the issued and outstanding equity securities of ASSIA S.R.L., DZS Canada Inc., DZS do Brasil LTDA, DZS

---

[3] As defined in that certain Asset Purchase Agreement dated October 16, 2024 by and between DZS Inc. and AXON Networks, Inc.

GmbH, DZS International Inc., DZS International Ltd., DZS Italy S.R.L.,

DZS Solutions India Private Limited, DZS Solutions Spain S.L.U.,

NetComm Wireless Pty Ltd., Paradyne Corporation, Zhone Technologies

Campus, LLC, Zhone Technologies SA, and Zhone Technologies PTE. Ltd

(collectively the "DZS Subsidiaries").

(collectively, the "Acquired Assets").

9.      No Excluded Assets will be sold pursuant to this Order.  As used herein, the Excluded

Assets means all assets of the Debtors, other than the Acquired Assets, and include, without limitation,

the following:

     i.      Cash and cash equivalents held by the Debtors;

     ii.     Bank accounts in the name of any Debtor;

     iii.    Securities and investments held by or for the benefit of the Debtors;

     iv.     All rights to any and all avoidance actions and/or claims of any Debtor

currently held by the Trustee, other than all rights to any and all avoidance

actions of the Debtor(s) currently held by the Trustee:

        1.      Related to the Assigned Contracts; or,

        2.      Of customers or suppliers of Debtors which are related to the

Acquired Assets as mutually agreed by the parties;

     v.      All rights in connection with *Perficient, Inc. v. DZS, Inc.* in the United States

District Court for the Eastern District of Texas, Sherman Division (Case No.

4:22-cv-00801-SDJ);

vi.     Any Claims (or potential Claims) or causes of action brought by the Trustee which are not related to the Acquired Assets, including, but not limited to any Claims or causes of action against EdgeCo, LLC;

vii.    All tax attributes of the Debtors, including, without limitation, all payments or credits from or on behalf of any taxing authority, including, without limitation, tax refunds and all Net Operating Losses;[4] and

viii.   All prepaid insurance and all directors' and officers' insurance policies of Sellers and any related claims.

(collectively, the "Excluded Assets").

10.    The Trustee is the sole and rightful owner of the Acquired Assets with all rights, title, and interest to transfer and convey the Acquired Assets to the Purchaser and no other person other than the Trustee has any ownership right, title, or interest therein other than those persons or entities who have validly perfected liens and security interests in the Acquired Assets.[5] The Trustee has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion. In the Trustee's business judgement, the APA should be approved, and the relief requested in the Motion, the Sale Transaction, and all related relief should be granted and approved.

11.    The Trustee is disclaiming any interest in the "Australian" inventory, as more particularly described as the NetComm Inventory located at Seko Logistics, Fort Worth, Texas. DNS

---

[4] As defined in the Internal Revenue Code of 1986, as amended.

[5] Purchaser executed an Agreement with Australian Administrators dated April 20, 2025, with respect to the purchase of shares and a Deed of Company Arrangement, regarding the Debtors' Australian affiliate, NetComm Wireless Pty Ltd ACN 002 490 486 (Administrators Appointed ) ("NetComm") which is the subject of an Australian Administrative Proceeding which was commenced on March 17, 2025. Subject to the Second Creditors' Meeting of NetComm to approve the Agreement with Purchaser, which meeting is scheduled for May 1, 2025, and the execution of all necessary transaction documents scheduled to occur on May 2, 2025, the transaction as between the Purchaser and NetComm will close on May 9, 2025. This Agreement resolves the claim to the Dallas Inventory asserted by NetComm in this case.

has filed an objection to the sale (Dkt. 101)(the "DNS Objection") asserting that certain DNS Materials and Products (as defined in the DNS Objection) are property of DNS and are not property of the estates. By no later than April 29, 2025, DNS shall provide a schedule of the DNS Materials and Products (the "DNS Schedule") to the Trustee and the Purchaser. DNS, Purchaser and Trustee shall meet and confer about the items on the DNS Schedule.  If the parties cannot reach an agreement on any part of the DNS Schedule, then the Court will hold a hearing on May 8, 2025 at 130 pm to determine whether any of the disputed DNS scheduled items are property of the estate. The parties shall file witness and exhibit lists by May 6, 2025.

12.    Sufficient notice of the Motion and Sale Hearing has been provided in accordance with sections 102(1), 363, 364, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, 6006, and 9014.

13.    Actual written notice of the Motion and a reasonable opportunity under the exigent circumstances to object or be heard with respect to the Motion and the relief requested in the Motion have been afforded to the following parties: (a) all entities that have, to the best knowledge of the Trustee's counsel, executed a written non-disclosure agreement ("NDA") related to a potential sale of the Purchased Assets from the Debtors as described in the Letter of Intent since the Petition Date of March 14, 2025; (b) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Acquired Assets, including EdgeCo. LLC ("EdgeCo"); (c) the U.S. Trustee; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002; (e) to the extent not already included above, all creditors and parties in interest listed on the Debtors' creditor matrix, (f) parties to  Assigned Contracts, Assigned Licensed IP, Assigned Real Property Leases, Assigned Personal Property, Assigned Material Agreements, and (g) counsel to the Purchaser (collectively, the "Notice Parties") and no further notice of the Motion or the Sale Hearing is required.

14.     Trustee has served *Notices of Executory Contracts and Unexpired Leases That May Be Assumed and Assigned, Pursuant To Section 365 of the Bankruptcy Code, In Connection With The Sale of Substantially All of the Estates' Assets, and the Proposed Cure Amounts* (the "Notice of Potentially Assumed Contracts and Leases")[6] on all known counterparties to executory contracts and unexpired leases that may be assumed and assigned in connection with a sale of the Acquired Assets (the "Assumed Contracts and Leases").

15.     The Purchaser will file one or more notices of any contract or lease which is assumed and assigned ("Notice of Actually Assigned Contracts and Leases"), which notice may be filed with this Court under seal and/or redacted in accordance with Local Rule 9037-1.  The Purchaser has the right to modify the list of the Assumed Contracts and Leases with respect to (i) any Assumed Contracts and Leases disclosed by the Purchaser, after the date of this Order and up to three (3) calendar days before May 12, 2025.  Such modification rights include, but are not limited to, the right of the Purchaser to designate an Asset for assumption by the Trustee and assignment to the Purchaser, as well as for exclusion from the APA as Excluded Assets.  The Purchaser would not have agreed to the Sale Transaction without such modification rights.  The Purchaser currently estimates that the "cure" obligations related to Assumed Contracts and Leases is approximately Thirteen Million and 00/100ths Dollars ($13,000,000.00).

16.     The Purchaser will file one or more Notices of Assigned Avoidance Actions on or before June 30, 2025.

17.     The LOI filed with the Motion and the APA attached to this Order as Exhibit A were negotiated and entered into after arms' length, good faith negotiations between the Trustee, the Purchaser, and their respective counsel and advisors, and without collusion.  The terms and

---

[6] ECF Nos. 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 69.

conditions of the APA shall govern the Sale Transaction and to the extent there is any conflict between the LOI and the APA, the APA shall control.

18.     The Notices of Potentially Assumed Contracts and Leases was due, proper, timely, adequate, and sufficient and the potential assumption and assignment of the Assumed Contracts and Leases, and the Sale Transaction has been provided to the Notice Parties and to other parties-in-interest; and such notice was, and is, good, sufficient, and appropriate under the circumstances of these Chapter 7 Cases, provided a fair and reasonable opportunity for parties-in-interest to object, and to be heard, with respect thereto, and was provided in accordance with sections 102(a), 363, 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014, and applicable Local Rules; and (iii) no other or further notice of with respect of with respect to such matter is necessary or shall be required.

19.     The consideration provided by the Purchaser is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act, (ii) fair consideration under the Texas Uniform Fraudulent Transfer Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia.

20.     The Purchaser is a "good faith purchaser" as that term is used in section 363(m) of the Bankruptcy Code.  The Purchaser is not an insider within the meaning of section 101 (31) of the Bankruptcy Code.  Neither the Purchaser, MNSi nor any of its respective representatives, has engaged in any conduct that would cause or permit the APA or the consummation of the Sale Transaction to be avoidable or avoided, or for costs or damages to be imposed, under section 363(m) of the Bankruptcy Code, or acted in bad faith or in any improper or collusive manner with any person or entity in connection therewith.  The Purchaser is hereby granted all protections and

benefits provided to a good faith purchaser under the Bankruptcy Code.  Neither the reversal nor

modification on appeal of this Order or the authorization contained herein shall affect the validity

of the Sale Transaction and the consummation of the transactions contemplated herein.

21.    The APA represents a fair and reasonable offer to purchase the Acquired Assets

under the circumstances of these Chapter 7 Cases.  No other person, entity, or group of entities has

offered to purchase the Acquired Assets for higher and better terms or for greater economic value

to the Debtors' estates than the Purchaser.

22.    Approval of the Motion and the consummation of the Sale Transaction

contemplated thereby are in the best interests of the bankruptcy estates, creditors and other parties-

in-interest.

23.    The Trustee has demonstrated compelling circumstances and a good, sufficient, and

sound business purpose and justification for the Sale Transaction.  The Trustee's entry into and

performance under the APA, which consummates transactions reflected in the APA (i) are a result

of due deliberation by the Trustee and constitute a sound and reasonable exercise of the Trustee's

business judgment consistent with her fiduciary duties, (ii) provide value to and are beneficial to

the Debtors' estates and are in the best interest of the Debtors' and their stakeholders, and (iii) are

reasonable and appropriate under the circumstances.

24.    The Sale Transaction was not entered into and will not be consummated for the

purpose of hindering, delaying or defrauding creditors of the Debtors, and neither the Trustee nor

the Purchaser have or has entered into the Sale Transaction or is or are consummating the

transactions contemplated thereby with any fraudulent or otherwise improper purpose.

25.    The Trustee has full power and authority to close the Sale Transaction, including

the APA, in substantially the form attached hereto as Exhibit A,  and to agree to reasonable

modifications to the APA including any schedules and/or exhibits, and all other documents contemplated thereby, and no further consents or approvals are required for the Trustee to consummate the transactions contemplated by the APA.

26.     The transfer of the Acquired Assets to the Purchaser, as of the Closing Date, will be a legal, valid, and effective transfer of such Acquired Assets and will vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all liens, claims, and encumbrances and, to the extent permitted under applicable law, other interests accruing, arising, or relating to any time prior to the applicable closing date, SAVE AND EXCEPT any valid liens held by or in favor of any taxing authority relating solely to the Acquired Assets (the "Ad Valorem Personal Property Tax Liens").  For avoidance of doubt, the Acquired Assets  do not include any real property and therefore are not subject to any liens assessed on real property.

27.     The sale and transfer of the Acquired Assets to the Purchaser, and transfer of title to Acquired Assets will not make the Purchaser a successor of the Debtors nor subject the Purchaser to any liability (including successor liability) with respect to the operation of the Debtors' business prior to the Closing Date or by reason of such transfer.  The Purchaser (i) is not, and shall not be considered, a successor to the Debtors or any officer, director, member, agent, employee, or anyone under the direction of any of the foregoing, (ii) has not, *de facto* or otherwise, merged with or into the Debtors, (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of the Debtors, the Debtors' estates, their respective businesses or operations, or any enterprise of the Debtors, and (iv) does not have a common identity of incorporators, directors, or equity holders with the Debtors.

28.     The Purchaser would not have entered into the Sale Transaction and would not consummate the transactions contemplated thereby if the sale of the Acquired Assets to the

Purchaser were not, except as otherwise provided in the APA, free and clear of all Liens of any kind or nature whatsoever, or if the Purchaser were not free of all successor liability with respect to Debtors' liabilities, except as expressly assumed in the APA.

29.     Pursuant to the terms of the APA, if requested by the Purchaser, the Trustee shall assume and assign to the Purchaser the Contracts and Leases identified to the Trustee in writing.  The Purchaser shall pay all cure amounts for the Assumed Contracts and Leases within ten (10) calendar days of the Notice of Actually Assigned Contract and Lease, or such other date as agreed to by the Purchaser and the counterparty to such Assumed Contract and Lease.  The Purchaser shall assume and perform and discharge the liabilities to be assumed by the Purchaser (the "Assumed Liabilities"), if any, under the Assumed Contracts and Leases, including pursuant to any contract or lease assignment agreements, as applicable and as modified with the consent of the contract counterparty. Pursuant to section 365(k) of the Bankruptcy Code, the assignment of the Assumed Contracts relieves the Trustee and the estate of all liability for any breach of such contract or lease occurring after such assignment.

30.     The payment of the applicable cure amounts related to the Assumed Contracts and Leases, or any Notice of Assumed Contracts and Leases or as otherwise agreed to by the Purchaser and the Counterparty to such contract shall constitute the cure of all defaults arising under the Assumed Contracts and Leases as required by section 365(b)(1)(A) of the Bankruptcy Code (after giving effect to section 365(b)(2) of the Bankruptcy Code).

31.     To the extent that any Assumed Contract is subject to a cure amount pursuant to Sections 363 or 365 of the Bankruptcy Code or otherwise, Purchaser shall directly pay or otherwise provide for the payment of the amount of any applicable Cure Payment immediately after Closing or such other date as agreed to by Purchaser and the counterparty to such Assumed Contract.

32.     In order to preserve the value of the Debtors' estates and its assets and to reduce the amount of post-petition expense borne by the Trustee, it is essential that the sale of the Acquired Assets occur within the time constraints set forth in the Motion and APA.  Time is of the essence in consummating the Sale Transaction.  Accordingly, there is cause to waive or lift the fourteen (14) day stay contemplated by Bankruptcy Rule 6004(h) with respect to the Sale Transaction.

33.     Given the facts and circumstances of these Chapter 7 Cases and the adequacy and fair value of the consideration, the sale of the Acquired Assets to the Purchaser constitutes a reasonable and sound exercise of the Trustee's business judgment and should be approved.

34.     EdgeCo has asserted a secured claim of $15,300, 593.10, plus unpaid interest and attorney's fees (the "Secured Claim").  *See* Claim 6 (the "EdgeCo POC").  EdgeCo asserts that its collateral includes the Acquired Assets.  EdgeCo's asserted liens, if any, will attach to the proceeds of the Sale Transaction pending adjudication of its Secured Claim and the payment described in Paragraph 46 below, until all amounts owed with respect to the Secured Claim, as such may be amended or supplemented, have been paid.  The Trustee has reserved all rights to object to the Secured Claim.

35.     Holders of liens are deemed to have consented to the Sale Transaction, pursuant to the Bankruptcy Code including section 363(f)(2).  All persons having claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such claims against Purchaser, or any of its affiliates, successors or assigns, or their assets or property, or the Acquired Assets.  The Trustee and the Purchaser reserve the right to seek a further order of this Court to address actions by any known or unknown lienholders in violation or contravention of this Order.

36.     The Sale Transaction does not constitute a *de facto or sub rosa* plan of reorganization or liquidation because this is not a chapter 11 proceeding and in any event the Sale Transaction does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) circumvent chapter 7 safeguards, including those set forth in sections 725 and 726 of the Bankruptcy Code, or (iii) classify claims or equity interests.

37.     The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 364, 365(b) and 365(f), and all applicable requirements of such sections have been complied with in respect of the Sale Transaction.

38.     The Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon the Debtors and the Trustee and shall not be subject to any rejection or avoidance by the foregoing parties or any other person.

39.     The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT**:

40.     The relief requested in the Motion is **GRANTED AND APPROVED** as set forth in this Order, the APA and the Sale Transaction contemplated thereby is **APPROVED**.

41.     Notwithstanding anything to the contrary herein, the Acquired Assets do not include Excluded Assets.

42.     The Trustee's determination that the Sale Transaction, as set forth in the APA, constitutes a valid and sound exercise of the Trustee's business judgment.  The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of these Chapter 7 Cases.  The APA constitutes the highest and best offer for the Acquired Assets and will provide

greater value for the Debtors' estates than would be provided by any other alternative.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater value to the Debtors estate than the Purchaser.  Approval of the Motion and the APA, and the prompt consummation of the Sale Transaction contemplated thereby, is in the best interest of the Debtors, their creditors, their estates, and other parties-in interest.

43.     Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Trustee is authorized and directed to transfer the Acquired Assets to the Purchaser on the Closing Date (as defined in the APA).  Upon the Closing Date, Purchaser will take title to and possession of the Acquired Assets.  All liens against Acquired Assets shall attach to the proceeds of the Sale Transaction with the same validity, priority, force, and effect that they now have as against the Acquired Assets, subject to any claims and defenses the Trustee, the Debtors and their estates may possess with respect thereto, save and except only the Ad Valorem Personal Property Tax Liens.

44.     The Trustee and her respective employees and agents are authorized and directed to execute and deliver, and authorized to perform under, consummate, and implement, the APA (in substantially the form attached hereto), and all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Transaction and to take all further actions as may be (a) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to the Purchaser's possession, the Acquired Assets or (b) necessary or appropriate to the performance of the obligations contemplated by the APA or to implement the Sale Transaction, all without further order of the Court including, but not limited to, such documentation to evidence a transfer of equity securities if an Option is exercised by Purchaser.

45.     The sale of the Acquired Assets to Purchaser shall be, except as otherwise provided in this Order, free and clear of all liens.  The Acquired Assets shall not be subject to any claims or interests allowed in this Chapter 7 Case, including, without limitation, any claims allowed under sections 361, 362, 363, 364, 365, 502, 503, 506, or 507 of the Bankruptcy Code.

46.     Within five (5) business days of the Trustee's receipt of the Cash Purchase Price, the Trustee shall transfer to EdgeCo the sum of $11,770,858.75, the principal allegedly owed to EdgeCo on behalf of its Secured Claim, subject to the Trustee's reservation of rights to seek a claw back of all or part of this payment.  The Trustee must hold in escrow the sum of $4,229,141.25 until the Secured Claim is resolved.  The Trustee and EdgeCo agree to resolve and mediate if necessary the Secured Claim as soon as reasonably possible.  The Trustee and EdgeCo agree that any interest will stop accruing on the principal upon payment of the $11,770,868.75.

47.     EdgeCo does not waive any rights to amend its Secured Claim to include all amounts relating to all pre- and post-Petition Date interest, fees, costs, expenses, charges, and attorney and other professional fees and expenses as to which the Debtor is liable, including without limitation all costs and expenses incurred in enforcing and preserving EdgeCo's rights under the Secured Claim.  EdgeCo reserve all rights to (i) amend, clarify, modify, update, or supplement the EdgeCo POC at any time and in any respect.

48.     The Trustee does not waive any rights to contest or object to the EdgeCo POC. Nothing contained in this Order shall have any preclusive effect upon any argument that the Trustee or EdgeCo may assert in the claim objection process, and the Trustee and EdgeCo are preserving and reserving all of their rights hereto.

49.     Should the Bankruptcy Estate or Debtor receive any wire or ACH as a payment on accounts receivable after the Closing Date, then the Trustee shall file a Notice with the Court of

such amounts received and deliver such funds to Purchaser by check after five (5) days from the filing of the Notice.  Should the Trustee receive any checks and/or money orders dated after the Closing Date, the Trustee is authorized and directed to promptly to deliver such checks and/or money orders to the Purchaser.

50.     Except as expressly provided by this Order, all persons and entities holding any lien on all or any portion of the Acquired Assets are forever barred, estopped, and permanently enjoined from asserting against the Purchaser or its successors or assigns, their property, or the Acquired Assets, such liens and all claims and rights relating thereto.  On the Closing Date, each holder of a lien is authorized and directed to execute such documents and take all other actions as may be deemed by the Purchaser to be necessary or desirable to release its lien on the Acquired Assets, as provided for in this Order, as such Liens may have been recorded or may otherwise exist.

51.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the Acquired Assets to the Purchaser in accordance with the terms of this Order.  The Trustee and the Purchaser may seek relief from this Court to enforce this or any other provision of this Order.

52.     All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Purchaser on the Closing Date.  The Trustee shall exercise commercially reasonable efforts to assist the Purchaser in assuring that all persons that are presently, or on the applicable Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Trustee before the Closing Date, or (ii) the Purchaser on or after the Closing Date.

53.     The assumption of the Assumed Contracts and Leases by the Trustee and assignment to the Purchaser shall constitute a legal, valid, and effective transfer of such Assumed Contracts and Leases notwithstanding any requirement for approval or consent by any person and vests the Purchaser with all rights, title, and interest of the Debtors in and to such Assumed Contracts and Leases, free and clear of all liens, claims, and encumbrances of any nature whatsoever pursuant to section 363(f) of the Bankruptcy Code, other than obligations expressly assumed in the APA.

54.     This Order (a) shall be effective as a determination that, as of the Closing Date, all liens will have been unconditionally released, discharged, and terminated as to the Purchaser and the Acquired Assets and that the conveyances and transfers described herein will have been effected and (b) is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments that reflect that the Purchaser is the assignee and owner of the Acquired Assets free and clear of all liens, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers").  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county, or local government agency, department, or office.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to effect, consummate, and/or implement the transactions contemplated by this Order.  All Recording Officers are authorized and

specifically directed to strike recorded Liens, claims, liens, and other interests against the Acquired

Assets recorded prior to the date of this Order.  A certified copy of this Order may be filed with

the appropriate clerk and/or recorded with the appropriate recorder to cancel any liens of record.

55.    If, following a request duly made, any person or entity that has filed statements or

other documents or agreements evidencing liens on all or any portion of the Acquired Assets shall

have delivered to the Purchaser on or prior to the Closing Date, in proper form for filing and

executed by the appropriate parties, termination statements, instruments of satisfaction, releases of

liens and any other documents necessary or desirable to the Purchaser for the purpose of

documenting the release of all liens, which the person or entity has or may assert with respect to all

or any portion of the Acquired Assets, and the Trustee is hereby authorized and directed, and the

Purchaser is hereby authorized, to execute and file such statements, instruments, releases and other

documents on behalf of such person or entity with respect to the Acquired Assets.

56.    This Order shall govern the acts of all persons and entities, including, without

limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages,

recorders of deeds, registrars of deeds, administrative agencies, governmental departments,

secretaries of state, federal and local officials and all other persons and entities who may be required

by operation of law, the duties of their office or contract to accept, file, register or otherwise record

or release any documents or instruments, or who may be required to report or insure any title or

state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized

and directed to accept for filing any and all of the documents and instruments necessary and

appropriate to consummate the transactions contemplated by this Order.

57.     Following the Closing Date, no holder of any claim shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to any such claim or based on any actions the Trustee may take in these Chapter 7 Cases.

58.     Except as otherwise provided in this Order and to the maximum extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, certificate, filing and governmental authorization or approval of the Trustee with respect to the Acquired Assets, and to the maximum extent available under applicable law, all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing Date.  All existing licenses or permits applicable to the Acquired Assets shall remain in place for the Purchaser's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Chapter 7 Cases or the consummation of the Sale Transaction.

59.     On the Closing Date, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Acquired Assets or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Acquired Assets to the Purchaser as of the Closing Date.

60.     Except as expressly set forth in the APA, the Purchaser and its successors and assigns shall have no liability for any claim, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature, or character whatsoever, by reason of any theory of law

or equity, including claims arising under, without limitation: (a) the Debtors' business operations or

the cessation thereof; (b) any litigation involving the Debtors; (c) any employee, workers'

compensation, occupational disease, or unemployment or temporary disability related law,

including, without limitation, claims that might otherwise arise under or pursuant to (i) the

Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act,

(iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the

National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of

1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in

Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the

Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state and local discrimination laws,

(xi) state and local unemployment compensation laws or any other similar state and local laws,

(xii) state workers' compensation laws, or (xiii) any other state, local, or federal employee benefit

laws, regulations, or rules or other state, local, or federal laws, regulations, or rules relating to

wages, benefits, employment, or termination of employment with the Debtors or any predecessors;

(d) any antitrust laws; (e) any environmental laws, rules, or regulations, including, without

limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act,

42 U.S.C. §§ 9601, *et seq.*, or similar statutes; (f) any bulk sales or similar laws; (g) any federal,

state, or local tax statutes, regulations, or ordinances, including, without limitation, the Internal

Revenue Code of 1986, as amended, or the Texas Tax Code; and (h) any common law doctrine of

*de facto* merger or successor or transferee liability, successor-in-interest liability theory, or any

other theory of or related to successor liability.

  61.  The Purchaser shall not have any liability for any obligation of any of the Debtors

arising under or related to any of the Acquired Assets prior to the Closing Date.  Without limiting

the generality of the foregoing, the Purchaser shall not be liable for any claims against the Debtors

or any of their predecessors or affiliates.  By virtue of the Sale Transaction, the Purchaser and its

respective affiliates, successors and assigns shall not be deemed or considered to (a) be a legal

successor or otherwise be deemed a successor to any of the Debtors, (b) have, *de facto* or otherwise,

merged with or into the Debtors, or (c) be a continuation or substantial continuation, or be holding

itself out as a mere continuation, of the Debtors or their estates, businesses or operations, or any

enterprise of the Debtors, in each case by any law or equity, and the Purchaser has not assumed

nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates.

The Purchaser shall have no successor or vicarious liabilities of any kind or character, including,

but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor

law, *de facto* merger or substantial continuity, whether known or unknown as of the Closing Date,

now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any

obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities

on account of any taxes arising, accruing or payable under, out of, in connection with, or in any

way relating to the operation of any of the Acquired Assets prior to the Closing Date.

62.     All time periods set forth in this Order shall be calculated in accordance with

Bankruptcy Rule 9006(a).

63.     To the extent that this Order is inconsistent with any prior order or pleading with

respect to the Motion filed in these Chapter 7 Cases, the terms of this Order shall govern.  To the

extent that there is a conflict between the APA and this Sale Order, the terms of this Sale Order

shall control.

64.     The Purchaser shall permit, for a period of not less than two (2) years, the Debtors

and their professionals and any direct or indirect successors to any of the foregoing and the Trustee

and her professionals (collectively, the "Permitted Parties"), reasonable access to all books and records of the Debtors, that are Acquired Assets relating to the Debtors' operations prior to the applicable Closing Date and are in the Purchaser's (or any affiliate's, agent's or affiliate's agent's) possession or control for the purposes of (a) pursuing, assessing, settling, or otherwise dealing with any assets or liabilities that are excluded from the applicable Sale Transaction; (b) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any claim, action, or cause of action (including, without limitation, any objection or motion) that any Permitted Party has a right to pursue, including collections of accounts receivable; (c) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the claims reconciliation process relating to the Debtors (including, without limitation, with respect to claims against any person), including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative claims and any general unsecured claims that accrue prior to the closing of the applicable Sale Transaction; and (d) without limiting the generality of the preceding clauses (a) through (c), otherwise administering the Debtors' estates (including, compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down the Debtors' estates, preparing or filing tax returns, and causing audits to be performed) and/or for any other reasonable purpose.  Notwithstanding the assignment of the NDAs, the Trustee retains the right to assert that an alleged violation of an NDA is additional grounds for seeking relief against a third party or in connection with the defense of a claim.

65.    The provisions of this Order and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered (a) confirming or consummating any plan of

reorganization of the Debtors, (b) dismissing the cases, (c) withdrawal of the reference by the District Court, or (d) pursuant to which this Court abstains from hearing these cases.

66.     The Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Order, the Sale Transaction, and all amendments thereto and any releases, waivers, and consents hereunder and thereunder, and each of the agreements executed in connection therewith to which any of the Debtors is a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to any of the foregoing, including any disputes that may arise among the Debtors and the Purchaser.  So long as these Chapter 7 Cases are not closed (or, if closed but then reopened), the Court shall retain jurisdiction to enforce the injunctions and other rights of the Purchaser described in this Order, in the event that after the Closing Date any third parties attempt to or actually interfere with such rights of the Purchaser, even if the Debtors or the Trustee is not directly involved or named in any such actions or disputes between the Purchaser and such third parties.

67.     The form of the Notice of Actually Assigned Contract and Leases is approved as providing sufficient and accurate notice to counterparties to Executory Contracts or Leases.  Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption, assumption and assignment, or related cure amount is deemed to have assented to such assumption and assignment and/or cure amount of such Executory Contract or Unexpired Lease, as applicable, and any untimely objection shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Purchaser, without the need for any objection by the Purchaser or any other party in interest or any further notice to or action, order, or approval of the Court.  Such counterparties to such Executory Contract(s) or Unexpired Lease(s) shall be deemed

to release and waive, subject to such counterparties' receipt of the applicable cure amount(s), any and all rights arising under such Executory Contract(s) or Unexpired Lease(s) related to any default, cross-default, termination, put right, or other similar provision related to any event, default, or potential default on or occurring prior to the Closing Date.

68.     The LOI, the APA (in substantially the form attached hereto as **Exhibit A**), the Sale Transaction and the terms and conditions thereof are hereby APPROVED, and the Trustee is authorized and directed to enter into all documents related thereto.   The failure to include specifically any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the LOI and the APA be authorized and approved in their entirety.

69.     This Order shall be binding in all respects upon the Trustee, the Debtors, their estates, all holders of equity interests in the Debtors, all holders of any Claim(s) (as defined in the Bankruptcy Code) against the Debtors, whether known or unknown, any holders of liens on all or any portion of the Acquired Assets, all counterparties, the Notice Parties, the Purchaser, all successors and assigns of the Purchaser, or any other bidders for the Acquired Assets.  This Order shall inure to the benefit of the Trustee, the Debtors, their estates, their creditors, the Purchaser, and each of their successors and assigns.  The Sale Transaction, and this Order shall not be subject to rejection or avoidance by the Trustee, Debtors, their estates, their creditors, or any party acting in whole or in part on behalf of the Trustee, the Debtors, or their creditors.

70.     The form of the Notice of Assigned Avoidance Action(s) is approved.  Upon filing of a Notice of Assigned Avoidance Action(s), the listed avoidance action shall be deemed assigned to Purchaser with no further action required.

71.     The transactions contemplated by and consummated under this Order were undertaken by the Purchaser without collusion and in good faith and at arms-length, as that term is defined in sections 363(m) and 364(e) of the Bankruptcy Code, as applicable.  The Sale Transaction will not be consummated for the purpose of hindering, delaying or defrauding creditors of the Debtors, and neither the Trustee nor the Purchaser have or has entered into the LOI or the APA or is or are consummating the Sale Transaction contemplated thereby with any fraudulent or otherwise improper purpose.

72.     Michelle H. Chow, in her capacity as Trustee to these Chapter 7 Cases, is authorized to execute any and all documents related to the Sale Transaction, including without limitation, to execute the APA as substantially set forth in Exhibit A.  For avoidance of doubt, the Trustee has the authority to agree to modifications of the APA to the extent that there are no changes to any material terms.

73.      The Trustee is authorized to pay Normandy Lane LLC the amount of $180,000.00 after Closing without further approval or Order of the Court.  In addition, the Trustee is authorized to pay any personal property tax owed without further approval or Order of the Court.

74.     Notwithstanding anything contained to the contrary herein, the Trustee is allowed to continue to use the Debtors' names to administer these Bankruptcy Cases to conclusion.  Other than in the ordinary course of their duties, the Trustee's consultants will maintain the confidentiality of all materials, documentation and other information in respect to the Debtors, their business and their stakeholders including regarding their customers, vendors, suppliers, the Acquired Assets and Assumed Contracts.

75.     It is necessary and appropriate, in order to ensure the validity of the sale of the Assets and to ensure compliance with this Order, for this Court to retain jurisdiction to: (a) interpret and enforce the provisions of the APA and this Order; (b) protect the Purchaser and any of the

Acquired Assets against any Lien or Claim; (c) resolve any disputes arising under or relating to the APA and/or this Order; and (d) and the disposition of the proceeds of sale of the Acquired Assets.

76.     Subject to paragraph 49, all payments on Acquired Receivables shall be made to Zhone Technologies, Inc. Any inquiries or parties seeking confirmation as to payment directions s are to contact John Higgins at 469.581.9204.

77.     The fourteen (14) day stay contemplated by Bankruptcy Rule 6004(h) is waived. The Purchaser and the Trustee are authorized to close the Sale Transaction immediately.

**IT IS SO ORDERED.**

Signed on 04/28/2025

_Brenda T. Rhoades_          SD

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

Prepared by:

Larry A. Levick
Texas State Bar No. 12252600
Michelle E. Shriro
Texas State Bar No. 18310900
Todd A. Hoodenpyle
Texas State Bar No. 00798265
**SINGER & LEVICK, P.C.**
16200 Addison Road, Suite 140
Addison, Texas 75001
Phone: 972-380-5533
Email: levick@singerlevick.com
Email: mshriro@singerlevick.com
Email: hoodenpyle@singerlevick.com

**GENERAL COUNSEL FOR**
**MICHELLE H. CHOW, CHAPTER 7 TRUSTEE**

Shauna Martin
Texas State Bar No. 24007606
Mary Elizabeth Heard
Texas State Bar No. 24096727
**GRABLE MARTIN PLLC**
8330 Meadow Road, Suite 216
Dallas, Texas 75209
Phone: 512-415-4635
Email: smartin@grablemartin.com
Email:meheard@gramblemartin.com

**SPECIAL COUNSEL FOR**
**MICHELLE H. CHOW, CHAPTER 7 TRUSTEE**

Deborah D. Williamson
Texas State Bar No. 21617500
Dominique A. Douglas
Texas State Bar No. 24134409
**DYKEMA GOSSETT PLLC**
112 E. Pecan St., Suite 1800
San Antonio, Texas 78205
Phone: 210-554-5275
Email: dwilliamson@dykema.com
Email: ddouglas@dykema.com

**ATTORNEYS FOR**
**MANAGED NETWORK SYSTEMS, INC.**
**and FIBRE ACQUISITION CORPORATION**

## EXHIBIT A
## ASSET PURCHASE AGREEMENT

EXECUTION VERSION

## CONTENTS

Definitions and Rules of Construction..............................................................................1

Section 1.1.    Definitions. ...................................................................................1

Section 1.2.    Rules of Construction. ...................................................................6

Purchase and Sale; Assumption of Certain Liabilities.........................................................6

Section 2.1.    Purchase and Sale of Assets. ..........................................................6

Section 2.2.    Assignment and Assumption of Liabilities. .......................................7

Section 2.3.    Purchase Price. .............................................................................7

Section 2.4.    Deemed Consents and Cure Payments...............................................7

Section 2.5.    Obligations in Respect of Assumed Contracts. ...................................7

Section 2.6.    Post-Closing Assignment of Contracts. .............................................7

Closing ..........................................................................................................................7

Section 3.1.    Closing. .......................................................................................7

Section 3.2.    Deliveries by Trustee. ....................................................................8

Section 3.3.    Deliveries by Purchaser..................................................................8

Representations and Warranties of Trustee and Sellers.......................................................8

Section 4.1.    Power and Authorization.................................................................9

Section 4.2.    Title to Assets. ..............................................................................9

Section 4.3.    Conflicts; Consents. .......................................................................9

Section 4.4.    Brokers. ......................................................................................10

Representations and Warranties of Purchaser..................................................................10

Section 5.1.    Organization, Standing and Power...................................................10

Section 5.2.    Authorization................................................................................10

Section 5.3.    No Conflict or Violation. ...............................................................10

Section 5.4.    Availability of Funds.....................................................................10

Section 5.5.    Cure Amounts. .............................................................................10

Section 5.6.    Brokers. ......................................................................................11

Section 5.7.    Limitation of Representations and Warranties....................................11

Section 5.8.    Sophistication of Purchaser ............................................................11

Section 5.9.    Purchaser is Knowledgeable ..........................................................11

Covenants of Purchaser and Sellers; Other Agreements ...................................................12

Section 6.1.    Consents and Approvals.................................................................12

Section 6.2.    Access to Information. ................................................. 12

Section 6.3.    Further Assurances. .................................................... 12

Section 6.4.    Bankruptcy Actions. ................................................... 13

Section 6.5.    Other Bids. ............................................................... 13

Section 6.6.    Disclosure Schedules and Supplements. ....................... 13

Section 6.7.    Conduct of Trustee and Sellers Prior to Closing. ........... 14

Section 6.8.    Assumed Obligations. ................................................ 15

Section 6.9.    Disclaimer. ............................................................... 15

Section 6.10.   Acquisition of DZS Subsidiaries. ................................ 15

Section 6.11.   Post-Closing Accounts Receivable and Payments. ......... 15

Section 6.12.   Cure Payments .......................................................... 15

Conditions Precedent to Obligations of Purchaser ................................ 16

Section 7.1.    Representations and Warranties; Covenants. ................. 16

Section 7.2.    Bankruptcy Court Approval. ....................................... 16

Section 7.3.    No Injunctions. ......................................................... 16

Section 7.4.    Closing Deliveries. .................................................... 16

Section 7.5.    Assignment Arrangements ........................................... 16

Conditions Precedent to Obligations of Sellers ..................................... 17

Section 8.1.    Representations and Warranties; Covenants. ................. 17

Section 8.2.    Consideration. ........................................................... 17

Section 8.3.    Bankruptcy Court Approval. ....................................... 17

Section 8.4.    No Injunctions. ......................................................... 17

Section 8.5.    Closing Deliveries. .................................................... 17

Termination; Termination Payment ...................................................... 17

Section 9.1.    Termination. ............................................................. 17

Section 9.2.    Expense Reimbursement. ............................................ 18

Section 9.3.    Deposit Reimbursement ............................................. 18

Section 9.4.    Effect of Termination or Breach. ................................. 19

Additional Post-Closing Covenants ...................................................... 19

Section 10.1.   Joint Post-Closing Covenant of Purchaser and Sellers. ... 19

Section 10.2.   Tax Matters. .............................................................. 19

Miscellaneous ................................................................................... 20

Section 11.1.   Expenses. ................................................................. 20

Section 11.2.    Amendment. ................................................................................................. 21

Section 11.3.    Notices. ........................................................................................................ 21

Section 11.4.    Waivers. ....................................................................................................... 22

Section 11.5.    Counterparts and Execution. ......................................................................... 22

Section 11.6.    Headings. ..................................................................................................... 22

Section 11.7.    Governing Law; Jurisdiction. ....................................................................... 22

Section 11.8.    Binding Nature; Assignment. ....................................................................... 23

Section 11.9.    No Third-Party Beneficiaries. ...................................................................... 23

Section 11.10.   Construction. ............................................................................................... 23

Section 11.11.   Public Announcements. ................................................................................ 23

Section 11.12.   Entire Understanding. .................................................................................. 23

Section 11.13.   Closing Actions. .......................................................................................... 23

Section 11.14.   Conflict Between Transaction Documents. ................................................... 23

Section 11.15.   No Survival .................................................................................................. 24

<u>Exhibits</u>

Exhibit A – Bill of Sale

Exhibit B – Intellectual Property Assignment Agreement

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made and entered into as of this 22nd day of April, 2025 (the "Execution Date"), by and among Fibre Acquisition Corporation, a Texas corporation ("Purchaser"), and Michelle H. Chow, solely in her capacity as Chapter 7 Trustee (the "Trustee") of the bankruptcy estates of each of DZS Inc., a Delaware corporation, DZS Services Inc., a Delaware corporation and DZS California Inc., a Delaware corporation (each referred to herein as a "Seller" and collectively as the "Sellers". Purchaser, the Trustee and each Seller are each referred to herein as a "Party", and collectively as the "Parties").

**WHEREAS,** each of the Debtors (as defined herein) is a debtor in the Chapter 7 Cases;

**WHEREAS**, the Trustee is entering in this Agreement on behalf of each Seller, subject to the approval of the Bankruptcy Court; and

**WHEREAS**, Purchaser desires to purchase, and Sellers, through the Trustee, desire to sell, convey, assign, transfer and deliver to Purchaser, certain assets of the Debtors.

**NOW, THEREFORE, BE IT RESOLVED**, in consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and the Trustee, acting solely in her capacity as such and upon the approval of the Bankruptcy Court, hereto agree as follows:

## ARTICLE I.

## DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1.   Definitions.** Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Acquired Assets" means, to the extent assignable, all of the direct and indirect right, title and interest of Sellers in and to the property and assets of Sellers set forth on Schedule 1.1 under the heading Acquired Assets. For purposes of clarification, the Acquired Assets shall not include any Excluded Assets.

"Affiliate" of any particular Person means any other Person directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Agreement" means this Asset Purchase Agreement, including all the Exhibits and the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"AI Technologies" means any and all deep learning, machine learning, and other artificial intelligence technologies, including without limitation any and all: (i) proprietary algorithms, Software, or systems that make use of or employ neural networks, statistical learning algorithms (such as linear and logistic regression, support vector machines, random forests, or k-means

1

clustering), or reinforcement learning, and (ii) proprietary embodied artificial intelligence and related hardware or equipment.

"<u>Allocation</u>" shall have the meaning set forth in <u>Section 10.2(b)</u> hereof.

"<u>Alternate Proposal</u>" means a proposal (other than by Purchaser or any of its Affiliates) relating to any acquisition of some or all of the Acquired Assets pursuant to one or more transactions.

"<u>Assumed Contracts</u>" means, collectively, those Contracts of Debtors designated as "Assumed Contracts", in notices filed with the Bankruptcy Court (each a "<u>Notice of Assumed Contract</u>"), from time to time through and including May 12, 2025 in accordance with the terms of this Agreement.

"<u>Assumed Obligations</u>" means the obligations (i) assumed by, and assigned to, Purchaser pursuant to a Sale Order, this Agreement and/or any Transaction Document, or (ii) which are ongoing and provided under any Assumed Contract or directly related to an Acquired Asset.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division.

"<u>Bidders</u>" shall have the meaning set forth in <u>Section 6.5</u> hereof.

"<u>Bids</u>" shall have the meaning set forth in <u>Section 6.5</u> hereof.

"<u>Bill of Sale</u>" shall have the meaning set forth in <u>Section 3.2(a)</u> hereof.

"<u>Books and Records</u>" means all information, books, records and lists of Debtors relating to the Acquired Assets and in the possession of the Trustee, including, without limitation, (i) all records relating to customers and suppliers of Debtors (including, without limitation, customer, prospective customer, supplier, prospective supplier, Intellectual Property provider and mailing lists) and (ii) all books, ledgers, files, reports, plans, logs, guides, manuals, materials, drawings and operating records of Debtors, in each case, whether in written, printed, electronic or computer printout form, or stored on computers, media devices or other data and software storage; <u>provided, however</u>, that "<u>Books and Records</u>" shall not include any information regarding the Debtors' former employees or the originals of any Debtor's minute books, stock books and Tax Returns.

"<u>Business Day</u>" means a day other than Saturday, Sunday or other day that banks located in Dallas, Texas are authorized or required by Law to close.

"<u>Cash Purchase Price</u>" shall have the meaning set forth in <u>Section 2.3</u> hereof.

"<u>Chapter 7 Cases</u>" means collectively the cases commenced by Debtors under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court, titled *In Re DZS Inc.* (EDTX 25-40712), *In Re DZS Services Inc.* (EDTX 25-40713) and *In Re DZS California Inc.* (EDTX 25-40714).

"<u>Claim</u>" has the meaning ascribed by Bankruptcy Code §101(5), and includes all (a) rights to payment, whether or not any such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) rights to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not any such right to equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"<u>Closing</u>" shall have the meaning set forth in <u>Section 3.1</u> hereof.

2

"Closing Date" shall have the meaning set forth in Section 3.1 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality Agreement, dated March 28, 2025 between Managed Network Systems, Inc. and the Trustee.

"Contract" means any agreement, contract, commitment, indenture, note, bond, lease, sublease or other binding arrangement or understanding, whether written or oral.

"Credentials" means all user names, identification numbers, passwords, licenses or security keys, security tokens, identification numbers, security codes or other login credentials used in or necessary for access to or development of Software or to access or operate the Acquired Assets, including, without limitation, login credentials to third-party services including source code repositories and collaboration tools, including, without limitation, for services provided to the Sellers in connection with the Software and Acquired Assets prior to Closing by Amazon Web Services, Inc., Atlassian Corporation, Salesforce, Inc, Oracle Corporation and their Affiliates.

"Cure Payments" means any cure payment or obligations (pursuant to section 363 or 365 of the Bankruptcy Code) due by Sellers, and required by the Bankruptcy Court to be made upon assumption of the Assumed Contracts by Purchaser, in order to cure any default with respect to any Acquired Assets or Assumed Obligations.

"Debtor" or "Debtors" means, individually or collectively, DZS Inc., Delaware corporation, DZS Services Inc., a Delaware corporation, and DZS California Inc., a Delaware corporation.

"Deposit" means an amount in cash equal to One Million and NO/100 Dollars ($1,000,000.00), such amount having been paid by Managed Network Services Inc. (an Affiliate of Purchaser) pursuant to that certain letter of intent dated April 2, 2025 between it and the Trustee, and held by the Trustee pursuant to the terms hereof.

"Dollars" or "$" means dollars of the United States of America.

"DZS Subsidiaries" means ASSIA S.R.L., DZS Canada Inc., DZS do Brasil LTDA, DZS GmbH, DZS International Inc., DZS International Ltd., DZS Italy S.R.L., DZS Solutions India Private Limited, DZS Solutions Spain S.L.U., NetComm Wireless Pty Ltd., Paradyne Corporation, Zhone Technologies Campus, LLC, Zhone Technologies SA, and Zhone Technologies PTE. Ltd.

"Execution Date" shall have the meaning set forth in the Preamble hereto.

"Exhibits" means the exhibits hereto.

"Excluded Assets" means any assets of Sellers other than the Acquired Assets. For purposes of clarification, but not limitation, the Acquired Assets shall not include (i) cash or cash equivalents held by Sellers, (ii) bank accounts in the name of any Debtor or Seller, (iii) securities and investments held by or for the benefit of any Debtor or Seller, (iv) all rights to any and all avoidance actions and/or claims of any Seller currently held by the Trustee, other than all rights to any and all avoidance actions of Sellers currently held by the Trustee (1) related to the Assigned Contracts, or (2) of customers or suppliers of Debtors which are related to the Acquired Assets, (v) all rights in connection with *Perficient, Inc. v. DZS, Inc.* in the United States District Court for the Eastern District of Texas, Sherman Division (Case 4:22-CV-00801-SDJ), (vi) any Claims (or potential Claims) or causes of action brought by the Trustee which are not related to the Acquired Assets, including, but not limited to any Claims or causes of action against EdgeCo, LLC, (vii) all prepaid

3

insurance and all directors' and officers' insurance policies of Sellers and any related claims, and (viii) as set out in Schedule 1.1 (subject to the terms set out therein).

"Excluded Liabilities" shall mean any and all Claims, Liens, Tax or liability, obligation, agreement or contract other than an Assumed Obligation, and shall include, without limitation, any and all obligations relating to (i) all Taxes of Debtors, and (ii) all former employees of Debtors arising or accruing prior to the Closing including those for workplace safety and insurance, wages, salaries, bonuses, accrued vacation, pensions and benefits, termination and severance (taking into consideration their seniority). For greater certainty, Purchaser will not be responsible for any obligations to any of the employees of Debtors who are terminated by Debtors before, on or after Closing.

"Final Order" means an Order which has not been stayed or vacated and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Intellectual Property" means all right, title and interest of Sellers, if any, in and to all (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals and foreign counterparts thereof and all registrations and renewals in connection therewith and all patents claiming priority of the foregoing, (ii) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (iii) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (iv) mask works and all applications, registrations and renewals in connection therewith, (v) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (vi) Software and AI Technologies, (vii) the Credentials, (viii) Internet addresses, uniform resource locaters, domain names, social media accounts and handles, websites and web pages, (ix) any and all other intellectual property and proprietary property or rights, (x) any applications for or registrations of the foregoing, (xi) goodwill related to all of the foregoing, and (xii) all causes of action and rights of recovery associated with the foregoing.

"Intellectual Property Assignment Agreement" shall have the meaning set forth in Section 3.2(b) hereof.

"Law" means any law, statute, regulation, ruling, ordinance, code, rule, treaty, decree, writ, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Liability" means any indebtedness, obligation or other liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted).

"Licensed Intellectual Property" means all material Intellectual Property used by Sellers, other than the Owned Intellectual Property, and excluding any Intellectual Property in the Excluded Assets.

"Lien" or "Liens" means with respect to any property or asset, any charge, claim, lien, option, encumbrance, mortgage, pledge, security interest, conditional sale agreement or other title retention agreement, lease, security agreement, right of first refusal, option, restriction, tenancy, license, covenant, right of way, contractual right of set-off, restriction on transfer, easement or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or statute or law of any jurisdiction) on such property or asset.

"Option" shall have the meaning set forth in Section 6.10 hereof.

"Order" means any decree, order, injunction, rule, judgment or consent of or by any Governmental Authority.

"Owned Intellectual Property" means all Intellectual Property owned by Sellers, excluding any Intellectual Property in the Excluded Assets.

"Party" and "Parties" shall have the meaning set forth in the Preamble hereto.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses possessed by Sellers, or through which Sellers have rights, that are used, useable or useful in the use or enjoyment or benefit of the Acquired Assets.

"Permitted Liens" means (i) Liens granted or reserved by an instrument executed in connection with this Agreement or the transactions contemplated hereby or thereby; and (ii) any contractual right of set-off or restriction on transfer contained in any Assumed Contract, but only to the extent that such contractual right of set-off or restriction on transfer does not prohibit or otherwise limit the assignment and assumption of such Assumed Contract pursuant to the provisions of this Agreement.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

"Purchase Price" shall have the meaning set forth in Section 2.3 hereof.

"Purchaser" shall have the meaning set forth in the Preamble hereto.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"Sale Order" means an Order entered by the Bankruptcy Court in a form satisfactory to Purchaser and Sellers, authorizing Trustee to sell the Acquired Assets to Purchaser pursuant to this Agreement and Sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests other than the Assumed Obligations.

"Schedules" means the schedules attached hereto.

"Seller" and "Sellers" shall have the meaning set forth in the Preamble hereto.

"Software" means all computer software, programs and databases in any form, compilations, tool sets, application programming interfaces, libraries, data compilers, higher level or "proprietary" language, scripts and macros, including Internet web sites, web content, member or user lists and information associated therewith, links, firmware, middleware, embedded code, operating systems and specifications, data, database management code, utilities, graphical user interfaces, menus, images, icons, forms, methods of processing, software engines, and platforms, all versions, updates, corrections, enhancements, replacements and modifications of the foregoing, whether in source code or object code form, and all related documentation, diagrams, descriptions and programs, computer print-outs, underlying tapes and materials.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person all federal, state, local, county, foreign and other taxes, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Transaction Documents" means this Agreement, the Bill of Sale, the Intellectual Property Assignment Agreement, the Notices of Assumed Contracts and all other agreements, instruments, certificates and other documents to be entered into or delivered by any Party in connection with the transactions consummated pursuant to this Agreement.

"Trustee" shall have the meaning set forth in the Preamble hereto.

**Section 1.2.   Rules of Construction.** Unless the context otherwise clearly indicates, in this Agreement:

(a)    the singular includes the plural;

(b)    "includes" and "including" are not limiting;

(c)    "may not" is prohibitive and not permissive; and

(d)    "or" is not exclusive.

# ARTICLE II.

## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

**Section 2.1.   Purchase and Sale of Assets.** On the terms and subject to the conditions set forth in this Agreement, at the Closing, Sellers, through the Trustee, shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and

6

delivery of, for the consideration specified in <u>Section 2.3</u>, all of the Acquired Assets, free and clear of all Liens other than Permitted Liens.

> **Section 2.2.   Assignment and Assumption of Liabilities.** Subject to the terms and conditions set forth in this Agreement, Purchaser shall assume from Sellers, and thereafter be solely responsible for the payment, performance or discharge, of the Assumed Obligations. Purchaser shall have no liability or obligation with respect to any Excluded Liabilities or for greater certainty, any other Liabilities of Sellers or Debtors that are not Assumed Obligations.

> **Section 2.3.   Purchase Price.** The aggregate purchase price for the Acquired Assets (the "<u>Purchase Price</u>") shall be (i) cash in an amount equal to EIGHTEEN MILLION AND NO/100 DOLLARS (US$18,000,000.00) (the "<u>Cash Purchase Price</u>"), and (ii) aggregate dollar value of the Assumed Obligations. At the Closing, Purchaser shall pay by wire transfer to the Trustee an amount in cash equal to the Cash Purchase Price, minus the Deposit. The Purchase Price shall be allocated amongst the Acquired Assets in accordance with <u>Section 10.2(b)</u>.

> **Section 2.4.   Deemed Consents and Cure Payments.** For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Contract if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, Sellers are authorized to assume and assign such Assumed Contract to Purchaser pursuant to Section 365 of the Bankruptcy Code and any applicable Cure Payments have been satisfied by Purchaser on behalf of Sellers, as provided herein.

> **Section 2.5.   Obligations in Respect of Assumed Contracts.** To the extent that any Assumed Contract is subject to a cure amount pursuant to Sections 363 or 365 of the Bankruptcy Code or otherwise, Purchaser shall directly pay or otherwise provide for the payment of the amount of any applicable Cure Payment immediately after Closing or such other date as agreed to by Purchaser and the counterparty to such Assumed Contract.

> **Section 2.6.   Post-Closing Assignment of Contracts.** With respect to any Sellers' Contract that is not an Assumed Contract, and provided that such Contract is still in effect and has not been rejected (or deemed rejected sixty (60) days following the date of filing of the Chapter 7 Cases) by Sellers pursuant to Section 365 of the Bankruptcy Code, upon written notice(s) from Purchaser, as soon as practicable, Sellers shall take all actions reasonably necessary to assume and assign to Purchaser, pursuant to Section 365 of the Bankruptcy Code, any Contract(s) set forth in Purchaser's notice(s); <u>provided, that</u> any applicable Cure Payment with respect to such Contract(s) shall be satisfied by Purchaser. Sellers agree and acknowledge that they shall provide Purchaser with reasonable advance notice of any motion(s) to reject any Contract relating to the Acquired Assets. Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed by, and assigned to, Purchaser in writing pursuant to this <u>Section 2.6</u>, such Contract shall be deemed to be an Assumed Contract for all purposes under this Agreement.

## ARTICLE III.

## CLOSING

> **Section 3.1.   Closing.** Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "<u>Closing</u>") will take place electronically via the exchange of electronic documents and signature pages at 10:00 a.m. (Dallas, Texas time), the date that is the [**second**] Business Day after the date

on which the conditions set forth in Article VII and Article VIII have been satisfied or waived; or on such other earlier or later date or place as Purchaser and Seller may agree in writing (the "Closing Date").

      **Section 3.2.   Deliveries by Trustee.** At the Closing, the Trustee on behalf of Sellers, shall deliver or procure delivery to Purchaser of:

    (a)    one or more bill of sale, assignment and assumption agreements, substantially in the form attached hereto as Exhibit A (collectively, the "Bill of Sale"), conveying in the aggregate all of the owned personal property of Sellers included in the Acquired Assets and assigning the Assumed Obligations, in each case to Purchaser, duly executed by the Trustee on behalf of Sellers;

    (b)    one or more Intellectual Property assignment agreements, substantially in the form attached hereto as Exhibit B (collectively, the "Intellectual Property Assignment Agreement"), assigning all of Seller's right, title and interest in and to any and all Owned Intellectual Property to Purchaser, duly executed by the Trustee on behalf of Sellers;

    (c)    the Credentials, to the extent in the possession of the Trustee or any advisor of the Trustee;

    (d)    duly executed statutory and regulatory consents and approvals, if any, which are required under the laws or regulations of the United States and other Governmental Authorities, including, without limitation, the Bankruptcy Code;

    (e)    the Books and Records;

    (f)    evidence of the transfer of all of the issued and outstanding equity securities of the DZS Subsidiaries to which Purchaser has exercised the Option to purchase prior to Closing, in form and substance reasonably acceptable to Purchaser;

    (g)    evidence of the transfer of Sellers' Permits included in the Acquired Assets, to the extent transferable, to Purchaser, in form and substance reasonably acceptable to Purchaser; and

    (h)    all other agreements, records and other documents required by this Agreement.

      **Section 3.3.   Deliveries by Purchaser.** At the Closing, Purchaser shall deliver or procure delivery to Trustee of:

    (a)    the Cash Purchase Price less the amount of the Deposit; and

    (b)    the Bill of Sale duly executed by Purchaser.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF TRUSTEE AND SELLERS

      Except as disclosed in the Schedules delivered by Trustee to Purchaser on the Execution Date (with any disclosure in any section or subsection thereof being deemed and understood to be a disclosure in each other section or subsection thereof to which the applicability of the disclosure is apparent on its face, notwithstanding the reference to a specific section or paragraph), which Schedules may, subject to the terms of this Agreement, be amended from time to time through the

Closing Date, Trustee (where applicable) and Sellers (jointly and severally) represent and warrant to Purchaser as follows:

**Section 4.1.  Power and Authorization.** Subject to any necessary authorization from the Bankruptcy Court, the Trustee, acting on behalf of each Seller, has all requisite power and authority to execute and deliver the Transaction Documents to which it or each Seller is a party and to perform its obligations thereunder. All Transaction Documents to which any Seller is a party have been duly executed by the Trustee, on behalf of each Seller, and delivered by the Trustee on behalf of such Seller, except such Transaction Documents that are required by the terms of this Agreement to be executed and delivered by the Trustee, on behalf of a Seller, after the Execution Date, in which case such Transaction Documents will be duly executed and delivered by the Trustee, on behalf of such Seller, at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court and consistent with any applicable Sale Order or Final Order, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Sellers as provided in the Sale Order or any Final Order.

**Section 4.2.  Title to Assets.** Subject to Bankruptcy Court approval and consistent with any applicable Sale Order or other Final Order, Sellers have the power and the right to sell, assign and transfer and Sellers will sell, assign and/or transfer and deliver to Purchaser, and Purchaser will be vested with good, valid, marketable and undivided title to, the Acquired Assets, free and clear of all Liens other than Permitted Liens and the Assumed Obligations.

**Section 4.3.  Conflicts; Consents.**

(a)     Subject to Bankruptcy Court Approval and consistent with any applicable Sale Order or other Final Order, the execution, delivery and performance by each Seller of this Agreement, the Transaction Documents and the consummation of the transactions contemplated hereby, and compliance by each Seller with any of the provisions of this Agreement do not, or will not at the time of execution or thereafter, result in the creation of any Lien upon the Acquired Assets and do not, or will not at the time of execution, conflict with or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of: (i) such Seller's certificate of incorporation, bylaws or comparable charter or organizational documents, (ii) subject to entry of the Sale Order, any Assumed Contract to which such Seller is a party or by which any of the Acquired Assets are bound, (iii) subject to entry of the Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to such Seller or any of the Permits, licenses, rights, properties or assets of such Seller as of the date hereof, or (iv) subject to entry of the Sale Order, any applicable Law.

(b)     Subject to entry of the Sale Order, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the

9

assignment or conveyance of the Acquired Assets, including without limitation, the Assumed Contracts.

**Section 4.4.   Brokers.** No Seller has incurred any Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby, other than Liabilities which will be paid by Sellers following the Closing as provided by the Bankruptcy Code or approved by the Bankruptcy Court.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows:

**Section 5.1.   Organization, Standing and Power.** Purchaser is a corporation duly incorporated, validly existing and in good standing under the Laws of the state of Texas.

**Section 5.2.   Authorization.** Purchaser has all requisite power and authority to own, lease and operate its properties, to carry on its business and to execute and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder. All Transaction Documents to which Purchaser is a party have been duly executed and delivered by Purchaser, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Purchaser after the Execution Date, in which case such Transaction Documents will be duly executed and delivered by Purchaser at or prior to the Closing, and all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

**Section 5.3.   No Conflict or Violation.** Except to the extent any of the foregoing is not enforceable due to operation of applicable bankruptcy Law or the Sale Order, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Purchaser do not and shall not violate any Law or any provision of the charter or organizational documents of Purchaser in any material respects.

**Section 5.4.   Availability of Funds.** Purchaser has cash available or has existing borrowing facilities, which together are sufficient to enable it to consummate the transactions contemplated by this Agreement. The Trustee has been provided financial information sufficient, in its business judgment, to evidence the ability of Purchaser to consummate the transactions contemplated by this Agreement and, upon request of the Bankruptcy Court at the Sale Hearing, will provide similar information (or such other information as the Bankruptcy Court shall require) to the Bankruptcy Court for an in camera review or as otherwise directed by the Bankruptcy Court.

**Section 5.5.   Cure Amounts.** At Closing, Purchaser will provide to Sellers information related to of the Cure Payments required to be satisfied for purposes of the assumption and assignment to Purchaser of the Assumed Contracts under Section 365 of the Bankruptcy Code to the extent that any such Cure Payments are different from the amounts contained in the *Notices Of Executory Contracts And Unexpired Leases That May Be Assumed And Assigned, Pursuant To Section 365 Of The Bankruptcy Code, In Connection With The Sale Of Substantially All Of The Estates' Assets, And The Proposed Cure Amounts*.

**Section 5.6.   Brokers.** Purchaser has incurred no Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

**Section 5.7.   Limitation of Representations and Warranties.** PURCHASER REPRESENTS AND ACKNOWLEDGES THAT IF THE CLOSING IS CONSUMMATED, THE ACQUIRED ASSETS AND ASSUMED OBLIGATIONS ARE BEING SOLD TO PURCHASER ON AN "AS IS, WHERE IS" BASIS WITH ALL FAULTS, WITHOUT ANY WARRANTIES OR REPRESENTATIONS, EITHER EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, OTHER THAN AS PROVIDED IN THIS AGREEMENT. THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 4.1 THROUGH SECTION 4.4 ARE ONLY SET FORTH HEREIN FOR PURPOSES OF DEFINING THE CONDITION TO PURCHASER'S OBLIGATIONS TO CLOSING SET FORTH IN Article VII. IMMEDIATELY FOLLOWING THE CLOSING, SUCH REPRESENTATIONS AND WARRANTIES WILL CEASE TO HAVE ANY FURTHER FORCE OR EFFECT AND ANY BREACH THEREOF, WHETHER BEFORE OR AFTER THE CLOSING, MAY NOT SERVE AS A BASIS FOR A BREACH OF CONTRACT OR OTHER CLAIM BY PURCHASER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO (A) ANY PROJECTIONS, ESTIMATES OR BUDGETS DELIVERED TO OR MADE AVAILABLE TO PURCHASER OF FUTURE FINANCIAL RESERVES, FUTURE REVENUES, FUTURE RESULTS OF OPERATIONS (OR ANY COMPONENT THEREOF), FUTURE CASH FLOWS OR FUTURE FINANCIAL CONDITION (OR ANY COMPONENT THEREOF) FROM THE ACQUIRED ASSETS OR (B) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO PURCHASER OR ITS COUNSEL, ACCOUNTANTS OR ADVISORS WITH RESPECT TO SELLERS OR THE ACQUIRED ASSETS OR ASSUMED LIABILITIES. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, THERE WILL BE NO PURCHASE PRICE ADJUSTMENTS OF ANY TYPE OR MANNER, INCLUDING ANY QUALITY ASSESSMENT OF THE ACQUIRED ASSETS BEING CONVEYED. SELLERS MAKE NO REPRESENTATIONS AS TO THE CONDITION OF THE ACQUIRED ASSETS AND PURCHASER HAS MADE ITS OWN INSPECTION AND IS SATISFIED WITH THE ACQUIRED ASSETS IN ALL RESPECTS.

**Section 5.8.   Sophistication of Purchaser.** PURCHASER IS A SOPHISTICATED PURCHASER WHO IS FAMILIAR WITH THE OWNERSHIP AND OPERATION OF ASSETS SIMILAR TO THE ACQUIRED ASSETS, AND PURCHASER HAS HAD ADEQUATE OPPORTUNITY OR WILL HAVE ADEQUATE OPPORTUNITY PRIOR TO CLOSING TO COMPLETE ALL PHYSICAL AND FINANCIAL EXAMINATIONS RELATING TO THE ACQUISITION OF THE ACQUIRED ASSETS IT DEEMS NECESSARY, AND WILL ACQUIRE THE SAME SOLELY ON THE BASIS OF AND IN RELIANCE UPON SUCH EXAMINATIONS, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLERS.

**Section 5.9.   Purchaser is Knowledgeable.** PURCHASER IS A KNOWLEDGEABLE BUSINESS OPERATOR OF ASSETS SUCH AS THE ACQUIRED ASSETS AND, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, HAS RELIED SOLELY ON ITS OWN

REVIEW AND ANALYSIS AND THAT OF ITS OWN LEGAL AND FINANCIAL
ADVISORS.

## ARTICLE VI.

## COVENANTS OF PURCHASER AND SELLERS; OTHER AGREEMENTS

**Section 6.1.   Consents and Approvals.** Prior to Closing, Sellers and Purchaser shall cooperate and use commercially reasonable efforts to: (a) obtain all necessary consents and approvals to consummate the purchase and sale of the Acquired Assets and the assignment of the Assumed Obligations, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including, without limitation, obtaining the Sale Order, (b) to make all filings, applications, statements and reports to any Governmental Authority that are required to be made prior to the Closing by or on behalf of Sellers pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby, and (c) to obtain all required consents and approvals (if any) necessary to assign and transfer Sellers' Permits included in the Acquired Assets to Purchaser at Closing. In the event that certain of Sellers' Permits included in the Acquired Assets are not transferable or replacements therefore are not obtainable on or before the Closing, but such Permits are transferable or replacements therefore are obtainable after the Closing, Sellers and Purchaser shall continue to cooperate and use such commercially reasonable efforts after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits after Closing and shall do all things necessary to give Purchaser the benefits that would be obtained under such Permits.

**Section 6.2.   Access to Information.** Sellers shall, prior to the Closing Date, (a) provide Purchaser and its representatives, upon reasonable written notice and at reasonable times, access to the Books and Records as it reasonably requests and, to the extent Sellers are able, access to Sellers' office and facilities, (b) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations of Sellers related to the Acquired Assets as Purchaser shall reasonably request, and (c) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may reasonably require, provided, that Purchaser shall be bound by and shall comply with the terms of the Confidentiality Agreement with respect to Purchaser's ability to use or disclose any such information and provided, further, that no Seller shall be required to disclose any internal or confidential materials prepared by or on behalf of it in connection with the transactions contemplated hereby, and provided, further, that Sellers shall not disclose or provide copies of any documents or materials that are covered by Sellers' attorney-client privilege.  Notwithstanding anything contained in this Agreement to the contrary, Sellers are only required to provide information including Books and Records that are in Sellers' actual possession.

**Section 6.3.   Further Assurances.**

(a)   Sellers will use commercially reasonable efforts to obtain the entry of the Sale Order on the Bankruptcy Court's docket as soon as practicable and no later than April 29, 2025.

(b)   With respect to each Assumed Contract, to the extent required by the Bankruptcy Court, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract by Purchaser. Purchaser shall take such commercially reasonable actions as may be reasonably requested by Sellers to assist Sellers in obtaining the

Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)   From time to time after the Closing and without further consideration, (i)(i) Trustee on behalf of Sellers, upon the reasonable request of Purchaser, but at no cost to Sellers, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby and to vest in Purchaser title to the Acquired Assets transferred hereunder, or to otherwise more fully consummate the transactions contemplated by this Agreement, and (ii) subject to the Sale Order, Purchaser, upon the reasonable request of Sellers, but at no cost to Purchaser, shall execute and deliver such documents and instruments of contract or lease assumption as Sellers may reasonably request in order to confirm Purchaser's assumption of the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement.

**Section 6.4.   Bankruptcy Actions.** Trustee, on behalf of each Seller shall:

(a)   promptly make any filings, take all actions and use all commercially reasonable efforts to obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Transaction Documents.

(b)   shall give notice to all Parties entitled to notice of the Sale Order and any motions related thereto in accordance with all applicable Laws, the Rules and any applicable local rules, and to any other Persons reasonably requested by Purchaser.

(c)   shall promptly notify Purchaser if any Party appeals, requests a stay of, or seeks reconsideration of the Sale Order or takes any action which would prevent or delay the Sale Order from becoming a Final Order and provide Purchaser a copy of any related notices, applications or motions within one (1) Business Day after receipt by Sellers.

**Section 6.5.   Other Bids.** Purchaser acknowledges that Sellers will solicit bids ("Bids") from other prospective purchasers (collectively, "Bidders") for the sale of all or any portion of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement. In the event that the Trustee receives a Bid prior to April 25, 2025 at 5:00 p.m. (Dallas, Texas time) which she determines to be a higher and better offer, Purchaser shall have the right to provide a revised bid that is higher and/or better than such Bid.  Such revised bid from Purchaser must be submitted at or prior to the Sale Hearing.  Purchaser shall have the right to seek approval from the Bankruptcy Court of any such revised offer and to object to other Bids as not being higher and/or better. The Parties agree that the Bankruptcy Court shall have the sole authority to determine the ultimate highest and best offer.

**Section 6.6.   Disclosure Schedules and Supplements.** Trustee on behalf of Sellers shall notify Purchaser of, and shall supplement or amend the Schedules to this Agreement with respect to, any matter that (a) arises after the Execution Date and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement, or (b) makes it necessary to correct any information in the Schedules

to this Agreement or in any representation and warranty of Sellers that has been rendered inaccurate thereby. Each such notification and supplementation, to the extent known, shall be made no later than two (2) Business Days after discovery thereof and no later than three (3) days before the date set for the Closing by the Parties. Each such supplement or amendment to the Schedules to this Agreement shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement, but only if approved in writing by Purchaser, with such approval not to be unreasonably withheld.

**Section 6.7.   Conduct of Trustee and Sellers Prior to Closing.** Except as expressly contemplated by this Agreement or with Purchaser's prior written consent, and except to the extent expressly required or permitted under the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court, Trustee on behalf of Sellers or Sellers,:

(a)   shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim or other encumbrance, except for Permitted Liens;

(b)   shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a material breach of any representation or warranty made by Trustee or Sellers in this Agreement;

(c)   shall comply in all material respects with all Laws applicable to them or having jurisdiction over Sellers or any Acquired Asset;

(d)   shall not enter into any Contract material to Sellers (taken as a whole) to which any Seller is a party or by which it is bound and that are related to the Acquired Assets or amend, modify, reject or terminate any Assigned Contract;

(e)   shall not cancel or compromise any material debt or claim or waive or release any right of Sellers that constitutes an Acquired Asset;

(f)   shall not terminate, amend, reject or modify in any manner any lease for leased real property;

(g)   shall, subject to the Trustee's duties and consistent with Trustee's responsibilities under the Bankruptcy Code in a Chapter 7 bankruptcy case, at its own expense promptly notify Purchaser of any and all necessary and appropriate actions known to the Trustee needed to maintain, preserve and protect all of the Acquired Assets, and keep all tangible Acquired Assets in good repair, working order and condition (taking into consideration ordinary wear and tear) to the extent that such tangible Acquired Assets are in the possession or control of the Trustee;

(h)   shall, subject to the Trustee's duties and consistent with Trustee's responsibilities under the Bankruptcy Code in a Chapter 7 bankruptcy case, take all required actions to retain possession and control of the Acquired Assets;

(i)   shall, subject to the Trustee's duties and consistent with Trustee's responsibilities under the Bankruptcy Code in a Chapter 7 bankruptcy case, maintain all Books and Records in the condition they exist on the Execution Date;

(j)   shall periodically report to Purchaser concerning the Trustee's knowledge of the state of the Acquired Assets, including, without limitation, the Trustee's knowledge concerning any diminished inventory; and

14

(k)    shall not take, agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

**Section 6.8.    Assumed Obligations.** Subsequent to the Closing, Purchaser agrees to be solely responsible for the payment and performance of the Assumed Obligations.

**Section 6.9.    Disclaimer.** Sellers do not make, have not made and, if previously made, hereby expressly disclaim, any representations or warranties in connection with the transactions contemplated hereby other than those expressly set forth in this Agreement. It is understood that any data, any financial information, and projections or any memoranda or offering materials or presentations are not and shall not be deemed to be or to include representations or warranties of Sellers and no representation or warranty is made with respect thereto and, if made, is hereby expressly disclaimed. Except as expressly set forth in this Agreement, no Person, other than the Trustee, has been authorized by Sellers to make any representation or warranty relating to Sellers, the Acquired Assets, the Assumed Obligations or otherwise in connection with the transactions contemplated hereby and, if made, such representation or warranty is expressly disclaimed and may not be relied upon as having been authorized by Sellers.

**Section 6.10. Acquisition of DZS Subsidiaries.** Purchaser shall have the option (the "Option"), but not the obligation, to acquire all of the issued and outstanding equity securities of each of the DZS Subsidiaries. The purchase price shall be One Hundred and No/100 Dollars (US$100.00) per DZS Subsidiary to which Purchaser elects to exercise the Option. The Option may be exercised by Purchaser at any time prior to May 30, 2025 by delivering written notice to the Trustee, together with the applicable purchase price for such acquisition.

**Section 6.11. Post-Closing Accounts Receivable and Payments.**

(a)    Within the later of (i) three (3) Business Days following the Closing Date, or (ii) issuance by Purchaser of an intent to include a Contract as an Acquired Asset, and in any case prior to the termination of the Chapter 7 Cases, Purchaser, at its sole cost and expense, shall deliver a written notice, in form and substance satisfactory to Purchaser, acting reasonably, to the customers of, and all applicable account managers, agents and/or administrators with respect to, the Assumed Contracts included in the Acquired Assets regarding the transfer of the Assumed Contracts to Purchaser and directing that all future payments thereunder be made to Purchaser. The Trustee, acting on behalf of Sellers, shall reasonably cooperate with Purchaser in sending such notices (so long as such cooperation is at no expense to Trustee, Sellers or Sellers), including, without limitation, by signing such written notice.

(b)    Any (i) funds, proceeds or other property or assets forming part of the Acquired Assets, or (ii) other proceeds collected or derived from an Acquired Asset, in each case collected or received by the Trustee or Sellers from and after the Closing Date, other than the Purchase Price paid hereunder, shall be held in trust for the benefit of Purchaser, and such funds shall not form part of Debtors' estate or otherwise be made available to the Debtors' stakeholders, and, upon receipt following the Closing, shall promptly be paid to, and for the benefit of, Purchaser in accordance with its rights under this Agreement.

**Section 6.12. Cure Payments.** Prior to the Sale Hearing, Purchaser will provide to Seller an estimated summary of the aggregate total of the Cure Amounts it anticipates it will pay

following Closing.  Purchaser will promptly update the same if the aggregate total Cure Amounts increase or decrease from the amounts set forth in such estimated summary prior to the Sale Hearing.

## ARTICLE VII.

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are, at the option of Purchaser, subject to satisfaction of the following conditions precedent on or before the Closing Date.

**Section 7.1.    Representations and Warranties; Covenants.**

(a)    Each of the representations and warranties of Sellers contained herein shall be true and correct on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct in all respects as of that date) with the same force and effect as though made on and as of the Closing Date.

(b)    Sellers shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

**Section 7.2.    Bankruptcy Court Approval.** The Sale Order shall have been entered by the Bankruptcy Court and shall have become a Final Order.

**Section 7.3.    No Injunctions.** On the Closing Date, there shall be no Laws, Orders or other legal proceedings that operate to restrain, enjoin or otherwise prevent or make illegal the consummation of the transactions contemplated by this Agreement. No action or proceeding initiated by any Governmental Authority seeking an Order prohibiting the consummation of the transactions contemplated by this Agreement shall be pending.

**Section 7.4.    Closing Deliveries.** Sellers shall have delivered to Purchaser: (a) a certificate signed by Trustee on behalf of Sellers dated the Closing Date, in form and substance reasonably satisfactory to Purchaser, certifying that the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> have been satisfied as of the Closing, and (b) all of the closing deliveries set forth in <u>Section 3.2</u>.

**Section 7.5.    Assignment Arrangements.** Purchaser shall have (a) (i) entered into consents to assignment, and amendment, as applicable, and (ii) agreed on Cure Payments, or (b) received verbal comfort, with each of the customers, suppliers, Intellectual Property providers or other Persons that has a business relationship with Seller or its Affiliates, set forth in <u>Schedule 7.5</u>, under terms and conditions acceptable to Purchaser.

16

# ARTICLE VIII.

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers under this Agreement are, at the option of Sellers, subject to the satisfaction of the following conditions precedent on or before the Closing Date.

**Section 8.1.   Representations and Warranties; Covenants.**

(a)   The representations and warranties of Purchaser contained herein shall be true and correct in all material respects on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date in all material respects) with the same force and effect as though made by Purchaser on and as of the Closing Date.

(b)   Purchaser shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

**Section 8.2.   Consideration.** Purchaser shall have delivered the Cash Purchase Price pursuant to Section 2.3.

**Section 8.3.   Bankruptcy Court Approval.** The Sale Order shall have been entered by the Bankruptcy Court.

**Section 8.4.   No Injunctions.** On the Closing Date, there shall be no Laws or Orders that operate to restrain, enjoin or otherwise prevent or make illegal the consummation of the transactions contemplated by this Agreement. No action or proceeding initiated by any Governmental Authority seeking an Order prohibiting the consummation of the transactions contemplated by this Agreement shall be pending.

**Section 8.5.   Closing Deliveries.** Purchaser shall have delivered to Sellers: (a) a certificate signed by an officer of Purchaser, dated the Closing Date, in form and substance reasonably satisfactory to Sellers, certifying that the conditions specified in Section 8.1(a) and Section 8.1(b) have been satisfied as of the Closing; (b) the individual(s) named in the certificate is a duly elected qualified and acting officer of Purchaser, and each such individual is authorized to execute and deliver on behalf of Purchaser each document to which it is a party, and all other agreements, documents and certificates delivered by Purchaser; and (c) all of the closing deliveries set forth in Section 3.3.

# ARTICLE IX.

## TERMINATION; TERMINATION PAYMENT

**Section 9.1.   Termination.** This Agreement may be terminated prior to the Closing as follows:

(a)   by mutual written agreement of Purchaser and Seller;

(b)   automatically and without any action or notice by either Seller to Purchaser, or Purchaser to Seller, and immediately upon the entry thereof, if there shall be in effect a Final Order or other legal proceeding restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated under this Agreement;

(c) by either Purchaser or Sellers (_provided_ that the terminating Party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other Party, which breach would give rise to the failure of the condition set forth in Section 7.1 or Section 8.1, as applicable, and such breach is not cured within ten (10) days following written notice to the Party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(d) by Purchaser, if the Sale Order shall not have been entered by May 12, 2025;

(e) by Purchaser or Sellers if the Bankruptcy Court enters an order approving any Alternate Proposal;

(f) by either Purchaser or Sellers on any day on or after May 12, 2025 if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Sellers in writing), _provided_ that the right to terminate this Agreement under this Section 9.1(f) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been a significant cause of, or resulted in, the failure of the Closing on or before such date;

(g) by Purchaser, if, prior to the Closing any of Sellers' Chapter 7 Cases shall have been dismissed;

(h) by Purchaser (_provided_ that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in Article VII has not been fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied); and

(i) by Sellers (_provided_ that no Seller is then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in Article VIII has not been fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied).

**Section 9.2. Expense Reimbursement.** If any Seller consummates an Alternate Proposal, Purchaser shall have the right to request the Bankruptcy Court to reimburse Purchaser's actual legal expenses in an amount not to exceed $750,000 incurred in pursuit of the transactions contemplated hereby.

**Section 9.3. Deposit Reimbursement.**

(a) If this Agreement is automatically terminated pursuant to Section 9.1(b), then the Trustee shall return one hundred percent (100.0%) of the Deposit, together with all accrued interest, to Purchaser.

(b) If Purchaser terminates this Agreement pursuant to Section 9.1(d) or Section 9.1(f), then the Trustee shall (i) return fifty percent (50.0%) of the Deposit, together with all

accrued interest, to Purchaser, and (ii) the remaining fifty percent (50.0%) of the Deposit shall be forfeited to the Trustee.

(c)  If Purchaser terminates this Agreement pursuant to, <u>Section 9.1(c)</u>, <u>Section 9.1(e)</u>, <u>Section 9.1(g)</u>, or <u>Section 9.1(h)</u>, then the Trustee shall return one hundred percent (100.0%) of the Deposit, together with all accrued interest, to Purchaser.

(d)  If the Trustee terminates this Agreement pursuant to <u>Section 9.1(c)</u> or <u>Section 9.1(i)</u>, then one hundred percent (100.0%) of the Deposit, together with all accrued interest, shall be forfeited to the Trustee.

**Section 9.4.   Effect of Termination or Breach.** If the transactions contemplated hereby are not consummated, this Agreement shall become null and void and of no further force and effect, except (a) for this <u>Section 9.4</u>, (b) for the provisions of <u>Section 9.2</u>, <u>Section 9.3</u>, <u>Section 11.1</u>, <u>Section 11.7</u>, <u>Section 11.8</u>, <u>Section 11.9</u> and <u>Section 11.11</u> hereof, and (iii) that the termination of this Agreement for any cause shall not relieve any Party hereto from any Liability which at the time of termination had already accrued to any other Party hereto or which thereafter may accrue in respect of any act or omission of such Party prior to such termination.

# ARTICLE X.

## ADDITIONAL POST-CLOSING COVENANTS

**Section 10.1. Joint Post-Closing Covenant of Purchaser and Sellers.** Purchaser and Sellers jointly covenant and agree that, from and after the Closing Date, Purchaser and Sellers will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (a) the preparation of an audit of any Tax Return of any Seller or Purchaser for all periods prior to or including the Closing Date, (b) any audit of Purchaser and/or any audit of any Seller with respect to the sales, transfer and similar Taxes imposed by the Laws of any Governmental Authority, relating to the transactions contemplated by this Agreement, (c) pending litigation as of the Closing Date, and (d) investigation or action by any Governmental Authority, including, without limitation, the Securities and Exchange Commission, including preserving any documents or data (in any and all mediums) and tangible personal property that any such agency may request, provided that any cooperation efforts that Seller requests from Purchaser in connection with (c) and (d) will be at no cost to Purchaser. In furtherance hereof, Purchaser and Sellers further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith. All costs and expenses incurred in connection with this <u>Section 10.1</u> referred to herein shall be borne by the Party who is subject to such action.

**Section 10.2. Tax Matters.**

(a)  Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Sellers and Sellers shall indemnify, defend (with counsel reasonably satisfactory to Purchaser), protect and save and hold Purchaser harmless from and against any and

19

all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes.

(b) Purchaser shall, within the later of (i) one hundred twenty (120) days after the Closing Date or (ii) thirty (30) days prior to the date by which Sellers' federal income Tax Returns must be filed, prepare and deliver to Sellers a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the purchase price) among the respective Sellers and the Acquired Assets (such schedule, the "Allocation"). The Allocation shall be deemed final unless the Trustee notifies Purchaser in writing that the Trustee objects to one or more items reflected in the Allocation within thirty (30) days after delivery of the same to Sellers. In the event of any such objection, Purchaser and the Trustee shall negotiate in good faith to resolve the dispute. Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Authority or any other proceeding). Purchaser and Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to such Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 10.2(b) shall survive the Closing without limitation.

## ARTICLE XI.

## MISCELLANEOUS

### Section 11.1. Expenses.

(a) Except as otherwise provided in this Agreement, each Party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

(b) The Parties hereto agree that if any Claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees or commissions are ever asserted against Purchaser or Sellers in connection with the transactions contemplated hereby, all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify (with counsel reasonably satisfactory to the Party(ies) entitled to indemnification) and hold the other Party harmless from and against any and all such claims or demands asserted by any Person, firm or corporation in connection with the transaction contemplated hereby.

**Section 11.2. Amendment.** This Agreement, including the Exhibits and Schedules hereto, may not be amended, modified or supplemented except by a written instrument signed by Trustee on behalf of Sellers and Purchaser.

**Section 11.3. Notices.** Any notice, request, instruction or other document to be given hereunder by a Party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) on the date of transmission if sent by telex, telecopy, email or other wire transmission (with answer back confirmation of such transmission, if applicable), (c) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (d) upon delivery, or refusal of delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid. Unless another address is specified in writing, any notice, request, instruction or other documents given to the Parties to this Agreement shall be sent to the addresses indicated below:

To Purchaser:                 Fibre Acquisition Corporation
                            c/o Managed Network Systems Inc.
                            3363 Tecumseh Rd E
                            Windsor, ON N8W 1H4
                            Attn: Clayton Zekelman
                            Telephone: (519) 985-8410
                            Email: clayton@MNSi.Net

with a required copy to:     Bennett Jones LLP
                            100 King St W, Suite 3400
                            Toronto, ON M5X 1A4
                            Attn: Curtis Cusinato and Lucas Stevens-Hall
                            Telephone: (416) 777-5774 and (416) 777-4685
                            Email: CusinatoC@bennettjones.com and
                            StevensHallL@bennettjones.com

                            And to:

                            Dykema Gossett PLLC
                            112 E. Pecan Street, Suite 1800
                            San Antonio, TX 78205
                            Attention: Deborah D. Williamson
                            Telephone: (210) 554-5272
                            Email: DWilliamson@dykema.com

| | |
|---|---|
| To Sellers: | Michelle Chow |
| | Chapter 7 Bankruptcy Trustee 16200 |
| | 16200 Addison Road, Suite 140 |
| | Addison, TX 75001 |
| | Telephone: (972) 380-5533 |
| | Email: mhchow@swbell.net |
| | |
| with a required copy to: | Singer & Levick |
| | 16200 Addison Road, Suite 140 |
| | Addison, TX 75001 |
| | Attn: Michelle E. Shriro |
| | Telephone: (972) 380-5533 |
| | Email: mshriro@singerlevick.com |
| | |
| | And to: |
| | |
| | Grable Martin PLLC |
| | 5473 Blair Road, Suite 100 |
| | PMB 51281 |
| | Dallas, Texas 75231-4227 |
| | Attention: Shauna Martin |
| | Telephone: (512) 415-4635 |
| | Email: smartin@grablemartin.com |

**Section 11.4. Waivers.** The failure of a Party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a Party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Sellers, in the case of a waiver by any Seller, or Purchaser, in the case of any waiver by Purchaser, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

**Section 11.5. Counterparts and Execution.** This Agreement may be executed simultaneously in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

**Section 11.6. Headings.** The headings preceding the text of the Articles and Sections of this Agreement and the Schedules are for convenience only and shall not be deemed part of this Agreement.

**Section 11.7. Governing Law; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Texas (without giving effect to the principles of conflicts of Laws or choice of Law thereof that would compel the application of the substantive Law of any other jurisdiction), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law.

For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in the State of Texas.

**Section 11.8. Binding Nature; Assignment.** Upon the approval of this Agreement by the Bankruptcy Court, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto without prior written consent of the other Parties (which shall not be unreasonably withheld or delayed), except: (a) this Agreement may be assigned to any Affiliate or Affiliates of Purchaser, and (b) as otherwise provided in this Agreement.

**Section 11.9. No Third-Party Beneficiaries.** This Agreement is solely for the benefit of the Parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the Parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.

**Section 11.10. Construction.** The language used in this Agreement will be deemed to be the language chosen by the Parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any Party. Any reference to any federal, state, local or foreign Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise.

**Section 11.11. Public Announcements.** Except as required by Law or in connection with the Chapter 7 Cases, neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party(ies) hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable Law, the disclosing Parties shall give the other Party a copy of the proposed disclosure and reasonable opportunity to comment on the same. Notwithstanding the foregoing, Purchaser shall not be restricted from making any public announcements or issuing any press releases after the Closing.

**Section 11.12. Entire Understanding.** This Agreement, the Exhibits and the Schedules set forth the entire agreement and understanding of the Parties hereto in respect to the transactions contemplated hereby. This Agreement, the Exhibits and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

**Section 11.13. Closing Actions.** All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the Party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

**Section 11.14. Conflict Between Transaction Documents.** The Parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way

inconsistent with or in conflict with any term, condition or provision of any other Transaction Document referred to herein, this Agreement shall govern and control.

**Section 11.15. No Survival**. The representations and warranties of Sellers and Purchaser contained in this Agreement or in any instrument delivered in connection herewith shall not survive the Closing**.**

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed and delivered on the date first above written.


**PURCHASER:**

**FIBRE ACQUISITION CORPORATION**

By: _____

Name:   Clayton Zekelman

Title:   President


**SELLERS:**

By: _____

Michelle H. Chow, in her capacity as
Chapter 7 Trustee of DZS Inc.
(EDTX 25-40712); DZS Services,
Inc. (EDTX 25-40713); and DZS
California Inc. (EDTX 25-40714)

<u>Exhibit A</u>

<u>Bill of Sale</u>

## *[REDACTED]*

Case 25-40712   Doc 175   Filed 04/28/25   Entered 04/28/25 16:47:05   Desc Main

<u>Exhibit B</u>

<u>Intellectual Property Assignment Agreement</u>

**_[REDACTED]_**

Disclosure Schedules

*[REDACTED]*